# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WILLIAM H. MELENDEZ,

      Plaintiff,

v.                                      Civil Action No. 3:20-cv-1023-BJD-JBT

MARK S. INCH, Secretary of the
State of Florida Department of Corrections;
DONALD DAVIS, Warden of Florida State
Prison; JEFFREY R. MCCLELLAN, Assistant
Warden of Florida State Prison; BARRY
REDDISH, former Warden of Florida State
Prison; ERICH HUMMEL, Regional Director;
JOHN PALMER, Regional Director;
P. HUNTER, Classification Officer;
JACK VAN ALLEN, ROBERT
ATTEBERRY, ROBERT BROWN, JAMAAL
CHANDLER, BILLY FOLSOM, WILLIAM
HALL, CHARLES NOSBISCH, DANIEL
PHILBERT, COLIN WILLIAMS,
M. GEIGER, STEVEN KNOTT, LLOYD WEBB,
JONATHAN WILLIS, BRANDON WOODS,
Correctional Officers at Florida State Prison;
RONNIE WOODALL, Warden of New River
Correctional Institution; KEVIN TOMLINSON,
Classification Supervisor; TERRY BRYANT,
ADAM GWARA, JUSTIN MORELAND,
AGDEREMME OLIVA, EUGENE WILLIAMS,
Correctional Officers at New River Correctional
Institution; and THE STATE OF FLORIDA
DEPARTMENT OF CORRECTIONS,
an agency of the State of Florida,

      Defendants.

_____/

**SECOND AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff William H. Melendez sues defendants Mark S. Inch, in his official capacity as the Secretary of Corrections for the State of Florida Department of Corrections ("FDOC" or "the Department"); Donald Davis, in his individual capacity and in his official capacity as the Warden of Florida State Prison ("FSP"); Jeffrey R. McClellan, in his individual capacity and in his official capacity as the Assistant Warden of FSP; Barry Reddish, the former Warden of FSP, in his individual capacity; Erich Hummel, the former Region 2 Regional Director for the Department, in his individual capacity; John Palmer, in his individual capacity and in his official capacity as the Region 2 Regional Director for the Department; P. Hunter, in her individual capacity and in her official capacity as Classification Officer for FSP; Jack Van Allen, Robert Atteberry, Robert Brown, Jamaal Chandler, Billy Folsom, William Hall, Charles Nosbisch, Daniel Philbert, Colin Williams, M. Geiger, Steven Knott, Lloyd Webb, Jonathan Willis, and Brandon Woods, Correctional Officers at FSP, in their individual capacities; Ronnie Woodall, the Warden of New River Correctional Institution ("New River"), in his individual capacity; Kevin Tomlinson, the Classification Supervisor of New River, in his individual capacity; Terry Bryant, Adam Gwara, Justin Moreland, Agderemme Oliva, and Eugene Williams of New River, in their individual capacities; and the FDOC, for the repeated and ongoing violations of his civil rights, as follows:

## I.     INTRODUCTION

1.     The State of Florida holds about 10,000 people in solitary confinement[1] every day—10% of its total prison population, a percentage more than double the national average. Many are isolated for weeks, and many like the plaintiff, Mr. William Melendez, are isolated for years. Except for a brief four-month period, the Department has held Mr. Melendez in solitary confinement continuously since he attempted suicide on August 24, 2016. The Department has, through its agents and by the actions and omissions of the named Defendants, locked Mr. Melendez away in isolation with no end in sight, despite the serious threat that this ongoing confinement poses to his health.

2.     The profound effects on people subjected to extended periods in isolation are well-documented. They are more likely to exhibit anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality. These effects begin to manifest almost immediately, worsen over time, and can cause permanent damage to individuals, especially those subjected to isolation for months or years.

---

[1] The terms solitary confinement, isolation and segregation are used interchangeably throughout this amended complaint to refer generally to the practice of removing and detaining an incarcerated person from the prison's general population. These general terms include all types of solitary confinement, including Maximum Management, Close Management, Disciplinary Confinement, and Administrative Confinement, as those terms are defined in Chapter 33, Florida Administrative Code.

These effects are more acutely felt by those with physical disabilities and mental illness, such as Mr. Melendez.

3.      Mr. Melendez is a 62-year-old man with severe mental illness. According to Plaintiff's mental health expert, who examined Mr. Melendez in April 2021, Mr. Melendez is suffering from a Major Depressive Disorder with psychotic features and is actively suicidal. He has attempted suicide multiple times in the Department's custody, including by swallowing a razor blade, chewing through an IV tube, and inserting metal wires, staples, and nails into his arm. He was previously held in the Department's inpatient psychiatric facility for mental illness and suicidality, where he was diagnosed with Bipolar Disorder and/or Manic Depressive Disorder. During a prior incarceration in Illinois, he was diagnosed by prison mental health staff as manic depressive.

4.      Mr. Melendez has advanced-stage liver fibrosis and Hepatitis C. As a result, he passes loose and bloody stool and his body is feeble. He previously used a walker as a mobility assistive device when moving outside his cell. The Department confiscated his walker upon his entry to segregation in 2016, and one of the nurses told him, ominously, that he "wouldn't be needing that anymore."

5.      Throughout Mr. Melendez's solitary confinement, and as is more specifically detailed in the counts that follow, the named Defendants have intentionally deprived Mr. Melendez of basic human needs such as human

contact, social interaction, physical exercise, his mental health, and environmental stimulation.

6.     The named Defendants have also deprived Mr. Melendez of the basic and fundamental rights of free speech and due process. He has been repeatedly harassed and threatened for raising complaints about officer misconduct, including being physically attacked. Retaliation for engaging in protected activity is rampant within the Department,[2] including at FSP, and yet the Defendants, including Secretary Inch, Warden Davis, Assistant Warden McClellan, Warden Reddish, and Regional Directors Hummel and Palmer, have failed to take reasonable and adequate measures to put a stop to it.

7.     Mr. Melendez has been barred from attending and participating in disciplinary and segregation hearings. FSP and New River staff routinely find Mr. Melendez guilty of alleged offenses that have indefinitely extended his solitary confinement *in his absence*. They also rubberstamp his solitary confinement *in his absence*.

---

[2] Magistrate Judge Fitzpatrick of the Northern District of Florida made extensive findings regarding retaliation against prisoners who participated in interviews in connection with the *Harvard v. Inch* class action lawsuit against the Department. *See Harvard v. Inch*, 4:19-cv-00212, D.E. 240. Judge Fitzpatrick found "credible testimony . . . that revealed retaliation exists and is feared" within the Department. *Id.* at 42. While Chief Judge Walker later vacated the ruling, he did not revisit Judge Fitzpatrick's finding that retaliation has occurred. *Id.*, D.E. 279.

8.     As detailed in the counts that follow, correctional officers improperly use force by beating Mr. Melendez and spraying him with chemical agent. They also place him on extended strip status without just cause or process. Correctional officers have falsified reports claiming that Mr. Melendez has refused medical treatment, including mental health treatment, to justify the deliberate, punitive withholding of medical care, and to avoid creating a record of Mr. Melendez's injuries and suffering.

9.     In short, Mr. Melendez has been inhumanely caged and systematically abused by the named Defendants and those under their supervision. The effects have been sadly but predictably tragic.

10.    While in isolation, Mr. Melendez's mental and physical health have declined dramatically. His major depressive disorder has been exacerbated, and he has engaged in dangerous cutting. His liver condition, which the prison doctors claim to be "monitoring" without treatment, causes bloody stool. Nearly all of the teeth in his head have been pulled. His vision and hearing have deteriorated to the point where he is recognized by the Department as hearing and vision impaired. He lies awake at night in fear of officers entering his cell to beat him.

11.    FDOC's outdated system of solitary confinement isolates vulnerable people suffering from a heightened risk of harm, including people who suffer from physical and mental health issues like Mr. Melendez. Defendants Inch, Davis,

McClellan, Reddish, Hummel, Palmer, Hunter, Woodall, and Tomlinson, overuse and misuse solitary confinement despite knowing that the condition of FDOC's most-vulnerable population will deteriorate as a result.

12.     All Defendants know or should know about the effects that prolonged isolation has on people with physical disabilities and mental illnesses. 130 years ago, the United States Supreme Court recognized that "[people subject to isolation] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arose them, and others became violently insane; others still committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In re Medley*, 134 U.S. 160, 168 (1890). Since then, a broad consensus has developed in the medical and psychiatric communities regarding the harms caused by prolonged isolation. Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325, 338 (2006).

13.     A 2016 report by the United States Department of Justice recommended that absent special circumstances, prisoners with serious mental illness should not be placed in isolation because it exacerbates their symptoms. When isolation must be used, the report recommended that it be at the lowest possible level to ensure the safety of all people, based on specific articulated reasons, and serve a specific penological purpose.

7

14.     Defendants Inch, Davis, McClellan, Reddish, Hummel, Palmer, Hunter, Woodall and Tomlinson have callously ignored the broad consensus developed among scientists, professionals, and the United States government regarding best practices in using isolation. Their insistence on holding Mr. Melendez in solitary confinement serves no legitimate penological purpose and amounts to torture.

## II.     PARTIES, JURISDICTION AND VENUE

15.     Mr. Melendez is a resident of Florida. He is currently incarcerated in solitary confinement at FSP.

16.     Mark S. Inch is the Secretary of Corrections for the Department and is being sued in his official capacity as the Secretary of the Department. Secretary Inch is responsible for the overall management and operation of Florida's correctional system, including the protection of the constitutional and statutory rights of all people in the custody of the Department. Secretary Inch is responsible for the Department's policies and procedures, including those involving the imposition of solitary confinement in Florida's prisons. Secretary Inch is responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times, Secretary Inch was acting under color of state law and as the head of the Department.

17.     Donald Davis is the Warden of FSP and is being sued individually and in his official capacity. Warden Davis is responsible for the management and operation of FSP, including the protection of the constitutional and statutory rights of all prisoners at FSP. Warden Davis is responsible for implementing and enforcing the Department's policies and procedures at FSP, including those involving the imposition of solitary confinement. Among his responsibilities, he is tasked with officially inspecting and touring the Close Management unit at FSP every week. Fla. Admin. Code 33-601.800(15)(a)(8). Warden Davis is responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times following January 14, 2021, Warden Davis was acting under color of state law and as the warden at FSP.

18.     Jeffrey R. McClellan is the Assistant Warden of FSP and is being sued individually and in his official capacity. Assistant Warden McClellan is responsible for the management and operation of FSP, including the protection of the constitutional and statutory rights of all prisoners at FSP. Assistant Warden McClellan is responsible for implementing and enforcing the Department's policies and procedures at FSP, including those involving the imposition of solitary confinement. Among his responsibilities, he is tasked with officially inspecting and touring the Close Management unit at FSP every week. Fla. Admin.

9

Code 33-601.800(15)(a)(8). Assistant Warden McClellan is responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times, Assistant Warden McClellan was acting under color of state law and as the assistant warden at FSP.

19.   Barry Reddish is the former Warden of FSP and is being sued in his individual capacity. Warden Reddish was responsible for the management and operation of FSP, including the protection of the constitutional and statutory rights of all prisoners at FSP. Warden Reddish was responsible for implementing and enforcing the Department's policies and procedures at FSP, including those involving the imposition of solitary confinement. Among his responsibilities, he was tasked with officially inspecting and touring the Close Management unit at FSP every week. Fla. Admin. Code 33-601.800(15)(a)(8). Warden Reddish was responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times prior to January 14, 2021, Warden Reddish was acting under color of state law and as the warden at FSP.

20.   Erich Hummel is the former Region 2 Regional Director for the Department. He is being sued in his individual capacity. Director Hummel was

10

responsible for the management and operation of the prisons in his region, including FSP and New River. His job duties included the protection of the constitutional and statutory rights of all prisoners at prisons within his region. Director Hummel was responsible for implementing and enforcing the Department's policies and procedures at the prisons within his region, including those involving the imposition of solitary confinement. Director Hummel was responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times, Director Hummel was acting under color of state law and as Regional Director for the Department.

21.    John Palmer is the current Region 2 Regional Director for the Department and the former Region 2 Assistant Regional Director. He is being sued individually and in his official capacity as Regional Director. Director Palmer is responsible for the management and operation of the prisons in his region, including FSP and New River. His job duties include the protection of the constitutional and statutory rights of all prisoners at prisons within his region. Director Palmer is responsible for implementing and enforcing the Department's policies and procedures at the prisons within his region, including those involving the imposition of solitary confinement. Director Palmer is responsible for supervising correctional officers and for taking adequate measures, including

through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times, Director Palmer was acting under color of state law and as Regional Director or Assistant Regional Director for the Department.

22.    P. Hunter is the Classification Officer at FSP and is being sued in her individual and official capacities. Ms. Hunter is responsible for placing prisoners at Florida State Prison in the appropriate level of custody. Her job duties include the protection of the constitutional and statutory rights of all prisoners at Florida State Prison. Ms. Hunter is responsible for implementing and enforcing the Department's policies and procedures with respect to the classification of prisoners at FSP, including those involving the imposition of solitary confinement. At all material times, Ms. Hunter was acting under color of state law and as the Classification Officer at FSP.

23.    Jack Van Allen, Robert Atteberry, Robert Brown, Jamaal Chandler, Billy Folsom, William Hall, Charles Nosbisch, Daniel Philbert, Colin Williams, M. Geiger, Steven Knott, Lloyd Webb, Jonathan Willis and Brandon Woods are current and former correctional officers at FSP. In addition to their general responsibilities as correctional officers, Defendant Hall served as a captain with supervisory authority over the correctional officers working in Mr. Melendez's segregation unit. Defendants Brown, Folsom, Philbert and Geiger served as dorm

sergeants with operational control over Mr. Melendez's segregation unit. Defendants Van Allen and Knott worked as correctional officers within Mr. Melendez's segregation unit. Defendants Van Allen, Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, Colin Williams, Geiger, Knott, Webb, Willis and Woods and are being sued in their individual capacities. At all relevant times, Defendants Van Allen, Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, Colin Williams, Geiger, Knott, Webb, Willis and Woods were acting under color of state law.

24.    Ronnie Woodall is the Warden of New River and is being sued in his individual capacity. Warden Woodall is responsible for the management and operation of New River, including the protection of the constitutional and statutory rights of all prisoners at New River. Warden Woodall is responsible for implementing and enforcing the Department's policies and procedures at New River, including those involving the imposition of solitary confinement. He is also responsible for ensuring that his staff do not abuse the prisoners in his custody and care, including through excessive force. Warden Woodall is responsible for supervising correctional officers and for taking adequate measures, including through officer training, oversight and discipline, to ensure correctional officers do not employ excessive force. At all material times, Warden Woodall was acting under color of state law and as the warden of New River.

25.     Kevin Tomlinson is the Classification Supervisor of New River and is being sued in his individual capacity. He is responsible for placing prisoners in the appropriate level of custody. His job duties include the protection of the constitutional and statutory rights of all prisoners at New River. Mr. Tomlinson is responsible for implementing and enforcing the Department's policies and procedures with respect to the classification of prisoners at New River, including those involving the imposition of solitary confinement. At all material times, Mr. Tomlinson was acting under color of state law and as the Classification Supervisor at New River.

26.     Terry Bryant, Adam Gwara, Justin Moreland, Agderemme Oliva, and Eugene Williams are all correctional officers at New River and are being sued in their individual capacities. At all relevant times, Defendants Bryant, Gwara, Moreland, Oliva and Eugene Williams were acting under color of state law.

27.     The Florida Department of Corrections is an agency of the State of Florida that operates Florida's prison system, including FSP and New River.

28.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Mr. Melendez's causes of action are brought under the First, Eighth, and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act; and the Rehabilitation Act.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

### III.    FACTS

30.     Mr. Melendez entered the custody of the Department on October 26, 2011. He was initially held at Liberty Correctional Institution, was later transferred to Charlotte CI for inpatient mental health care, then to Blackwater River Correctional Facility, Santa Rosa CI, FSP, New River, and finally back to FSP, where he remains in solitary confinement today.

### A.     Solitary Confinement Practices in FDOC Needlessly Extend Solitary Confinement Terms and Lead to its Overuse.

31.     The Department uses four forms of solitary confinement: Maximum Management, Disciplinary Confinement, Close Management and Administrative Confinement. Prisoners can be subject to any form of isolation or several simultaneously.

32.     Mr. Melendez was classified to Close Management from September 13, 2016 to March 23, 2020, and again from October 19, 2020 to the present. During this time, Mr. Melendez has also been subjected to lengthy Disciplinary

Confinement terms[3] and to Administrative Confinement while awaiting resolution of a disciplinary or classification hearing. From July 2020 until his October 2020 CM classification, Mr. Melendez was on Administrative Confinement status, experiencing the same restrictions as exist in Close Management.

33.    Close Management is used to isolate people the Department has determined cannot remain in general population without "abusing the rights and privileges of others." Close Management is comprised of three levels—CM I, II and III—in order of most restrictive to least restrictive. There is no limit to the amount of Close Management that can be imposed by the Department.

34.    Although the Department has a process by which a prisoner can "step down" from CM I to CM III and eventually back into the general population, in practice the review process is rigged to achieve predetermined results. Each CM prisoner is supposed to be reevaluated by an Institutional Classification Team (ICT) member every week for the first 60 days and then every 30 days thereafter to determine whether he can be stepped down to the next level. Per Department

---

[3] The Department uses Disciplinary Confinement to punish people found guilty of disciplinary charges. Each charge carries a specific period of isolation not to exceed 60 days, but one incident can (and frequently does) result in multiple charges. Fla. Admin. Code 33-601.314. These sanctions are most often stacked to be served consecutively. Like Close Management, there is no limit to the total amount of Disciplinary Confinement that can be imposed by the Department.

policy, "[t]he purposes of this review shall be to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely[.]" Fla. Admin. Code 33-601.800(16)(a). To the extent this review occurs at all, Mr. Melendez is not present and cannot participate in it.

35.     After six months, prisoners in Close Management are to have an ICT review hearing at which the ICT members "consider the results of Behavioral Risk Assessments, mental health evaluations, and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security." Fla. Admin. Code 33-601.800(16)(d). According to the policy, "[f]or an inmate to remain in CM, the ICT must justify the safety and security issues or circumstances that *can only* be met by maintaining the inmate at the current level or modifying the inmate to another level of CM." *Id.* (emphasis added).

36.     Despite these provisions, Mr. Melendez did not stepdown from CM I status for *years* and remains on CM I status to this day. Mr. Melendez presents no threat to the safety of any person except himself. He is at risk for self-injury and suicide because of his untreated mental illness that has been exacerbated by staff abuse and isolation. Defendants Inch, Davis, McClellan, Reddish, Hummel, Palmer, Hunter and those acting under their supervision routinely retain Mr.

Melendez on CM I status without considering less restrictive alternatives or the impact of isolation on Mr. Melendez's health and wellbeing.

37.     The hearings on Mr. Melendez's CM classification routinely occur *in absentia*, denying Mr. Melendez the ability to argue for his release to general population. By policy, FDOC denies prisoners any notice of the weekly/30-day ICT member reviews and any ability to participate in those reviews or provide a statement on their own behalf. For the six-month ICT reviews, Department policy provides that prisoners have a right to be present, but they can be barred if they exhibit "disruptive behavior, either before or during the review, that impedes the process[.]" Fla. Admin. Code 33-601.800(16)(d). In practice, Mr. Melendez is routinely barred from ICT reviews at FSP. He and other prisoners are not provided a copy of the Behavioral Risk Assessments that the ICT purportedly considers in determining whether to retain them on CM status. Thus Mr. Melendez has been unable to correct scoring inaccuracies in the Behavioral Risk Assessments, and he has also been unable to explain why he should be removed from CM status even though he has received disciplinary charges.

38.     FDOC policy calls for classification officers to interview CM prisoners before presenting their recommendations to the ICT for the six-month reviews. Fla. Admin. Code 33-601.800(16)(c). In practice, classification officers at FSP (including Defendant Hunter) do not conduct such interviews. Defendant Hunter

did not interview Mr. Melendez before making recommendations to ICT that extended his CM I classification for no sound penological purpose. Mr. Melendez was thus deprived of the ability to explain why he should have been removed from CM status.

**B.    Conditions in Solitary Confinement in FDOC are Inhumane and Breed Abuse of Vulnerable Persons, Including the Mentally Ill.**

39.    Correctional staff control every aspect of a prisoner's life in solitary confinement. In FDOC, correctional officers impose stark restrictions on prisoners' basic needs and on their few distractions from the monotony of isolation. These restrictions are in sharp contrast to the treatment of prisoners in general population facilities.

40.    Unlike prisoners in general population, Close Management prisoners are restricted to six hours of recreation outside of their cell (no more than two hours, three days per week). Fla. Admin. Code 33-601.800(1)(m). Mr. Melendez and other prisoners, however, are routinely denied the ability to go out of their cell for any recreation at all. Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, Knott, and other officers acting under the supervision of Defendants Davis, McClellan, Reddish, Hummel, Palmer, Brown, Folsom, Hall, Philbert, Geiger, and Woodall, have used excuses to deny Mr. Melendez out-of-cell recreation for things like having his towel in the wrong place or having his fingernails too long, or they falsely report that he refused recreation.

19

41.    Consistent with the nurse's prediction made when Mr. Melendez's walker was confiscated upon arrival at FSP, Mr. Melendez was not allowed outdoor recreation in the entirety of his isolation on CM I and CM II. He has not experienced a cool breeze or sunshine on his skin for over four years. He does not have access to natural light inside his cell.

42.    Mr. Melendez is constantly subjected to inhumane and degrading strip searches, during which correctional officers force him to remove his clothes and display his genitalia and anus or spread his buttocks while they make vulgar comments about his body. Every time Mr. Melendez leaves his isolation unit and sometimes even just to leave his cell, he is subjected to a strip search. These strip searches are done to humiliate Mr. Melendez and to discourage him from leaving his cell.

43.    FDOC policy provides for Close Management prisoners to shower three times a week. Fla. Admin. Code 33-601.800(10)(e)(1). In practice, Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, Knott and other officers acting under the supervision of Defendants Davis, McClellan, Reddish, Hummel, Palmer, Brown, Folsom, Hall, Philbert, Geiger, and Woodall, routinely deny showers to prisoners. This practice is so well-known at FSP that it there is an informal term for it: "bucking." Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, Knott and other officers acting under the supervision of

Defendants Davis, McClellan, Reddish, Hummel, Palmer, Brown, Folsom, Hall, Philbert, Geiger, and Woodall, find small pretextual reasons to deny prisoners a shower or destroy prisoners' cells if they leave for a shower, or else falsify shower refusals. Because Mr. Melendez was forced to go weeks without showers, he developed sores on his legs that led to a staph infection.

44.     These arbitrary and vindictive restrictions make Mr. Melendez's time in isolation considerably more oppressive but serve no legitimate penological purpose.

45.     Whereas prisoners in general population can earn up to ten days of gain time off their sentence each month, Mr. Melendez has been limited to two days of gain time per month as a consequence of his CM status.

46.     Unlike prisoners in general population, CM I and II prisoners are cuffed behind their back whenever they leave their cell, for any purpose. Fla. Admin. Code 33-601.800(14)(a)(1), (b). CM I and II prisoners are additionally shackled with leg irons any time that they are taken outside of their housing unit. Fla. Admin. Code 33-601.800(a)(3), (b).

47.     Mr. Melendez has also been denied contact with his family. CM I prisoners, unlike prisoners in general population, are limited to one telephone call every month after thirty days with no major rule violations. Fla. Admin. Code 33-601.800(11)(b)(5). But Mr. Melendez has been routinely denied even this minimum

allotment. Soon after he first arrived at FSP, Defendant Hunter rejected his approved telephone list without cause. As a result, he was unable to call family. In the last six months his telephone list was approved. Phone access, however, remains rare, and officers have claimed that the phones are broken. Officers acting under the supervision of Defendants Davis and McClellan also routinely withhold and interfere with Mr. Melendez's mail, including confiscating personal family photographs without notice.

48.     By policy, Mr. Melendez cannot have contact visitation with family while on CM I status. Were he in general population, Mr. Melendez would invite his son, two grandchildren, his sister, and his father, whom he has not seen in thirteen years, to travel to Florida for a contact visit.

49.     For the first 30 days in CM, prisoners cannot purchase any items through canteen. After 30 days with no major rule violations, they can purchase up to five non-food items and five food items per week. Fla. Admin. Code 33-601.800(10)(g). Even this small allowance is suspended for prisoners while they are on disciplinary confinement.

50.     Prisoners in Close Management have less personal property than general population prisoners. They cannot have a television in their cell, and prisoners on CM I and II status cannot possess a tablet. They can possess one

22

Walkman-type radio. However, Mr. Melendez's radio was confiscated when he arrived in FSP in January 2021, along with his tablet.

51.     Unlike prisoners in general population, prisoners in Close Management cannot put photographs or pictures up on the walls of their solitary cells. Mr. Melendez has children and grandchildren whose photographs he would like to see every day on the walls of his cells. FDOC policy forbids this.

52.     Unlike for prisoners in general population, there are no congregate religious services authorized for prisoners in Close Management. Fla. Admin. Code 33-601.800(10)(h). Mr. Melendez is an observant member of the Messianic Jewish religion, but he cannot join others of the Jewish faith for congregate services.

53.     There are no out-of-cell educational programs for CM I prisoners.

54.     Prisoners in Close Management cannot leave their cells to access the law library. Fla. Admin. Code 33-601.800(10)(i). Instead, they must request copies of specific cases or statutes. General population prisoners, on the other hand, can access the law library to search for relevant legal materials. Prisoners in Close Management can possess no more than three soft-covered books in their cell. Fla. Admin. Code 33-601.800(10)(l).

55.     FDOC strictly and unreasonably prohibits the ability of prisoners to communicate in Close Management. These rules apply only to CM prisoners and

not to prisoners in general population. For example, the FDOC Close Management Housing Unit Instructions include the following rules:

- *Inmates are to conduct themselves in a quiet and orderly manner at all times.*
- *There will be no talking between cells at any time.*
- *Inmates are not permitted to yell at staff members to gain their attention unless there is a true emergency.*
- *Inmates are to remain quiet when any staff member enters the wing. When a staff member passes by your cell, you may address staff at that time.*
- *Verbal or written correspondence with inmates in open population is prohibited.*

56.     These rules, which prohibit "talking" between cells, and calling out to staff members to garner their attention, are unduly strict and unreasonable given that prisoners in solitary confinement are isolated, cannot be heard through the cell doors without projecting their voice, and cannot otherwise leave their cell for movement to report concerns or access medical care, mental health care, or other necessities. These rules create excuses for prison staff to pile disciplinary charges upon prisoners in Close Management, especially prisoners like Mr. Melendez who have serious concerns, grievances and mental health issues, or who are favorite targets for prison staff abuse.

57.     FDOC policy provides enormous and unwarranted discretion to prison officers to place prisoners on property restriction. Fla. Admin. Code 33-601.800(10)(c). Officers have discretion to remove a CM prisoner's property for up to 72 hours to prevent property damage or for security needs. After 72 hours, the

warden is to determine whether to return the property or continue the restrictions. The practice of property restriction is known as putting a prisoner on "strip status." Mr. Melendez has endured repeated and unnecessary periods on strip status for days at a time. On these occasions, he was left with no clothing except his boxers, no blankets, no sheets, not even a mattress, inside a freezing cold cell with exhaust fans turned on. To stay warm at night inside of his cell, he would sleep with his body partially wedged into his storage locker.

### C. Mr. Melendez's Psychiatric Crisis, Suicidality, and Ensuing Isolation: August 24, 2016 to September 13, 2016.

58.     On August 24, 2016, Mr. Melendez attempted suicide at Blackwater River. He was suffering from mental illness and in anguish over mistreatment. He decided that his situation was hopeless. While being held in a shower for more than six hours, Mr. Melendez pulled a piece of metal from a chair and repeatedly gouged the veins in his arm. He inserted the metal so far into his arm that it had to be surgically removed. He nearly bled to death.

59.     Eventually, correctional officers noticed that Mr. Melendez was dying and attended to him. In doing so, some of his blood got on the skin of the officers — the assigned segregation officer Lieutenant Michael M. Manning, and Lieutenant Justin Tanner. The officers later claimed that Mr. Melendez assaulted them by telling the officers: "[N]ow you got what I got," meaning Hepatitis C. Mr.

Melendez knew full-well that the blood-borne virus could not be transferred in that way.

60.    Reporting staff described Mr. Melendez's self-inflicted injuries as "life-threatening," and he nearly lost consciousness. Nevertheless, the Department issued Mr. Melendez disciplinary charges for disobeying a verbal order and aggravated battery on a correctional officer.

**D.    Mr. Melendez's First Period in Close Management is Characterized by Isolation and Abuse: September 13, 2016 to March 23, 2020.**

61.    On September 13, 2016, Mr. Melendez was found guilty at a disciplinary hearing that he was barred from attending. He received 60 days of disciplinary confinement and 60 days loss of gain time for having bled on the officers who responded to his self-injury. He received another 60 days of disciplinary confinement and 30 days loss of gain time for having flooded his cell earlier in the day on August 24, 2016. Mr. Melendez was classified to Close Management the same day, September 13, 2016, also without attending a hearing.

62.    On November 9, 2016, Mr. Melendez was transferred to Florida State Prison as a CM I prisoner, still on disciplinary confinement status, and consigned to solitary confinement. He remained on CM I despite posing no threat to officers or other prisoners until being reclassified to CM II on June 17, 2019—a period of 1,008 days, or two years, nine months, and five days.

63.     For the 1,008 days Mr. Melendez was detained in CM I, the size of his cell was suffocating, measuring only six steps from front to back. On information and belief, Mr. Melendez was confined in cells that do not meet the minimum size standards required for accreditation by the American Correctional Association (ACA). The exterior window, covered by sheet metal with small holes, provided almost no view or sunlight. The artificial light was controlled by the housing officers, who turned the light off late and on early to limit sleeping hours. The cell was not air conditioned. Instead, air was circulated by noisy exhaust fans that ran continuously. The cell was stiflingly hot in summer and freezing cold in the winter.

64.     The cell's steel door had a single small, barred window above a food flap that opened from the outside. All of Mr. Melendez's meals were delivered through this food flap, and he ate his meals inside the same small cell where he lived, slept, and defecated. The steel door compounded Mr. Melendez's isolation from others and deprived him of meaningful human contact.[4]

65.     Prison staff controlled every aspect of Mr. Melendez's life, including flushing his toilet and turning the lights on and off. However, if he yelled out of his cell to get an officer's attention, he could be put on strip status. To communicate his desire to shower, go outside for recreation, or have his toilet flushed, Mr.

---

[4] On CM III status, Mr. Melendez's door had bars, which permitted slightly more interaction with other people.

Melendez made handwritten signs that he displayed in the window in the steel door of his cell when he believed officers may be walking by. For example, to have his toilet flushed after use, he held a sign to the window that read "FLUSH." Correctional officers routinely ignored Mr. Melendez's requests.

66.     In Mr. Melendez's cell there was a steel bed frame; combination toilet and sink; and a property storage box. Mr. Melendez had a pillow, two blankets, a few books, a radio and headphones. However, Mr. Melendez was routinely stripped of his personal property and put on strip status by the prison staff as a form of punishment. He had no table, no chair and there were no reflective surfaces, so he could not even look at himself.

67.     Despite being confined to his cell around the clock, officers acting under the supervision of Defendants McClellan and Reddish found Mr. Melendez guilty of trivial and pretextual disciplinary offenses that added months to his isolation. These incidents included conduct such as talking through the cell door to his neighbor, yelling, kicking his cell door, and disrespecting staff.

68.     At Mr. Melendez's first six-month CM review in March 2017, he was maintained on CM I status based on the "severity of subject's actions for his initial placement" and for "disorderly conduct" during the review period.

69.     On August 30, 2017, Defendant Hunter reviewed Mr. Melendez's CM status. Contrary to FDOC policy, she did not interview Mr. Melendez in

28

connection with this review. She did not discuss with Mr. Melendez what he needed to do in order to return to general population. For the basis for her recommendation, she wrote "Inmate is currently in CM1 and based on seriousness of original placement reason and/or inmate's poor adjustment safety and security concerns exist C1." Defendant Hunter concluded he should not progress to CM II because of the August 2016 incident that led to his CM classification, and because of three disciplinary tickets: one from March 31, 2017 for refusing an order to bring his cell into order, and two disciplinary tickets from April 4, 2017 and July 25, 2017 for "yelling continuously from his cell door."

70.    On September 8, 2017, the ICT approved Defendant Hunter's recommendation and ordered that Mr. Melendez remain on CM I for another six-month period. Defendant Reddish chaired the ICT. The ICT considered a Behavioral Risk Assessment that was completed six months prior and so was badly out of date. Mr. Melendez was not allowed to attend this ICT hearing to speak on his own behalf. Defendant Reddish and the ICT ordered Mr. Melendez complete six more months on CM I.

71.    The repressive environment in the solitary confinement units at FSP breeds correctional officer abuse. Indeed, review of Mr. Melendez's time in isolation reveals a pattern of correctional officers repeatedly using excessive force to physically assault Mr. Melendez.

### i.      Defendant Van Allen Crushes Mr. Melendez's Fingers: October 3, 2017.

72.      On or about October 3, 2017, Mr. Melendez noticed that he was passing a concerning amount of blood in his stool. After the fifth or sixth such incident in one day, Mr. Melendez asked Defendant Geiger, who was the dormitory sergeant at that time, to be taken to medical. Defendant Geiger refused to take Mr. Melendez out of his cell to see medical. Mr. Melendez filled a stool sample cup with blood from passing stool. Still, Defendant Geiger would not allow him to be taken to medical.

73.      Finally, Mr. Melendez placed his hand through the food flap to get the officers' attention and to demonstrate the urgency of his medical need. Defendant Van Allen slammed Mr. Melendez's hand in the cell door's steel food flap and leaned into the flap with his body to crush Mr. Melendez's fingers. When Mr. Melendez began screaming, Defendant Van Allen released the flap and walked away.

74.      Defendants Geiger, Van Allen, and others under Defendant Geiger's supervision, refused to take Mr. Melendez to the infirmary for six days to conceal the extent of the injury. Mr. Melendez suffered a laceration to his finger and swelling of his fingers and hand. Eventually, the infirmary applied a splint because Mr. Melendez still could not bend his fingers due to swelling.

75.   The day after the incident, Defendant Van Allen filed a disciplinary report against Mr. Melendez for causing a disturbance. As a result, Mr. Melendez was found guilty and sentenced to 50 days of disciplinary confinement and the forfeiture of 30 days of gain time.

### ii.   Defendants Attebery, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams Harass and Beat Mr. Melendez: February 2, 2018.

76.   On or about February 1, 2018, Mr. Melendez requested a shower. Defendant Folsom, who was then a dormitory sergeant in the segregated housing unit where Mr. Melendez was housed, and Officer Tovas, who was acting under Defendant Folsom's supervision, required that Mr. Melendez submit to a strip search in order to shower. FDOC policy does not require a strip search for movement within the unit, and so Mr. Melendez understood that Defendant Folsom was attempting to dissuade Mr. Melendez from taking a shower. Mr. Melendez submitted to the strip search in order to shower.

77.   The standard practice for prisoners submitting to a strip search is to require the prisoner to squat and cough. During the course of this particular strip search, Defendant Folsom demanded that Mr. Melendez bend at the waist, spread his cheeks and show Defendant Folsom his "brown eye." This command was contrary to procedure, explicit and degrading.

78.    In response, Mr. Melendez made a PREA complaint against Defendant Folsom and Officer Tovas for forcing him to participate in a sexually demeaning strip search and harassment in order to shower. Mr. Melendez alerted Defendant Folsom to the fact that he would be writing a PREA complaint against him by informing him verbally that he would do so. Defendant Folsom observed Mr. Melendez writing PREA complaints through the window into his cell. Mr. Melendez wrote an estimated five such complaints. That night, Mr. Melendez was put on strip status and had all the property removed from his cell.

79.    The next morning, February 2, 2018, Mr. Melendez was particularly hungry. His dinner tray the night before had been scrambled on the way to his cell and he had not eaten. While breakfast trays were being dispersed through the segregation unit, Officer Tovas told Mr. Melendez to go to the back of his cell during tray disbursement and look out the back window. Mr. Melendez did as he was ordered to, but Officer Tovas claimed loudly that Mr. Melendez was not complying. Defendant Folsom hollered from the second floor, from his seat at the sergeant's desk: "Melendez don't get a tray."

80.    There was no legitimate reason to deny Mr. Melendez a breakfast tray. The only plausible reason for doing so was retaliation for Mr. Melendez's recent PREA complaints. Mr. Melendez ran to the cell door and pushed the food flap open. He explained that he was hungry and asked for a tray. When one of the

32

prisoner orderlies handed Mr. Melendez a breakfast tray, Officer Tovas snatched the tray from his hand.

81.     Defendant Hall, a captain, entered the housing unit, spoke with Defendant Folsom, then came over to where Mr. Melendez had his hand out, asking for his tray. Mr. Melendez told Defendant Hall that he was being retaliated against for filing PREA grievances against Defendant Folsom and Officer Tovas. Rather than remedy the situation and provide Mr. Melendez a breakfast tray, Defendant Hall slammed the food flap down on Mr. Melendez's hand, causing him pain and injuring him. Defendant Hall told Mr. Melendez that he would be his "pet project" that day. Mr. Melendez heard him ordering an extraction team and a "can of black devil" mace over the radio.

82.     Defendant Hall assembled an extraction team of six correctional sergeants: Defendants Atteberry, Brown, Chandler, Nosbisch, Philbert and Colin Williams. Defendant Hall instructed Defendant Philbert to spray Mr. Melendez in the face with pepper spray, saying, "Hit this motherfucker dead on his face." When the cell door was opened, Defendant Philbert sprayed Mr. Melendez in the face for 20–25 seconds.

83.     Mr. Melendez said that he would submit to restraints and would voluntarily leave his cell to be decontaminated. Defendant Hall nevertheless gave the order to extract Mr. Melendez using force. The other sergeants entered the cell

33

in full riot gear and with shields. Defendant Colin Williams pressed the top edge of a riot shield into Mr. Melendez's neck and threw him to the ground. Defendant Nosbisch put handcuffs on Mr. Melendez's wrists, while Defendant Atteberry shackled Mr. Melendez at his ankles. After Mr. Melendez was so restrained, Defendant Colin Williams sat on top of Mr. Melendez and he and Defendant Nosbisch punched him in the face repeatedly, an estimated 25 times. Defendants Atteberry, Brown, Chandler, Nosbisch and Colin Williams continued to punch him in the face while he was on the ground and defenseless, leaving him bruised and swollen. Defendant Brown slammed Mr. Melendez's head onto the concrete walls and floor. Defendants Hall, Atteberry, Brown, Chandler, Nosbisch, Philbert and Colin Williams all failed to intervene to stop each other from assaulting Mr. Melendez.

84.    Defendants Hall, Atteberry, Brown, Chandler, Nosbisch, Philbert and Colin Williams put a spit shield over Mr. Melendez's face so that nobody would see the severity of his injuries. Mr. Melendez could not walk because of his injuries from the assault and was removed in a restraint chair.

85.    The use of force reports completed by the correctional officers—all of which are nearly identical—make no mention of hitting Mr. Melendez in the face. However, the post-use-of-force medical exam notes that Mr. Melendez arrived with a hematoma to the right side of his forehead, a swollen face, a black right eye,

34

a laceration beneath his right eye, a bloody and bruised nose and a bruised left eye.

86.     Defendant Hall told the nurses to minimize the extent of his injuries in their records. Thus the nurses did not stitch Mr. Melendez's facial injuries, even though at least one of the nurses believed he needed stitches.

87.     When he returned to his cell, Mr. Melendez vomited blood. His head was swollen and aching. His teeth were broken during the assault, requiring multiple surgeries and grinding down the broken shards of his teeth.

88.     Following this incident, Mr. Melendez received 48 days of disciplinary confinement and 50 days loss of gain time for allegedly having refused orders to remove papers that covered his cell window on February 1. He also received 18 days of disciplinary confinement for refusing orders to release the handcuff port on February 2, based on a report written by Defendant Hall. He was never charged with assault on an officer or with any conduct that would justify the extreme use of force used against him in extracting him from his cell.

89.     On February 19, 2018, Defendant Hunter conducted another six-month review of Mr. Melendez's CM status. Contrary to FDOC policy, Defendant Hunter did not interview Mr. Melendez. She recommended that he remain on CM I status. As the basis for her decision, she again wrote that the "seriousness of original placement reason and/or inmate's poor adjustment safety and security

concerns exist C1." She faulted Mr. Melendez for receiving four disciplinary charges. She cited the disciplinary charge he received on October 3, 2017 for having his hand out of the food flap when Defendant Van Allen slammed the flap on his hand. She also cited the two disciplinary charges he received on February 1 and 2, 2018, for having papers over his window and refusing to relinquish the handcuff port. Defendant Hunter claimed that Mr. Melendez caused the February 2, 2018 use of force by using physical resistance, even though he was never charged with resisting the cell extraction team. And she cited a disciplinary charge for mail violation on January 22, 2018. None of these disciplinary charges were Category 1 offenses.

90. On March 1, 2018, the ICT convened and adopted the recommendation of Defendant Hunter. Defendant McClellan was the chairperson of the ICT. The ICT ordered that Mr. Melendez remain on CM I status for another six months. The ICT considered a Behavioral Risk Assessment form that was completed six months earlier and contained information that was out of date. Mr. Melendez was not allowed to attend this ICT hearing to speak on his behalf.

### iii. Defendants Geiger, Knott, Webb, Willis and Woods Assault Mr. Melendez Following a Psychiatric Emergency: July 16, 2018.

91. On June 29, 2018, Mr. Melendez was gassed by officers under the supervision of Defendants Reddish and McClellan after he complained about officers' refusal to let him send legal mail. The officers issued Mr. Melendez a

disciplinary report for creating a disturbance. Mr. Melendez was not brought out of his cell to defend himself against the charges, and he was then sent to the disciplinary wing (B-Wing) to be held in even more isolating and restrictive conditions.

92.   Isolated in the disciplinary solitary confinement wing, correctional officers under the supervision of Defendants Reddish and McClellan began starving Mr. Melendez to further punish him. Officers would place his food tray in the door, but leave the flap locked so that Mr. Melendez could not access the tray.

93.   On July 16, 2018, after not eating for nearly ten days, Mr. Melendez requested medical treatment because he was in crisis. The dormitory sergeant, however, refused to allow Mr. Melendez to be taken to receive medical treatment. In desperation, Mr. Melendez attempted suicide by puncturing a vein in his arm with a staple. He bled out in his cell and into the hallway. Finally, the dormitory sergeant had no choice but to order Mr. Melendez be taken to the medical unit.

94.   Defendant Geiger escorted Mr. Melendez to the medical area. Mr. Melendez entered a medical room for treatment. He was handcuffed and shackled, when Defendant Willis walked into the medical room and abruptly slapped him in the face. The force of Defendant Willis's assault knocked Mr. Melendez to the ground. Defendant Willis then wrapped his hand around Mr. Melendez's throat,

pinned him to the floor, and held him in a chokehold. Mr. Melendez could not breathe, his vision blurred, and he thought he would die. Defendants Knott and Webb punched Mr. Melendez around the face and chest. Defendants Knott and Webb also failed to stop Defendant Willis from choking Mr. Melendez. Defendant Geiger stood at the entrance to the medical room and failed to intervene. Defendant Woods, a lieutenant with supervisory authority over Defendants Willis, Knott and Webb, viewed the entire incident from his desk in the medical area. He sat at his desk laughing and did nothing to intervene.

95.    This attack on Mr. Melendez was entirely unjustified and excessive, as Mr. Melendez was not resisting any officer at the time of the sasault. He suffered extensive injuries including a large bruise on his arm, bruising on his neck, and mental pain and suffering.

96.    None of the involved parties wrote a use of force report documenting the force used against Mr. Melendez.

97.    Following the assault, Mr. Melendez was not permitted to see anyone from mental health, even though he had been sent to medical for self-harm and after declaring a psychiatric emergency. Contrary to procedure, he was not placed on a mental health watch. Instead, he was returned to his cell in disciplinary confinement.

E.    **Mr. Melendez is Re-Classified to CM I after Suffering a Psychiatric Crisis and Being Assaulted by Officers: July 28, 2020 to Present.**

98.    The ICT retained Mr. Melendez on CM I status in September 2018. Defendant McClellan was the chairperson, and both Defendants Reddish and McClellan were present for the ICT hearing.

99.    Defendants Reddish and McClellan again relied on the August 2016 incident at Blackwater River and other recent minor disciplinary charges to retain Mr. Melendez on CM I status. As head administrators, Defendants Reddish and McClellan should have been aware of Mr. Melendez's recent psychiatric emergency and self-injury. Yet they rubberstamped the classification officer's recommendation and ordered that Mr. Melendez remain on CM I status for an additional six months, despite the known likelihood that he would suffer a continued decline in his mental health.

100.    Mr. Melendez was not reclassified to CM II until June of 2019. He was moved to CM III in October 2019. On CM III status, he could work and go to the dayroom. But officers under the supervision of Defendants Reddish and McClellan continued to arbitrarily deny him showers and dayroom. He remained on CM III status until he stepped down to general population on March 23, 2020.

101.    Mr. Melendez eventually transferred to New River, another prison in the same compound as FSP, in Raiford, Florida. There, Mr. Melendez received

positive marks for his work assignment and personal appearance. However, the cycle of abuse, retaliation, and isolation continued.

102.   On July 4, 2020, Mr. Melendez wrote a grievance complaining that Defendant Oliva, a sergeant, had threatened him and called him a "fucking spick" in front of other prisoners. His grievance was denied and no corrective actions were taken.

103.   On July 11, 2020, Defendant Oliva made a vulgar comment about his genitals, grabbed his penis, and threatened Mr. Melendez.

104.   On July 13, 2020, Mr. Melendez was placed in administrative confinement. On July 14, 2020, Mr. Melendez wrote a PREA grievance regarding Defendant Oliva's statements of July 11 and claiming that his administrative confinement placement was retaliation for the July 4 grievance.

105.   On or about July 26, 2020, Mr. Melendez was in administrative confinement when officers began threatening him. Officers threatened to charge him with a disciplinary offense and have him sent back to CM I. An officer working under the supervision of Defendant Woodall sprayed Mr. Melendez with mace without justification.

106.   This abuse triggered a psychiatric crisis. Mr. Melendez tied a tourniquet and inserted a nail from a battery into his arm. He lost a significant

amount of blood and covered the cell walls, floor, and bed with blood. Mr. Melendez was taken to a hospital where the nail was removed.

107.   Upon his return to New River, Mr. Melendez was again placed in isolation without treatment. He tried to declare a psychological emergency, but officers denied him. Voices inside his head instructed him to dig into his wound with his fingers. He did so, re-opening the injured vein. Again he soaked the floor, walls, windows, bed, toilet and sink in blood. Mr. Melendez required transport by stretcher and ambulance to an outside hospital.

108.   After this second act of self-mutilation and self-harm, Mr. Melendez was sent back to New River, where officers including Defendant Oliva continued to threaten him and encourage him to further self-harm. On or about July 28, 2020, Mr. Melendez used two pieces of steel wire to puncture a vein in his arm and insert wire into the vein.

109.   The following photograph was taken of Mr. Melendez's cell following his self-injury. It shows the extent of his disturbance and desperation at the time of these events, as well as the sparse condition of his cell, which did not have a bed frame or mattress.

41



110.   Mr. Melendez was removed from his cell and taken to the medical unit under the direction of Defendants Bryant and Oliva—handcuffed, shackled, and bound around the ribcage with a chain, and in a wheelchair because he could not walk due to loss of blood.

111.   Once inside the medical unit, the cell extraction team consisting of Defendants Gwara, Moreland, and Eugene Williams proceeded to beat Mr. Melendez without cause while he was cuffed and shackled. Defendants Gwara, Moreland, and Eugene Williams lifted Mr. Melendez high in the air and then slammed him onto the cot in the infirmary. In doing so, they injured Mr.

Melendez's left shoulder and arm. Defendants Gwara, Moreland, and Eugene Williams proceeded to beat Mr. Melendez. Defendant Gwara jumped on top of the cot and held Mr. Melendez's arms to allow Defendants Moreland and Eugene Williams to punch him while he was unable to shield his face from their fists. Defendant Eugene Williams punched Mr. Melendez in the face from one side, while Defendant Moreland punched him in the face from the other side. Defendants Moreland and Gwara struck Mr. Melendez in the face repeatedly, while he screamed for help. Defendant Bryant stated that Defendant Moreland needed new gloves because his broke while beating Mr. Melendez. This unjustified and brutal assault was done at the direction of Defendants Bryant and Oliva, who also failed to intervene to stop the assault.

112.   Mr. Melendez suffered severe injuries from this assault including lacerations to the inside of his mouth, swollen lips, swollen eyes, and bruising to his face. The following photograph was taken by staff at New River following the assault by Defendants Gwara, Moreland, and Eugene Williams, at the direction of and Defendants Bryant and Oliva.



113.   Following the attack on Mr. Melendez, Defendants Moreland and

Eugene Williams wrote identical false reports stating that Mr. Melendez had

assaulted Defendant Eugene Williams unprovoked. At first Mr. Melendez was

adjudicated guilty of assault based on the false reports. However, the disciplinary

charge was overturned on appeal.

114.   Even though the disciplinary charge for battery against Defendant

Eugene Williams was overturned, Defendant Tomlinson referred Mr. Melendez to

CM I status. Mr. Melendez alerted Defendant Tomlinson to the false nature of the

report made against him. Defendant Tomlinson still recommended him for Close Management.

115.   Defendant Tomlinson convened a biased ICT hearing that consisted of the same people who were responsible for the Close Management recommendation, including Defendant Tomlinson himself. Defendant Tomlinson caused Mr. Melendez to be classified to Close Management knowing that there was no sound basis for such classification, and knowing that Mr. Melendez was mentally ill and had been experiencing a psychiatric crisis including engaging in serious self-injury at the time of the events that led to his Close Management classification.

116.   Mr. Melendez continued to suffer from abusive and assaultive conduct by correctional officers under Defendant Woodall's supervision at New River, while in Close Management awaiting transfer to FSP. On January 8, 2021, Officers Waltman and D. Van Allen assaulted Mr. Melendez in his cell after bringing him back to the dormitories following a privileged phone call with Mr. Melendez's counsel in this lawsuit. Officer D. Van Allen's family member is a defendant to this lawsuit. Mr. Melendez suffered an injury to his hand from this assault, and medical records document a 15 mm laceration to his finger.

117.   On January 14, 2021, Mr. Melendez was transferred to FSP. Immediately upon arrival, he encountered abuse and harassment from

correctional staff. Under the supervision of Defendants Davis and McClellan, he has not been permitted outside recreation, he has been routinely denied showers and put on strip status, and he has been denied contact with family members.

118.   On February 22, 2021, Officer Tyre, acting under the supervision of Defendants Davis and McClellan, had Mr. Melendez gassed and placed him on strip status for 81 hours (four days), because Mr. Melendez provided the contact information for his attorneys to a neighboring prisoner so that his neighbor could contact his attorneys about Mr. Melendez's abuse. Mr. Melendez was freezing cold during this time and had no mattress, sheets, or blankets.

119.   On February 23, 2021, Mr. Melendez cut his arm and inserted a nail into his vein.

120.   Officer Tyre also confiscated Mr. Melendez's legal documents and personal property. Mr. Melendez has now lost all of his property---including his new sneakers, his watch, his eyeglasses, his radio and his tablet. His legal documents---including hundreds of dollars worth of transcripts from his criminal case---were returned reeking of urine and had to be destroyed. His Bibles were ripped up and ruined.

121.   Officers acting under the supervision of Defendants Davis and McClellan held Mr. Melendez in disciplinary confinement in a decrepit cell with

faulty plumbing. Water flowed into his cell from the tier above, causing cement to crumble from the ceiling. Water collected in pools around the base of his toilet.

122.   On March 29, 2021, Mr. Melendez complained to Officer Bishop that he had not received his religious meal for the Passover holiday. Officer Bishop responded by slamming the food flap on Mr. Melendez's hand and gassing him. Lieutenant Mason then responded with an extraction team in retaliation for Mr. Melendez's complaint about not receiving his religious meal. He sprayed Mr. Melendez with chemical agent again, even though Mr. Melendez submitted to the use of force. Unable to receive his religious diet, Mr. Melendez did not eat for thirteen days. All of this occurred under the supervision of Defendants Davis and McClellan.

123.   Under the supervision of Defendants Davis and McClellan, the administration and staff at FSP fail to meaningfully consider Mr. Melendez for stepdown from Close Management. Before Mr. Melendez's six-month ICT review on April 9, 2021, the classification officer failed to interview him or discuss the ICT recommendation. The classification officer simply slipped the recommendation under his cell door and said he was recommending Mr. Melendez remain at CM I status. The ICT recommendation states that Mr. Melendez was referred to Close Management for assaulting an officer without making clear that the guilty finding was overturned. It again cites the "seriousness of original placement reason

and/or inmate's poor adjustment safety and security concerns" as the basis for the recommendation.

124.   Mr. Melendez was not allowed to attend his six-month ICT hearing, and it was held in his absence. The Chairperson of the ICT hearing was Defendant McClellan. The ICT decision cites to a Behavioral Risk Assessment that Mr. Melendez has not seen and had no opportunity to challenge. The ICT decision also cites to multiple uses of force against Mr. Melendez, and to recent minor disciplinary charges that reflect Mr. Melendez's anxiety and fear of correctional officers. There remains no legitimate penological purpose for holding Mr. Melendez in Close Management.

125.   Plaintiff's mental health expert examined Mr. Melendez in April 2021. He found that Mr. Melendez suffers from auditory hallucinations that command him to self-harm. He diagnosed Mr. Melendez with major depressive disorder with paranoid features and recommended that he be immediately removed from Close Management and placed in a specialized mental health unit.

126.   All conditions precedent to bringing this action have occurred, been performed, or been waived.

## COUNT I.A

## 42 U.S.C. § 1983—FIRST AMENDMENT: RETALIATION

## Defendants Folsom and Hall

127.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 23, and 76-88 above.

128.    Defendants Folsom and Hall are sued in Count I.A in their individual capacity only.

129.    Mr. Melendez has a right to file grievances complaining of his mistreatment by the Department and its agents and employees. Mr. Melendez also has a right to raise his complaints regarding officer abuse, including by complaining to superior officers.

130.    Mr. Melendez's submission of grievances and complaints of abuse constitute speech or conduct that is protected by the First Amendment.

131.    On or about February 2, 2018, Defendant Folsom caused Mr. Melendez to be physically abused in retaliation for his grievance and complaints about his misconduct. On or about February 2, 2018, Defendant Hall physically abused and caused Mr. Melendez to be physically abused in retaliation for his grievances and complaints about Defendant Folsom's misconduct. The February 2, 2018 assault on Mr. Melendez constitutes adverse action taken against Mr. Melendez that would deter a person of ordinary firmness from continuing to

engage in that speech or conduct. The February 2, 2018 physical assault occurred immediately following the filing of the grievances, which immediate proximity establishes that the assaults were directly motivated by the protected speech or conduct.

132.    On February 2, 2018, and as described in Section III.D.ii., Defendant Folsom retaliated against Mr. Melendez for filing a PREA grievance against him by denying him a breakfast tray while Mr. Melendez was housed in segregated confinement, unable to otherwise access food. Defendant Folsom did so knowing that Mr. Melendez would react to the denial of his food tray, and intending to set him up for a use of force. Defendant Hall coordinated with Defendant Folsom to retaliate against Mr. Melendez by ordering a brutal assault far beyond any legitimate need to maintain or restore order.

133.    Mr. Melendez seeks relief in the form of nominal, compensatory, and punitive damages for his Count I.A individual capacity claims against Defendants Folsom and Hall.

## COUNT I.B

### 42 U.S.C. § 1983—FIRST AMENDMENT: RETALIATION

### Defendants Bryant, Gwara, Moreland, Oliva and Eugene Williams

134.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 26, and 101-115 above.

135.   Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams are sued in Count I.B in their individual capacities only.

136.   Mr. Melendez has a right to file grievances complaining of his mistreatment by the Department and its agents and employees. Mr. Melendez also has a right to raise his complaints regarding officer abuse by complaining to superior officers.

137.   Mr. Melendez's submission of grievances and complaints of abuse are instances of speech or conduct that is protected by the First Amendment.

138.   On July 28, 2020, Defendants Gwara, Moreland and Eugene Williams physically abused Mr. Melendez in retaliation for his grievances and complaints against Defendant Oliva. On July 28, 2020, Defendants Bryant and Oliva caused Mr. Melendez to be physically abused in retaliation for his grievances and complaints against Defendant Oliva. This physical assault constitutes adverse actions taken against Mr. Melendez that would deter a person of ordinary firmness from continuing to engage in that speech or conduct. The physical assaults occurred immediately following the filing of the grievances, which immediate proximity establishes that the assaults were directly motivated by the protected speech or conduct.

139.   On July 28, 2020, and as described in Section III.E, Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams retaliated against Mr. Melendez

for having filed a PREA grievance against Defendant Oliva. Defendants Bryant and Oliva brought Mr. Melendez to a medical unit where Defendants Gwara, Moreland, and Eugene Williams assaulted him out of view of the camera.

140.    Mr. Melendez seeks relief in the form of nominal, compensatory, and punitive damages for his Count I.B individual capacity claims against Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams.

**COUNT I.C**

**42 U.S.C. § 1983—FIRST AMENDMENT: RETALIATION**

**Defendants Davis, McClellan and Reddish**

141.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 17–19, 76-88, 117-120, and 122 above.

142.    Defendants Davis and McClellan are sued in Count I.C in their individual and official capacities. Defendant Reddish is sued in Count I.C in his individual capacity only.

143.    Mr. Melendez has a right to file grievances complaining of his mistreatment by the Department and its agents and employees. Mr. Melendez also has a right to raise his complaints regarding officer abuse, including by complaining to superior officers and communicating with lawyers.

144.   Mr. Melendez's submission of grievances, complaints of abuse and communications with lawyers about officer abuse are instances of speech or conduct that is protected by the First Amendment.

145.   Defendants Davis, McClellan, and Reddish have, by their failure to discipline or otherwise intervene, caused Mr. Melendez to be physically abused in retaliation for his grievances, complaints, and communications with lawyers. These physical assaults, including the February 2, 2018, February 22, 2021 and March 29, 2021 assaults, constitute adverse actions taken against Mr. Melendez that would deter a person of ordinary firmness from continuing to engage in that speech or conduct. The physical assaults occurred immediately following the filing of the grievances, the making of complaints, or attempts to communicate with lawyers, which immediate proximity establishes that the assaults were directly motivated by the protected speech or conduct.

146.   Additionally, Defendants Davis and McClellan have caused Mr. Melendez to suffer property destruction and placement on extended strip status as retaliation for providing contact information to another prisoner to further communication with his lawyers about officer abuse. The destruction of property and placement on extended strip status would deter a person of ordinary firmness from continuing to engage in this protected speech or conduct. The destruction of property and placement on extended strip occurred immediately following Mr.

Melendez's sharing of his lawyers' contact information with another prisoner, which establishes that the motive was retaliatory.

147.   On February 2, 2018, and as described in Section III.D.ii., Defendant Folsom retaliated against Mr. Melendez for filing a PREA grievance against him by denying him a breakfast tray while Mr. Melendez was housed in segregated confinement, unable to otherwise access food. Defendant Folsom did so knowing that Mr. Melendez would react to the denial of his food tray, and intending to set him up for a use of force. Defendant Hall coordinated with Defendant Folsom to retaliate against Mr. Melendez by ordering a brutal assault far beyond any legitimate need to maintain or restore order. Defendants Reddish and McClellan, as head administrators of FSP with supervisory responsibility, were aware of ongoing retaliation by FSP correctional officers and, in failing to address the issue of officer retaliation, brought about the retaliation suffered by Mr. Melendez on February 2, 2018.

148.   On February 22, 2021, and as described in paragraphs 118 and 120, Officer Tyre retaliated against Mr. Melendez for sharing the contact information for his attorneys with another prisoner so that the prisoner could contact Mr. Melendez's attorneys about officer abuse of Mr. Melendez. Officer Tyre used chemical agent against Mr. Melendez, had him placed on extended strip status in freezing cold conditions, and caused the destruction of his property. Defendants

Davis and McClellan, as head administrators of FSP with supervisory responsibility, were aware of ongoing retaliation by FSP correctional officers and, in failing to address the issue of officer retaliation, brought about the retaliation suffered by Mr. Melendez on February 22, 2021.

149.   On March 29, 2021, and as described in paragraph 122, Officer Bishop and Lieutenant Mason retaliated against Mr. Melendez for having complained about not receiving a Passover meal. Officer Bishop and Lieutenant Mason used chemical agent against Mr. Melendez, even though he did not pose a legitimate threat to the security of the prison. Defendants Davis and McClellan, as head administrators of FSP with supervisory responsibility, were aware of ongoing retaliation by FSP correctional officers and, in failing to address the issue of officer retaliation, brought about the retaliation suffered by Mr. Melendez on March 29, 2021.

150.   Mr. Melendez has been called a "snitch" by FDOC officers for reporting officer abuse to superiors, including as recently as February 2021. Multiple officers have referenced Mr. Melendez's pending lawsuit, including one officer who threatened to kill Mr. Melendez so that Mr. Melendez could not sue him.

151.   This retaliatory conduct was carried out in furtherance of an unconstitutional policy, custom or practice at FSP to punish prisoners who file grievances, complain, or take legal action that exposes their mistreatment.

152.   These practices and policies have been and continue to be implemented by Defendants Davis and McClellan and their agents and employees acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the First and Fourteenth Amendments. As a direct and proximate cause of Defendants Davis's and McClellan's acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm.

153.   These harms will continue unless enjoined by this Court.

154.   Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count I.C official capacity claims against Defendants Davis and McClellan. Specifically, Mr. Melendez seeks an order requiring Defendants Davis and McClellan to adopt and implement policies, procedures and practices that will stop the ongoing retaliation against Mr. Melendez, including but not limited to providing for Mr. Melendez to submit his grievances directly to a grievance officer as opposed to the same correctional officers who are the subject of grievances, requiring that grievance officers interview Mr. Melendez in a confidential setting

when he raises a claim of retaliation, and ensuring that correctional officers named in this lawsuit are not assigned to Mr. Melendez's housing unit.

155.    Mr. Melendez also seeks relief in the form of nominal, compensatory, and punitive damages for his Count I.C individual capacity claims against Defendants Davis, McClellan, and Reddish.

## COUNT I.D

## 42 U.S.C. § 1983 — FIRST AMENDMENT: RETALIATION

## Defendant Woodall

156.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 24, 101-116 above.

157.    Defendant Woodall is sued in Count I.D in his individual capacity only.

158.    Mr. Melendez has a right to file grievances complaining of his mistreatment by the Department and its agents and employees. Mr. Melendez also has a right to raise his complaints regarding officer abuse, including by complaining to superior officers and communicating with lawyers.

159.    Mr. Melendez's submission of grievances, complaints of abuse and communications with lawyers about officer abuse are instances of speech or conduct that is protected by the First Amendment.

160.    Defendant Woodall has, by his failure to discipline or otherwise intervene, caused Mr. Melendez to be physically abused in retaliation for his grievances, complaints, and communications with lawyers. These physical assaults, including the July 28, 2020 and January 8, 2021 assaults, constitute adverse actions taken against Mr. Melendez that would deter a person of ordinary firmness from continuing to engage in that speech or conduct. The physical assaults occurred immediately following the filing of the grievances, the making of complaints, or communications with lawyers, which immediate proximity establishes that the assaults were directly motivated by the protected speech or conduct.

161.    On July 28, 2020, and as described in Section III.E, Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams retaliated against Mr. Melendez for having filed a PREA grievance against Defendant Oliva. Defendants Bryant and Oliva brought Mr. Melendez to a medical unit where Defendants Gwara, Moreland, and Eugene Williams assaulted him out of view of the camera. Defendant Woodall, as head administrator of New River with supervisory responsibility, was aware of ongoing retaliation by New River correctional officers and, in failing to address the issue of officer retaliation, brought about the retaliation suffered by Mr. Melendez.

162.    On January 8, 2021 and as described in paragraph 116, Officers Waltman and D. Van Allen retaliated against Mr. Melendez for communicating with his lawyers about his lawsuit. Officers Waltman and D. Van Allen threw Mr. Melendez into his cell, and Officer Waltman pounded Mr. Melendez's hand as he was holding onto his steel bed frame, causing him injury. Defendant Woodall, as head administrator of New River with supervisory responsibility, was aware of ongoing retaliation by New River correctional officers and, in failing to address the issue of officer retaliation, brought about the retaliation suffered by Mr. Melendez.

163.    This retaliatory conduct was carried out in furtherance of an unconstitutional policy, custom or practice at New River to punish prisoners who file grievances, complain, or take legal action that exposes their mistreatment.

164.    Mr. Melendez seeks relief in the form of nominal, compensatory, and punitive damages for his Count I.D individual capacity claims against Defendant Woodall.

## COUNT II.A

## 42 U.S.C. § 1983 — EIGHTH AMENDMENT: CONDITIONS OF CONFINEMENT

### Defendants Inch, Hummel and Palmer

165.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–5, 10–14, 16, 20-21, 30–57, 61–71, 89–90, 98–100, 114–15, 117, and 123–125 above.

166.   Defendant Inch is sued in Count II.A in his official capacity only. Defendant Palmer is sued in Count II.A in his individual and official capacities. Defendant Hummel is sued in Count II.A in his individual capacity only.

167.   Through the Department's isolation-related practices and policies, Defendants Inch, Hummel, and Palmer have subjected Mr. Melendez to a substantial risk of serious harm and deprived him of the minimal civilized measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions.

168.   Defendant Inch, as Secretary of the Department with policy-making authority and supervisory responsibility for all correctional officers and Department administrators, is responsible for the FDOC's system of solitary confinement, which captures many prisoners, including Mr. Melendez, in a cycle of penologically unnecessary isolation and abuse.

169.    Defendants Hummel and Palmer, as regional directors with supervisory authority over FSP and New River, are responsible for the imposition of solitary confinement at those facilities, and for Mr. Melendez's extended and unwarranted isolation at both prisons.

170.    These practices and policies are inconsistent with current American standards of decency.

171.    By these practices and policies, Defendants Inch, Hummel and Palmer have caused Mr. Melendez to suffer the wanton infliction of pain.

172.    There is no legitimate penological purpose for these practices and policies.

173.    Defendants Inch, Hummel, and Palmer have been and are aware of the deprivations set forth in this complaint and have been and remain deliberately indifferent to them. Mr. Melendez wrote to Defendants Inch, Hummel, and Palmer to alert them to his extreme isolation and the lack of justification for it. Defendants Hummel and Palmer also conducted yearly inspections of the segregation units at FSP and New River.

174.    Defendants Inch, Hummel and Palmer are aware of the substantial risk of harm caused by these deprivations and have not acted to reduce or eliminate the risks posed by them. It should be obvious to these correctional professionals, or any reasonable person, that the conditions imposed on Mr.

Melendez would cause him to suffer mental anguish, physical injuries, the exacerbation of his mental health condition, and pain and suffering.

175.   These practices and policies have been and continue to be implemented by Defendants Inch and Palmer and their agents, officials, and employees acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Eighth and Fourteenth Amendments.

176.   As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm, including self-injury, suicidality, major depression, auditory hallucinations, extreme and unhealthy weight loss, vision loss and hearing loss, decline in the ability to focus and concentrate, sleep deprivation, and skin infections.

177.   These harms will continue unless enjoined by this Court.

178.   Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count II.A official capacity claims against Defendants Inch and Palmer. Specifically, Mr. Melendez seeks an order requiring that he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Mr. Melendez further seeks an order barring the Department from imposing upon him any form of isolation lasting more than 72 hours. Alternatively, Mr.

Melendez seeks an order including but not limited to requiring these Defendants to provide Mr. Melendez a minimum of one hour of exercise per day outside of his cell, five days per week, consistent with ACA standards for restrictive housing prisoners; showers three days a week; access to his radio and tablet; weekly phone access; contact visitation; congregate religious services; and restoration of his walker. Mr. Melendez also seeks an order barring Defendants Inch and Palmer from placing Mr. Melendez on property restriction or "strip status" and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells. Mr. Melendez further requests an order requiring Defendants Inch and Palmer to ensure their officers conduct an out-of-cell interview with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendants Inch and Palmer require their officers to provide Mr. Melendez with a concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days.

179.   Mr. Melendez also seeks nominal, compensatory, and punitive damages for his Count II.A individual capacity claims against Defendants Hummel and Palmer.

## COUNT II.B

## 42 U.S.C. § 1983—EIGHTH AMENDMENT: CONDITIONS OF CONFINEMENT

### Defendants Davis, McClellan, and Reddish

180.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–5, 10–14, 17-19, 34–57, 62–71 (McClellan and Reddish only), 75 (McClellan and Reddish only), 88–93 (McClellan and Reddish only), 97–100 (McClellan and Reddish only), 117-124 (Davis and McClellan only), and 125 above.

181.   Defendants Davis and McClellan are sued in Count II.B in their individual and official capacities. Defendant Reddish is sued in Count II.B in his individual capacity only.

182.   Through their isolation-related practices and policies, Defendants Davis, McClellan, and Reddish have subjected Mr. Melendez to a substantial risk of serious harm and deprived him of the minimal civilized measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions.

183.   Defendants Davis, McClellan, and Reddish, as wardens and an assistant warden at FSP, are responsible for the use of solitary confinement at those

facilities, including disciplinary solitary confinement, close management, and property restriction, and for Mr. Melendez's constant isolation without just cause.

184.    Defendants McClellan and Reddish, as ICT members at FSP, are responsible for causing Mr. Melendez to be subjected to solitary confinement and for extending the term of his isolation.

185.    These practices and policies are inconsistent with current American standards of decency.

186.    By their practices and policies and isolation of Mr. Melendez, Defendants Davis, McClellan, and Reddish have caused Mr. Melendez to suffer the wanton infliction of pain.

187.    There is no legitimate penological purpose for these practices and policies.

188.    Defendants Davis, McClellan, and Reddish have been and are aware of the deprivations set forth in this complaint and have been and remain deliberately indifferent to them. Mr. Melendez wrote to Defendants Davis and Reddish to alert them to his extreme isolation and the lack of justification for it. Defendants Davis, McClellan, and Reddish conducted weekly inspections of the segregation rounds and observed firsthand the conditions in the solitary confinement units and heard complaints from prisoners, including from Mr. Melendez about his extreme and unjustified isolation. Defendants Davis,

McClellan, and Reddish also answered grievances regarding the conditions in solitary confinement, including from Mr. Melendez about his extreme and unjustified isolation.

189.   Defendants Davis, McClellan, and Reddish are also aware of the substantial risk of harm caused by these deprivations and have not acted to reduce or eliminate the risks posed by them. It should be obvious to these correctional professionals, or any reasonable person, that the conditions imposed on Mr. Melendez would cause him to suffer mental anguish, physical injuries, the exacerbation of his mental health condition, and pain and suffering.

190.   These practices and policies have been and continue to be implemented by Defendants Davis and McClellan acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Eighth and Fourteenth Amendments.

191.   As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm, including self-injury, suicidality, major depression, auditory hallucinations, extreme and unhealthy weight loss, vision loss, hearing loss, decline in the ability to focus and concentrate, sleep deprivation, and skin infections.

192.    These harms will continue unless enjoined by this Court.

193.    Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count II.B official capacity claims against Defendants Davis and McClellan. Specifically, Mr. Melendez seeks an order requiring that he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Mr. Melendez further seeks an order barring Defendants Davis and McClellan from imposing upon him any form of isolation lasting more than 72 hours. Alternatively, Mr. Melendez seeks an order including but not limited to requiring these Defendants to provide Mr. Melendez a minimum of one hour of exercise per day outside of his cell, five days per week, consistent with ACA standards for restrictive housing prisoners; showers three days a week; access to his radio and tablet; weekly phone access; contact visitation; congregate religious services; and restoration of his walker. Mr. Melendez also seeks an order barring Defendants Davis and McClellan from placing Mr. Melendez on property restriction or "strip status" and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells. Mr. Melendez further requests an order requiring Defendants Davis and McClellan conduct an out-of-cell interview with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments

considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendants Davis and McClellan provide Mr. Melendez with a concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days.

194.    Mr. Melendez also seeks nominal, compensatory, and punitive damages for his Count II.B individual capacity claims against Defendants Davis, McClellan and Reddish.

## COUNT II.C

### 42 U.S.C. § 1983 — EIGHTH AMENDMENT: CONDITIONS OF CONFINEMENT

### Defendants Hunter and Tomlinson

195.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-5, 10–14, 22, 25, 30-33, 34–38 (Hunter only), 47 (Hunter only), 62 (Hunter only), 68–70 (Hunter only), 89–90 (Hunter only), 98–100 (Hunter only), 114–15 (Tomlinson only), and 125 above.

196.    Defendant Hunter is sued in Count II.C in her individual and official capacities. Defendant Tomlinson is sued in Count II.C in his individual capacity only.

197.    Defendants Hunter and Tomlinson have subjected Mr. Melendez to a substantial risk of serious harm and deprived him of the minimal civilized

68

measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions.

198.   Defendant Hunter, as classification officer at FSP, is responsible for causing Mr. Melendez to be subjected to solitary confinement at FSP and for extending the term of his isolation. She is also responsible for cutting off Mr. Melendez's contact with his family by denying approval of his phone contact list.

199.   Defendant Tomlinson, as classification supervisor at New River and as an ICT member at New River, is responsible for causing Mr. Melendez to be subjected to solitary confinement and for extending the term of his isolation.

200.   These practices and policies are inconsistent with current American standards of decency.

201.   In doing so, Defendants Hunter and Tomlinson have caused Mr. Melendez to suffer the wanton infliction of pain.

202.   There is no legitimate penological purpose for these practices and policies.

203.   Defendants Hunter and Tomlinson have been and are aware of the deprivations set forth in this complaint and have been and remain deliberately indifferent to them. Defendants Hunter and Tomlinson worked regularly in the segregation units and were directly familiar with the conditions in those units.

204.   Defendants Hunter and Tomlinson are also aware of the substantial risk of harm caused by these deprivations and have not acted to reduce or eliminate the risks posed by them. It should be obvious to these correctional professionals, or any reasonable person, that the conditions imposed on Mr. Melendez would cause him to suffer mental anguish, physical injuries, the exacerbation of his mental health condition, and pain and suffering.

205.   These practices and policies have been and continue to be implemented by Defendant Hunter and her agents acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Eighth and Fourteenth Amendments.

206.   As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm, including self-injury, suicidality, major depression, auditory hallucinations, extreme and unhealthy weight loss, vision loss and hearing loss, decline in the ability to focus and concentrate, sleep deprivation, and skin infections.

207.   These harms will continue unless enjoined by this Court.

208.   Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count II.C official capacity claims against Defendant Hunter. Specifically, Mr.

Melendez seeks an order requiring that he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Mr. Melendez further seeks an order barring Defendant Hunter from imposing upon him any form of isolation lasting more than 72 hours. Alternatively, Mr. Melendez requests an order requiring Defendant Hunter to conduct an out-of-cell interview with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendant Hunter provide Mr. Melendez with a concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days.

209.   Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count II.C individual capacity claims against Defendants Hunter and Tomlinson.

## COUNT II.D

### 42 U.S.C. § 1983 — EIGHTH AMENDMENT: CONDITIONS OF CONFINEMENT

### Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott

210.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–15, 23, 39–44, 47, 50, 61–66 above.

71

211.   Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott are sued in Count II.D in their individual capacities only.

212.   Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott have subjected Mr. Melendez to a substantial risk of serious harm and deprived him of the minimal civilized measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions.

213.   Defendant Hall, as a captain with supervisory responsibility over the segregation dormitories where Mr. Melendez was housed, is responsible for imposing severe restrictions on Mr. Melendez while on Close Management, including depriving him of outdoor recreation, showers, and phone calls, to which he was entitled, and placing him on strip status.

214.   Defendants Brown, Folsom, Philbert, and Geiger, as correctional sergeants with supervisory responsibility over the segregation dormitories where Mr. Melendez was housed, are responsible for imposing severe restrictions on Mr. Melendez while on Close Management, including depriving him of outdoor recreation, showers, and phone calls, to which he was entitled, and placing him on strip status.

215.   Defendants Van Allen and Knott, as correctional officers who worked in the segregation dormitories where Mr. Melendez was housed, are responsible

for imposing severe restrictions on Mr. Melendez while on Close Management, including depriving him of outdoor recreation, showers, and phone calls, to which he was entitled.

216.   These practices and policies are inconsistent with current American standards of decency.

217.   In doing so, Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott have caused Mr. Melendez to suffer the wanton infliction of pain.

218.   There is no legitimate penological purpose for these practices and policies.

219.   Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott are aware of the substantial risk of harm caused by these deprivations and have not acted to reduce or eliminate the risks posed by them. It should be obvious to these correctional professionals, or any reasonable person, that the conditions imposed on Mr. Melendez would cause him to suffer mental anguish, physical injuries, the exacerbation of his mental health condition, and pain and suffering.

220.   Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count II.D individual capacity claims against Defendants Van Allen, Brown, Folsom, Hall, Philbert, Geiger, and Knott.

## COUNT III.A

## 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants McClellan and Reddish

221.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 18-19, 72–75, 81–88, 91–96, 118 (McClellan only), and 122 (McClellan only) above.

222.   Defendants McClellan and Reddish are sued in Count III.A in their individual capacities only.

223.   As described above in Section III.D.i., Defendant Van Allen used excessive force against Mr. Melendez on October 3, 2017, without provocation and without legitimate penal justification. Defendants McClellan and Reddish were supervisory administrators and were aware of the ongoing pattern of excessive use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of October 3, 2017.

224.   As described above in Section III.D.ii, Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams used excessive force against Mr. Melendez on February 2, 2018, without provocation and without legitimate penal justification. Defendants McClellan and Reddish were supervisory administrators and were aware of the ongoing pattern of excessive

use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of February 2, 2018.

225.   As described above in Section III.D.iii, Defendants Geiger, Knott, Webb, Willis, and Woods used excessive force against Mr. Melendez on July 16, 2018, without provocation and without legitimate penal justification. Defendants McClellan and Reddish were supervisory administrators and were well aware of the ongoing pattern of excessive use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of July 16, 2018.

226.   While not direct participants, Defendants McClellan and Reddish caused the unprovoked and unjustified excessive use of force against Mr. Melendez by their actions and omissions, including in failing to discipline officers who use excessive force, and by failing to address the issue of officers assaulting prisoners in "blind spots" where there are no security cameras. Other instances of excessive use of force include the June 29, 2018 use of chemical agent against Mr. Melendez, which occurred under the supervision of Defendants Reddish and McClellan (paragraph 91); and the February 22 and March 29 uses of chemical agent, which occurred under the supervision of Defendant McClellan (paragraphs 118 and 122).

227.    The actions of Defendants McClellan and Reddish were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

228.    The acts of excessive force that occurred under the supervision of Defendants McClellan and Reddish were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

229.    The conduct of Defendants McClellan and Reddish was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment.

230.    Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.A individual capacity claims against Defendants McClellan and Reddish.

## COUNT III.B

### 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendant Woodall

231.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 24, 105-113, and 116 above.

232.    Defendant Woodall is sued in Count III.B in his individual capacity only.

233.     As described above in Section III.E, Defendants Gwara, Moreland, and Eugene Williams excessive force against Mr. Melendez on or about July 28, 2020, without provocation and without legitimate penal justification. Defendant Woodall was a supervisory administrator and was aware of the ongoing pattern of excessive use of force at New River. By failing to take proper corrective action to stop excessive force at New River, he brought about the assault on Mr. Melendez of July 28, 2020.

234.     While not a direct participant, Defendant Woodall caused the unprovoked and unjustified excessive use of force against Mr. Melendez by his actions and omissions, including in failing to discipline officers who use excessive force, and by failing to address the issue of officers assaulting prisoners in "blind spots" where there are no security cameras. Other instances of excessive use of force include the January 8, 2021 assault on Mr. Melendez following an attorney-client phone call, which occurred under the supervision of Defendant Woodall (paragraph 116).

235.     The actions of Defendant Woodall were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

236.   The acts of excessive force that occurred under the supervision of Defendant Woodall were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

237.   The conduct of Defendant Woodall was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment.

238.   Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.B individual capacity claims against Defendant Woodall.

## COUNT III.C

### 42 U.S.C. § 1983—EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants Hummel and Palmer

239.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 20-21, 72–75, 81–88, 91–96, and 105-113 (Palmer only) above.

240.   Defendants Hummel and Palmer are sued in Count III.C in their individual capacities only.

241.   As described above in Section III.D.i., Defendant Van Allen used excessive force against Mr. Melendez on October 3, 2017, without provocation and without legitimate penal justification. Defendants Hummel and Palmer were supervisory administrators and were aware of the ongoing pattern of excessive

use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of October 3, 2017.

242.   As described above in Section III.D.ii, Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams used excessive force against Mr. Melendez on February 2, 2018, without provocation and without legitimate penal justification. Defendants Hummel and Palmer were supervisory administrators and were well aware of the ongoing pattern of excessive use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of February 2, 2018.

243.   As described above in Section III.D.iii, Defendants Geiger, Knott, Webb, Willis, and Woods used excessive force against Mr. Melendez on July 16, 2018, without provocation and without legitimate penal justification. Defendants Hummel and Palmer were supervisory administrators and were well aware of the ongoing pattern of excessive use of force at FSP. By failing to take proper corrective action to stop excessive force at FSP, they brought about the assault on Mr. Melendez of July 16, 2018.

244.   As described above in Section III.E, Defendants Gwara, Moreland, and Eugene Williams used excessive force against Mr. Melendez on or about July 28, 2020, without provocation and without legitimate penal justification. Defendant Palmer was a supervisory administrator and was aware of the ongoing

pattern of excessive use of force at New River. By failing to take proper corrective action to stop excessive force at New River, he brought about the assault on Mr. Melendez of July 28, 2020.

245.   While not direct participants, Defendants Hummel and Palmer caused the unprovoked and unjustified excessive use of force against Mr. Melendez by their actions and omissions, including in failing to discipline officers who use excessive force, and by failing to address the issue of officers assaulting prisoners in "blind spots" where there are no security cameras.

246.   The actions of Defendants Hummel and Palmer were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

247.   The acts of excessive force that occurred under the supervision of Defendants Hummel and Palmer were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

248.   The conduct of Defendants Hummel and Palmer was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment.

249.   Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.C individual capacity claims against Defendants Hummel and Palmer.

## COUNT III.D

## 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants Van Allen and Geiger

250.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 23, and 72-75 above.

251.    Defendants Van Allen and Geiger are sued in Count III.D in their individual capacities only.

252.    As described above in Section III.D.i., Defendant Van Allen used excessive force against Mr. Melendez on October 3, 2017, without provocation and without legitimate penal justification. Defendant Van Allen acted maliciously and sadistically with the intent to cause Mr. Melendez pain. Defendant Geiger, who was at that time Defendant Van Allen's supervising sergeant, failed to intervene to stop Defendant Van Allen's use of force against Mr. Melendez. As a result, Mr. Melendez suffered a laceration to his finger and swelling to his fingers and hand, in addition to extreme mental pain and suffering.

253.    The actions of Defendants Van Allen and Geiger were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

254.    The acts of excessive force by Defendants Van Allen and Geiger were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

255.    The conduct of Defendants Van Allen and Geiger was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment, and with a malicious and sadistic intent to cause him pain.

256.    Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.D individual capacity claims against Defendants Van Allen and Geiger.

## COUNT III.E

### 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants Atteberry, Brown, Chandler,
### Folsom, Hall, Nosbisch, Philbert, and Colin Williams

257.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 23, and 76-88 above.

258.    Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams are sued in Count III.E in their individual capacities only.

259.    As described above in Section III.D.ii, Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams used excessive force against Mr. Melendez on February 2, 2018, without provocation and without

82

legitimate penal justification. Defendants Folsom and Hall coordinated the use of force to penalize Mr. Melendez for speaking up about officer abuse. As a result of the assault, Mr. Melendez suffered extensive injuries, including facial bruising, multiple lacerations, broken teeth, and extreme mental pain and suffering.

260.    The actions of Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

261.    The acts of excessive force by Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

262.    The conduct of Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment, and with a malicious and sadistic intent to cause him pain.

263.    Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.E individual capacity claims against Defendants Atteberry, Brown, Chandler, Folsom, Hall, Nosbisch, Philbert, and Colin Williams.

## COUNT III.F

## 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants Geiger, Knott, Webb, Willis, and Woods

264.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 23, and 91-97 above.

265.    Defendants Geiger, Knott, Webb, Willis, and Woods are sued in Count III.F in their individual capacities only.

266.    As described above in Section III.D.iii, Defendants Geiger, Knott, Webb, Willis, and Woods used excessive force against Mr. Melendez on July 16, 2018, without provocation and without legitimate penal justification. Defendants Geiger and Woods watched the unjustified assault on Mr. Melendez occur and failed to intervene to stop it. As a result, Mr. Melendez suffered bruising to his arm and neck, and extreme mental pain and suffering.

267.    The actions of Defendants Geiger, Knott, Webb, Willis, and Woods were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

268.    The acts of excessive force by Defendants Geiger, Knott, Webb, Willis, and Woods were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

269.    The conduct of Defendants Geiger, Knott, Webb, Willis, and Woods was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment, and with a malicious and sadistic intent to cause him pain.

270.    Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III.F individual capacity claims against Defendants Geiger, Knott, Webb, Willis, and Woods.

## COUNT III.G

### 42 U.S.C. § 1983 — EIGHTH AMENDMENT: EXCESSIVE FORCE

### Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams

271.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–15, 26, and 102–113 above.

272.    Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams are sued in Count III in their individual capacities only.

273.    As described above in Section III.E, Defendants Gwara, Moreland, and Eugene Williams excessive force against Mr. Melendez on or about July 28, 2020, without provocation and without legitimate penal justification. This instance of excessive force was done at the direction of Defendants Bryant and Oliva, both of whom did not intervene to end the assault on Mr. Melendez. As a result of the assault, Mr. Melendez suffered severe facial bruising and lacerations.

274.   The actions of Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams were performed under color of law and violated Mr. Melendez's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

275.   The acts of excessive force by Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams were the direct and proximate cause of serious and ongoing physical and psychological injuries to Mr. Melendez.

276.   The conduct of Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams was willful and exhibited a flagrant disregard for Mr. Melendez's rights to be free from cruel and unusual punishment, and with a malicious and sadistic intent to cause him pain.

277.   Mr. Melendez seeks nominal, compensatory, and punitive damages for his Count III individual capacity claims against Defendants Bryant, Gwara, Moreland, Oliva, and Eugene Williams.

## COUNT IV.A

## 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

### Defendants Inch, Hummel, and Palmer

278.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-16, 20-21, 31–39, 61–62, 66–70, 78, 89–90, 98–100, 114–15 (Inch and Palmer only), 117-18 (Inch and Palmer only) and 123–124 (Inch and Palmer only) above.

279.    Defendant Inch is sued in Count IV in his official capacity. Defendant Palmer is sued in Count IV.A in his individual and official capacities. Defendant Hummel is sued in Count IV.A in his individual capacity.

280.    Imposition of Close Management and Property Restriction constitutes an atypical and significant deprivation in relation to the ordinary incidents of prison life.

281.    Through their isolation-related practices and policies, Defendants Inch, Hummel, and Palmer have deprived Mr. Melendez of his right to be free from solitary confinement, and the imposition of formal and informal punishments, without due process of law. Their unlawful practices include classification of prisoners to solitary confinement without the opportunity to be heard and to attend ICT hearings, and depriving prisoners of the right to meaningfully challenge their classification to Close Management. As a result of

87

their policies and practices, Mr. Melendez has been subjected to pro forma reviews of his ongoing solitary confinement that hold no meaningful possibility of a different result; he has been barred from attending the ICT hearings at which decisions about extending his solitary confinement were made; he has not been interviewed by classification officers prior to ICT hearings, and he has not been afforded the opportunity to review and challenge assessment forms used by the ICT to determine his suitability for stepdown to general population.

282.   As a result of their property restriction policies, Mr. Melendez has been repeatedly placed on property restriction or "strip status" without notice and a chance to be heard, and without a sufficient evidentiary basis.

283.   Defendants Inch, Hummel and Palmer as chief administrators for the Department have adopted solitary confinement policies that led to these due process violations, and have also failed to correct these repeated due process violations by adopting remedial policies or appropriately training, disciplining and supervising staff.

284.   These actions constitute unconstitutional policies and practices that have deprived Mr. Melendez of his interest to be free from solitary confinement in Close Management without being afforded the minimum requirements of procedural due process, in violation of the Fourteenth Amendment to the United States Constitution.

285.    These practices and policies have been and continue to be implemented by Defendants Inch and Palmer and their agents acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Fourteenth Amendment.

286.    As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm.

287.    These harms will continue unless enjoined by this Court.

288.    Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count IV official capacity claims against Defendants Inch and Palmer. Specifically, Mr. Melendez seeks an order requiring that he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Alternatively, Mr. Melendez requests an order including but not limited to requiring Defendants Inch and Palmer to conduct an out-of-cell interview with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendants Inch and Palmer provide Mr. Melendez with a

concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days. Finally, Mr. Melendez seeks an order barring Defendants Inch and Palmer from placing Mr. Melendez on property restriction or "strip status," and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells.

289.   Mr. Melendez seeks nominal, compensatory and punitive damages for his Count IV.A individual capacity claims against Defendants Hummel and Palmer.

## COUNT IV.B

## 42 U.S.C. § 1983—FOURTEENTH AMENDMENT:
## PROCEDURAL DUE PROCESS

### Defendants Davis, McClellan, Reddish

290.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 17-19, 31–39, 57, 66–70, 78, 89–90, 98–100, 117-118 (Davis and McClellan only) and 123–124 (Davis and McClellan only) above.

291.   Defendants Davis and McClellan are sued in Count IV.B in their individual and official capacities. Defendant Reddish is sued in Count IV.B in his individual capacities.

292.   Imposition of Close Management, Disciplinary Confinement, and Property Restriction constitute an atypical and significant deprivation in relation to the ordinary incidents of prison life.

90

293.   Through their isolation-related practices and policies, Defendants Davis, McClellan, and Reddish have deprived Mr. Melendez of his right to be free from solitary confinement, and the imposition of formal and informal punishments, without due process of law. Their unlawful practices include the following:

a.   Defendants Reddish and McClellan have barred Mr. Melendez from participating in disciplinary hearings.

b.   Defendants Davis, McClellan, and Reddish have subjected Mr. Melendez to pro forma reviews of his ongoing solitary confinement that hold no meaningful possibility of a different result; they have overseen barring Mr. Melendez from attending the ICT hearings at which decisions about extending his solitary confinement were made; they have failed to require that correctional officers interview Mr. Melendez and record his statements prior to ICT hearings, and they have failed to provide Mr. Melendez the opportunity to review and challenge assessment forms used by the ICT to determine his suitability for stepdown to general population.

c.   Defendants Davis, McClellan, and Reddish have imposed informal, arbitrary punishments, placing Mr. Melendez on property restriction or "strip status" without affording Mr. Melendez notice and a chance to be heard, and without a sufficient evidentiary basis.

294.    These actions constitute unconstitutional policies and practices that have deprived Mr. Melendez of his interest to be free from solitary confinement in Close Management, disciplinary confinement and property restriction without being afforded the minimum requirements of procedural due process, in violation of the Fourteenth Amendment to the United States Constitution.

295.    These practices and policies have been and continue to be implemented by Defendants Davis and McClellan and their agents acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Fourteenth Amendment.

296.    As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm.

297.    These harms will continue unless enjoined by this Court.

298.    Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count IV.B official capacity claims against Defendants Davis and McClellan. Specifically, Mr. Melendez seeks an order requiring that he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Alternatively, Mr. Melendez requests an order including but not limited to requiring Defendants Davis and McClellan to conduct an out-of-cell interview

with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendants Davis and McClellan provide Mr. Melendez with a concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days. Mr. Melendez further seeks an order barring Defendants Davis and McClellan from holding disciplinary hearings in Mr. Melendez's absence. Finally, Mr. Melendez seeks an order barring Defendants Davis and McClellan from placing Mr. Melendez on property restriction or "strip status," and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells.

299.   Mr. Melendez seeks nominal, compensatory and punitive damages for his Count IV.B individual capacity claims against Defendants Davis, McClellan, and Reddish.

## COUNT IV.C

## 42 U.S.C. § 1983—FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

### Defendants Hunter and Tomlinson

300.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 22, 25, 34–38 (Hunter only), 39, 68–70 (Hunter only), 89–90 (Hunter only), 98–100 (Hunter only), and 114–15 (Tomlinson only) above.

301.    Defendant Hunter is sued in Count IV.C in her individual and official capacities. Defendant Tomlinson is sued in Count IV.C in his individual capacity.

302.    Imposition of Close Management constitutes an atypical and significant deprivation in relation to the ordinary incidents of prison life.

303.    Defendants Hunter and Tomlinson have deprived Mr. Melendez of his right to be free from solitary confinement without due process of law.

304.    Defendant Hunter has subjected Mr. Melendez to pro forma reviews of his ongoing solitary confinement that hold no meaningful possibility of a different result; she has barred Mr. Melendez from attending the ICT hearings at which decisions about extending his solitary confinement were made; she has failed to interview Mr. Melendez and record his statements prior to ICT hearings, and she has failed to provide Mr. Melendez the opportunity to review and challenge assessment forms used by the ICT to determine his suitability for stepdown to general population.

305.   Defendant Tomlinson has caused Mr. Melendez to be classified to Close Management without basis and without permitting Mr. Melendez to meaningfully challenge the classification and solitary confinement assignment.

306.   These actions constitute unconstitutional policies and practices that have deprived Mr. Melendez of his interest to be free from solitary confinement in Close Management without being afforded the minimum requirements of procedural due process, in violation of the Fourteenth Amendment to the United States Constitution.

307.   These practices and policies have been and continue to be implemented by Defendant Hunter and her agents acting under the color of state law, in their official capacities, and are the direct and proximate cause of the ongoing deprivation of Mr. Melendez's rights secured by the Fourteenth Amendment.

308.   As a direct and proximate cause of these acts and failures to act, Mr. Melendez has suffered, is suffering, and will continue to suffer from a substantial risk of and actual serious harm.

309.   These harms will continue unless enjoined by this Court.

310.   Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count IV.C official capacity claims against Defendant Hunter. Specifically, Mr. Melendez seeks an order requiring that he be removed from Close Management

and transferred to an appropriate facility for inpatient mental health care. Alternatively, Mr. Melendez requests an order including but not limited to requiring Defendant Hunter to conduct an out-of-cell interview with Mr. Melendez prior to making any recommendation as to his CM status and that these statements be recorded; that Mr. Melendez be afforded the opportunity to review and challenge the Behavioral Risk Assessments considered by the ICT; that Mr. Melendez be afforded the opportunity to attend the ICT hearings and speak on his behalf; and that Defendant Hunter provide Mr. Melendez with a concrete plan for stepping down from CM to the general population that involves out-of-cell programming and lasts no more than 30 days.

311.   Mr. Melendez seeks nominal, compensatory and punitive damages for his Count IV.C individual capacity claims against Defendants Hunter and Tomlinson.

## COUNT IV.D

### 42 U.S.C. § 1983—FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

### Defendants Van Allen, Brown and Knott

312.   Mr. Melendez incorporates by reference the allegations contained in paragraphs 1-15, 23, 37, 70, and 90 above.

313.   Defendants Van Allen, Brown, and Knott are sued in Count IV.D in their individual capacities.

314.   Imposition of Close Management constitutes an atypical and significant deprivation in relation to the ordinary incidents of prison life.

315.   Defendants Van Allen, Brown, and Knott have deprived Mr. Melendez of his right to be free from solitary confinement without due process of law. Defendants Van Allen, Brown and Knott have barred Mr. Melendez from attending the ICT hearings at which decisions about extending his solitary confinement were made.

316.   Defendant Brown has placed Mr. Melendez on property restriction or "strip status" without affording Mr. Melendez notice and a chance to be heard, and without a sufficient evidentiary basis.

317.   These actions constitute unconstitutional practices that have deprived Mr. Melendez of his interest to be free from solitary confinement in Close Management, disciplinary confinement and other penalties without being afforded the minimum requirements of procedural due process, in violation of the Fourteenth Amendment to the United States Constitution.

318.   Mr. Melendez seeks nominal, compensatory and punitive damages for his Count IV.D individual capacity claims against Defendants Van Allen, Brown, and Knott.

## COUNT V

## AMERICANS WITH DISABILITIES ACT

### State of Florida Department of Corrections

319.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–15, 27, 30, 36, 40–41, 43, 47–54, 58–60, 72, 93–99, 106–10, 115, 117, 119, and 125 above.

320.    Mr. Melendez is qualified as an individual with disabilities as defined by the Americans with Disabilities Act. Mr. Melendez has physical and mental impairments that substantially limit one or more major life activities, and he has records of his impairments.

321.    As such, Mr. Melendez is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in the Department's custody within the meaning of Title II of the ADA.

322.    The Department is a public entity as defined under 42 U.S.C. § 12131(1)(A), and it has an affirmative duty to create and implement practices and policies to prevent discrimination on the basis of disability.

323.    The Department has violated the ADA by failing to ensure that Mr. Melendez has access to, is permitted to participate in, and is not denied the benefits of, programs, services, and activities provided by the Department.

324.    The Department has violated the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

325.    The Department has discriminated and continues to discriminate against Mr. Melendez by administering programs and services in a way that denies him the opportunity to receive them in the most integrated setting appropriate to his needs.

326.    The Department has discriminated against Mr. Melendez by denying him access to his assistive device for mobility, specifically his walker, while in isolation.

327.    As a result of the Department's practices and policies, Mr. Melendez has been unnecessarily placed and indefinitely held in isolation because of his mental health disabilities. The Department has punished him for engaging in self-harm during psychiatric crises by issuing disciplinary charges, classifying him to Close Management, and extending his Close Management. Mr. Melendez has been denied equal access to activities, programs and services for which he is otherwise qualified, and he has been denied the opportunity to receive services in the most integrated setting appropriate to his needs.

328.    As a direct and proximate result of the Department's acts and failures to act, Mr. Melendez has suffered and continues to suffer harm as a result of the violations of his rights under the ADA.

329.    Mr. Melendez has no adequate remedy at law to redress the wrongs suffered by him as set forth in this complaint. Mr. Melendez has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, failures to act, practices and policies of the Department, unless enjoined by this Court. These practices and policies are the direct cause of the violations of the ADA.

330.    Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count V claims against the Department. Specifically, Mr. Melendez seeks an order requiring he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Mr. Melendez further seeks an order barring the Department from imposing upon him any form of isolation lasting more than 72 hours. Alternatively, Mr. Melendez seeks an order including but not limited to requiring the Department to provide Mr. Melendez a minimum of one hour of exercise per day outside of his cell, five days per week, consistent with ACA standards for restrictive housing prisoners; showers three days a week; access to his radio and tablet; weekly phone access; contact visitation; congregate religious services; and restoration of his walker. Mr. Melendez also seeks an order barring the Department from placing Mr. Melendez on property restriction or

"strip status" and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells. Finally, Mr. Melendez seeks an order requiring that any disciplinary charging decisions and any decisions as to his CM classification status be first referred to a mental health professional for assessment as to the likely impact of disciplinary sanction or CM classification upon his mental health and wellbeing.

331.    Mr. Melendez seeks nominal and compensatory damages as a remedy for his Count V claims against the Department.

## COUNT VI

## REHABILITATION ACT OF 1973

### State of Florida Department of Corrections

332.    Mr. Melendez incorporates by reference the allegations contained in paragraphs 1–15, 27, 30, 36, 40–41, 43, 47–54, 58–60, 72, 93–99, 106–10, 115, 117, 119, 125 above.

333.    Mr. Melendez is qualified as an individual with disabilities as defined in Section 504 of the Rehabilitation Act of 1973.

334.    As such, Mr. Melendez is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in the Department's custody within the meaning of Section 504 of the Rehabilitation Act.

335.   The Department receives federal financial assistance within the meaning of the Rehabilitation Act.

336.   The Department excludes Mr. Melendez from participating in, and denies him the benefits of programs or activities, because of his disabilities.

337.   The Department has discriminated and continues to discriminate against Mr. Melendez by administering programs and services in a way that denies him the opportunity to receive them in the most integrated setting appropriate to his needs.

338.   The Department uses criteria or methods of administration that intentionally or in effect discriminate on the basis of disability, and defeat or substantially impair accomplishment of the objectives of the Department's programs or activities with respect to disabled persons.

339.   The Department violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate Mr. Melendez's disabilities in its facilities and through its programs, activities, and services.

340.   The Department has discriminated against Mr. Melendez by denying him access to his assistive device for mobility, specifically his walker, while in isolation.

341.   Because of the Department's discrimination and failure to provide reasonable accommodations, Mr. Melendez does not have equal access to the

Department's activities, programs, and services for which he is otherwise qualified.

342.   As a result of the Department's practices and policies, Mr. Melendez has been unnecessarily placed and indefinitely held in isolation because of his mental health disabilities. The Department has punished him for engaging in self-harm during psychiatric crises by issuing disciplinary charges, classifying him to Close Management, and extending his Close Management. Mr. Melendez has been denied equal access to activities, programs and services for which he is otherwise qualified, and he has been denied the opportunity to receive services in the most integrated setting appropriate to his needs.

343.   As a direct and proximate result of the Department's practices and policies, Mr. Melendez has suffered, is suffering and will continue to suffer from harm and the violation of his rights provided by Section 504 of the Rehabilitation Act.

344.   Mr. Melendez has no adequate remedy at law to redress the wrongs suffered by him as set forth in this complaint. Mr. Melendez has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, failures to act, practices and policies of the Department, unless enjoined by this Court. These practices and policies are the direct cause of the violations of Section 504 of the Rehabilitation Act.

345. Accordingly, Mr. Melendez seeks injunctive relief as a remedy for his Count VI claims against the Department. Specifically, Mr. Melendez seeks an order requiring he be removed from Close Management and transferred to an appropriate facility for inpatient mental health care. Mr. Melendez further seeks an order barring the Department from imposing upon him any form of isolation lasting more than 72 hours. Alternatively, Mr. Melendez seeks an order including but not limited to requiring the Department to provide Mr. Melendez a minimum of one hour of exercise per day outside of his cell, five days per week, consistent with ACA standards for restrictive housing prisoners; showers three days a week; access to his radio and tablet; weekly phone access; contact visitation; congregate religious services; and restoration of his walker. Mr. Melendez also seeks an order barring the Department from placing Mr. Melendez on property restriction or "strip status" and from imposing sanctions on him for minor rule infractions including talking to prisoners in neighboring cells. Finally, Mr. Melendez seeks an order requiring that any disciplinary charging decisions and any decisions as to his CM classification status be first referred to a mental health professional for assessment as to the likely impact of disciplinary sanction or CM classification upon his mental health and wellbeing.

346. Mr. Melendez seeks nominal and compensatory damages as a remedy for his Count VI claims against the Department.

## DEMAND FOR ATTORNEY'S FEES AND COSTS

Pursuant to 42 U.S.C. § 1988, Melendez is entitled to recover from the defendants all of his attorneys' fees, costs, and litigation expenses incurred in connection with this action.

## DEMAND FOR JURY TRIAL

Mr. Melendez demands a trial by jury on all issues so triable.

WHEREFORE, Mr. Melendez respectfully requests that this Court:

a.      award Mr. Melendez damages, including nominal, compensatory, and punitive;

b.      declare that the conditions, acts, failures to act, practices and policies of the defendants and their agents, officials and employees violate the rights of Mr. Melendez under the First, Eighth and Fourteenth Amendments, the ADA and the Rehabilitation Act;

c.      permanently enjoin the defendants, their agents, officials and employees and all persons acting under color of state law from continuing its unlawful acts, failures to act, conditions, practices and policies against Mr. Melendez;

d.      order the equitable relief described above, and any other equitable relief as the Court may deem just and proper;

105

e.     award Mr. Melendez his reasonable attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:    *Lee D. Wedekind, III*

Lee D. Wedekind, III
Florida Bar Number 670588
Kelly Dunn Waters
Florida Bar Number 105871
50 North Laura Street, Suite 4100
Jacksonville, FL 32202
(904) 665-3652 (direct)
(904) 665-3699 (fax)
lee.wedekind@nelsonmullins.com
kelly.waters@nelsonmullins.com
allison.abbott@nelsonmullins.com

*- and -*

By:    *Maggie E. Filler*

Maggie E. Filler (pro hac vice)
Roderick and Solange MacArthur
Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, Illinois 60611
(312) 503-0899 (direct)
(312) 503-0891 (fax)
maggie.filler@macarthurjustice.org

Attorneys and Trial Counsel for William H. Melendez

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on July 12, 2021.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Len T. Hackett, Esq.
Greg Henderson, Esq.
Vernis & Bowling of
North Florida, P.A.
4309 Salisbury Road
Jacksonville, FL 32216
lhackett@florida-law.com
ghenderson@florida-law.com
*Attorneys for Defendants Florida Department of Corrections; Marks S. Inch; Barry Reddish; Erich Hummel; John Palmer; Classifications Officer P. Hunter; Ronnie Woodall; Kevin Tomlinson*

Mark G. Alexander, Esq.
David E. Chauncey, Esq.
Alexander Degance Barnett P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
mark.alexander@adblegal.com
david.chauncey@adblegal.com
mailbox@adblegal.com
*Attorneys for Defendants Daniel Philbert; Billy Folsom; Robert Brown; Charles Nosbisch; Jamaal Chandler; Robert Atteberry; Terry Holm; Justin Moreland; Matthew Geiger; Terry Bryant; Agderemme Oliva; Eugene Williams; Adam Gwara; Michael Van Allen*

Luke Newman, Esq.
Luke Newman, P.A.
908 Thomasville Road
Tallahassee, FL 32303
luke@lukenewmanlaw.com
*Attorneys for Defendant Jamaal Chandler*

/s/ Lee D. Wedekind, III
Attorney

4829-4912-4081