# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

WILLIAM H. MELENDEZ,

        Plaintiff,

v.                         Case No. 3:20-cv-01023-BJD-JBT

MARK S. INCH, Secretary of the
State of Florida Department of
Corrections; *et al.*,

        Defendants.

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Rules 3.01 and 6.02, Plaintiff William Melendez respectfully moves this Court for a preliminary injunction directing defendants Secretary Mark Inch, Regional Director John Palmer, Warden Donald Davis, Assistant Warden Jeffrey McClellan, and the Florida Department of Corrections (FDC) to remove plaintiff William Melendez from Close Management at Florida State Prison and to transfer Mr. Melendez to a mental health unit to address the serious psychological effects of his mental illness.

1.    Plaintiff's Second Amended Complaint [D.E. 134], alleges that Mr. Melendez has been subject to continuous solitary confinement since August 24, 2016, except for a brief four-month period. Plaintiff alleges that defendants' conduct constitutes cruel and unusual punishment, violates his constitutional right to Procedural Due Process, and discriminates on the basis of his disability of

mental illness. As relevant to this Emergency Motion, he seeks injunctive relief against Defendants Inch, Palmer, Davis, McClellan, and FDC.

2.      Plaintiff brings this Emergency Motion for a Preliminary Injunction on an emergency basis because Mr. Melendez is in existential crisis, having recently made multiple attempts to kill himself, and needs immediate inpatient psychiatric treatment. He has suffered serious self-injury at least four times within the past six weeks. A mental health expert evaluated Mr. Melendez on September 15, 2021, and determined that he was at an extremely high risk of suicide and that he requires prompt transfer to an inpatient treatment unit.  Accordingly, a ruling is requested by October 8, 2021.

3.      Plaintiff satisfies the four-part test for issuing a preliminary injunction. Plaintiff's claims—that the conditions of his confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment, that FDC is discriminating against him on account of his disability, and that his Close Management violates due process—are likely to succeed. If a preliminary injunction is not granted, Plaintiff will suffer immediate and irreparable harm; each day that he remains on Close Management and does not receive adequate mental health treatment, he faces a substantial and increasing risk of serious injury due to his worsening mental illness and suicidality. The balance of harms strongly favors entry of the requested injunction. Defendants have appropriate mental health treatment units where they could transfer Mr. Melendez, and he poses no serious risk to the staff or institution. Finally, it is in the public interest for

defendants to respect prisoners' constitutional rights and to rehabilitate them, or at least provide for their basic human needs required to survive. The bar is extraordinarily low.

6.     Through the undersigned counsel, Plaintiff has provided notice of the filing of this Emergency Motion for Preliminary Injunction to counsel for defendants. All documents filed with this Court in support of this motion, including declarations and the memorandum of law, are being served electronically on defense counsel within moments of filing.

7.     Plaintiff is also requesting an evidentiary hearing.

<u>**MEMORANDUM OF LAW**</u>

Plaintiff William H. Melendez is a 62-year-old man suffering from serious mental illness who is at imminent risk of injury and death due to the conditions of his confinement at Florida State Prison (FSP). In the past six weeks, he has made at least four serious attempts on his life, including by inserting nails into his arms and wrists and ingesting sharpened pieces of metal.

Mr. Melendez is likely to succeed on his claims that the conditions of his confinement violate his Eighth Amendment right to be free from cruel and unusual punishment [D.E. 134, Counts II.A & II.B], his right to due process of law [D.E. 134, Counts IV.A & IV.B], and his right to be free from discrimination on the basis of his disability [D.E. 134, Counts V &VI].  He has already endured serious bodily injury, and he faces a substantial risk of further injury and ultimately, death, absent court intervention. As will be explained, a preliminary injunction requiring

defendants Secretary Mark Inch, Regional Director John Palmer, Warden Donald Davis, Assistant Warden Jeffrey McClellan, and the Florida Department of Corrections (FDC) to remove Mr. Melendez from Close Management at FSP and to transfer Mr. Melendez to a mental health unit or other alternative housing is needed to protect him from further harm.

## I.    FACTS

Mr. Melendez entered FDC custody on October 26, 2011. Answer by Defendants Mark S. Inch, *et al.* ("Answer") [D.E. 161 ¶ 30]. He is due to be released on June 19, 2024.[1] He is 62 years old and suffers from serious mental illness—█ █████████████████████████████████████—that has worsened with solitary confinement. Expert Report of Terry A. Kupers, M.D. ("Kupers Report"), Exh. 1 at 20. He has repeatedly attempted suicide and engaged in extreme self-mutilation in FDC custody. Declaration of William H. Melendez ("Melendez Decl."), Exh. 2 ¶¶ 2, 8, 9, 10, 23, 30, 34, 39; Answer ¶ 3.[2] Mr. Melendez has been on Close Management (CM) in solitary confinement conditions at FSP for most of the past five years, and he remains there today. Melendez Decl. ¶¶ 5–6, 13; Answer ¶ 30.

---

[1]    Corrections    Offender    Network,    Inmate    Population    Detail    at http://www.dc.state.fl.us/OffenderSearch (last accessed September 20, 2021).

[2]    *See also* Plaintiff's Selected FDC Medical Records ("Medical Records"), Exh. 3 at 1-7 ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████; July 17, 2018 Incident Report ("Incident Report"), Exh. 4 (documenting self-mutilation on July 17, 2018 when Mr. Melendez used a staple or small piece of metal to cut his arm); Plaintiff's Selected FDC Classification & Disciplinary Records ("Class. & Disc. Records"), Exh. 6 at 1 (citing recent suicide attempts and self-injury incidents as of September 9, 2020).

### A.    Mr. Melendez's Consignment to Close Management

On August 24, 2016, officers at the Blackwater River Correctional Facility confined Mr. Melendez to a shower stall for six hours while he was in a psychiatric crisis. Melendez Decl. ¶ 2. Mr. Melendez attempted suicide by tying a tourniquet around his arm to restrict the blood flow, then inserting a piece of metal into a vein. *Id.* When officers arrived, they sprayed him with chemical agent. *Id.* Mr. Melendez untied the tourniquet around his arm, and his blood sprayed into the air, some of which landed on the officers. *Id.*

Mr. Melendez was charged with assault for bleeding on the officers and, instead of being referred to a mental health unit for treatment, was sent to solitary confinement and consigned to Close Management I (CM I) at FSP. *Id.* ¶¶ 3, 5. FDC retained Mr. Melendez on CM I status for nearly three years, until June 17, 2019, when he was reclassified to CM II status. *Id.* ¶ 6. Mr. Melendez was later reclassified to CM III status and moved to New River Correctional Facility (New River). *Id.* ¶ 7. He completed CM III status on March 23, 2020. *Id.*; Class. & Disc. Records at 26.

Mr. Melendez was in general population at New River for only a short period when, in July 2020, he was placed in administrative segregation, another form of solitary confinement. *Id.* ¶ 8. On July 26, 2020, he experienced a psychiatric crisis and inserted metal into his arm, requiring transport to an outside hospital for removal. *Id.* ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████. He reopened the wound the next day, soaking his cell in blood, and requiring return to the outside hospital for treatment. Melendez Decl. ¶ 9. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Upon his return to New River, Mr. Melendez was again placed in solitary confinement. Melendez Decl. ¶ 10. He again inserted metal into a vein in his arm using wire from his facemask, causing a significant amount of blood loss. *Id.* After finally removing Mr. Melendez from his cell and taking him to the medical unit, officers forcefully threw Mr. Melendez onto a medical cot and punched him about the face repeatedly. *Id.* Photographs of Mr. Melendez's bloodied face and cell following this incident are included at pages 20 and 21 of Exhibit 5, Selected Office of the Inspector General Reports ("OIG Reports"). ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ A prison doctor had to remove the wire from his arm. Melendez Decl. ¶ 11.

Despite Mr. Melendez's obvious need for inpatient mental health treatment, he was again placed in solitary confinement. *Id.* Officers alleged that Mr. Melendez

had "disobeyed orders" and "assaulted staff" while he was experiencing the psychiatric crisis on July 26 and 28. *Id.*; Class. & Disc. Records at 37–38,40–41, 43–44, 46–47. Mr. Melendez was found guilty on all four disciplinary tickets, placed in solitary confinement and, on August 21, 2020, referred to CM I. Melendez Decl. ¶ 11; Class. & Disc. Records at 25, 36, 39, 42, 45.

Mr. Melendez challenged the disciplinary charges, explaining that he was not presented with the evidence against him, that he was cut off in the middle of reading his statement, and that had video footage been reviewed, it would have proved that the officers' versions of events was a lie. Melendez Decl. ¶ 13; Class. & Disc. Records at 7–17. The disciplinary charges were overturned based on his complaints. Melendez Decl. ¶ 13; Class. & Disc. Records at 31–34.

The consequences of CM classification are more lasting than disciplinary sanctions. *See* Answer ¶ 33 (admitting there is no limit to how long someone can stay on CM status); Exh. 6 at 36, 39, 42, 45 (sanctioning Mr. Melendez with 156 days total for the four disciplinary charges). Yet prison officials referred Mr. Melendez to CM based on the same allegations that Mr. Melendez had assaulted an officer, and they discounted or ignored the fact that Mr. Melendez had successfully fought to have the disciplinary charges overturned. Class. & Disc. Records at 30, 35.

The July 2020 charges were clearly connected to Mr. Melendez's mental illness. Melendez Decl. ¶ 13; OIG Reports at 7–8. Officer Eugene Williams, the officer whom Mr. Melendez allegedly assaulted on July 28, 2020, stated that he

was in the medical clinic emergency room with Mr. Melendez "due to him inflicting injuries to himself while inside of his cell," and that a nurse "instructed [Officer Williams] to utilize a provided ammonia stick to keep inmate Melendez awake." OIG Reports at 7–8. Officer Williams said that Mr. Melendez then "woke up" and screamed at him while grabbing him by the throat. *Id.* at 8. After which, Mr. Melendez "remained in self-harm observation status in confinement pending disposition of mental health status evaluation and treatment as appropriate." *Id.* During the July 26, 2020 incident, Mr. Melendez repeatedly tried to declare a psychological emergency. *Id.* at 40, 53. Mr. Melendez was classified to CM I nonetheless. Melendez Decl. ¶ 13; Class. & Disc. Records at 25, 30.

In January 2021, Mr. Melendez was transferred back to FSP. Melendez Decl. ¶ 13. He was retained in CM I at his last Institutional Classification Team (ICT) hearing in April 2021, and he will not have another ICT hearing until October 2021. *Id.* He has been in solitary confinement continuously since July 26, 2020, and for 1,732 days out of the past 1,857 days (95% of the last five years). *See id.* ¶¶ 5–7, 13.

FDC policy requires reviewing CM I prisoners weekly for the first 60 days of CM I status and thereafter monthly to "reduce the inmate's status to the lowest management level possible or return the inmate to the general population as soon as . . . this can be done safely." Fla. Admin. Code R. 33-601.800(16)(a). Mr. Melendez has no knowledge of these weekly or monthly reviews. Melendez Decl. ¶ 6. FDC policy also requires that classification officers interview CM prisoners before making recommendations to the ICT for six-month CM reviews, Fla. Admin.

Code R. 33-601.800(16)(c), but Mr. Melendez does not recall any such interviews. Melendez Decl. ¶ 6. In practice, classification officers make recommendations based solely on his disciplinary history, without interviewing Mr. Melendez and without considering his suffering in CM and whether he could be safely transferred to a less restrictive environment. *Id.*

The ICT is supposed to "consider the results of Behavioral Risk Assessments, mental health evaluations, and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security." Answer ¶ 35. "For an inmate to remain in CM, the ICT must justify the safety and security issues or circumstances that can *only* be met by maintaining the inmate at the current level or modifying the inmate to another level of CM." Fla. Admin. Code R. 33-601.800(16)(d) (emphasis added). In Mr. Melendez's case, the ICT rubberstamps the classification officers' decision without considering housing alternatives. Melendez Decl. ¶ 6. Mr. Melendez is thus hopelessly trapped in a vicious cycle.

Mr. Melendez's CM status is particularly improper because the January 28, 2021 Behavioral Risk Assessment shows Mr. Melendez does not pose a high risk of violence or threat to security. Class. & Disc. Records at 2–4. To the contrary, the assessment found Mr. Melendez to have no history of predatory behavior, no history of possession of lethal contraband, no history of threat to safety of others, no history of homicidal behavior, no history of threat to institutional security, and no history of escape threat. *Id.* Similarly, security evaluations from December 15,

2020, and August 13, 2021, performed in connection with his gain time review, deemed Mr. Melendez "above satisfactory," and "satisfactory." *Id.* at 5, 6.

## B.   The Conditions of Mr. Melendez's Confinement

On CM I, Mr. Melendez is confined to a small cell and forbidden from talking with other prisoners. Melendez Decl. ¶ 14; Close Management Housing Unit Instructions, Exh. 7. The length of his cell is just a few steps across. Melendez Decl. ¶ 14. The only window to the outside world is covered by sheet metal with small holes, providing almost no view or sunlight. *Id.* The cell door is solid steel. *Id.* ¶ 20. The only furniture in his cell is a steel bed frame, a combination toilet and sink, and a property storage box. *Id.* ¶ 14. He has no table and no chair. *Id.* He has no reflective surface inside his cell, so he cannot look at himself. *Id.* His only property consists of a pillow, two blankets, books, a radio and headphones. *Id.* He can speak with family by phone no more than once a month. *Id.* ¶ 26. By policy, he is supposed to submit to a strip search anytime he leaves the building where he is housed. *Id.* ¶ 14. In practice, officers regularly require him to submit to a strip search anytime he leaves his cell. *Id.* Mr. Melendez is also only able to earn about two days of gain time off his sentence per month, whereas he was able to gain eight days per month in general population. *Id.* ¶ 40. These conditions are significantly more onerous and restrictive than those in general population. *Id.*

Before Mr. Melendez arrived at FSP, he used a walker as a mobility aid. *Id.* ¶ 15. A nurse confiscated the walker upon his arrival, saying that he would not be

needing it. *Id.* That proved accurate, because on CM I, corrections officers never take him out of his cell for recreation or exercise. *Id.* ¶¶ 15, 17.

Mr. Melendez asks to go out for recreation by holding up a small, handwritten sign that says "REC" to the window in the cell door. *Id.* ¶ 20. Officers either ignore him or come up with specious reasons for denying his recreation. *Id.* ¶ 16. For example, they have claimed that his fingernails were too long and out of compliance with FSP rules, even though Mr. Melendez does not have clippers to trim his fingernails. *Id.* Officers have also denied him recreation because he had a towel in the wrong place in his cell. *Id.*

Officers also routinely deny Mr. Melendez the ability to shower, even though the prison policy calls for showers at least three days a week. Melendez Decl. ¶¶ 18–19; Fla. Adm. Code R. 33-601.800(10)(e)(1). Mr. Melendez's only opportunity to leave his cell is a group "therapy" session that occurs four times a month for an hour at a time, and during which he is shackled hand and foot. Melendez Decl. ¶ 27. Deprived of opportunities for social interaction, he has engaged in obsessive behavior like counting the small holes in the sheet metal covering his window. (There are 13,450.) Kupers Report at 18.

Since Mr. Melendez's January transfer to FSP, he has been repeatedly subjected to strip status and unhygienic cells. On or about February 22, 2021, Mr. Melendez was punished with strip status for attempting to provide his lawyer's phone number to another prisoner. Melendez Decl. ¶ 24. He was left in a strip cell with no property, no mattress, sheets, or blankets, and was freezing cold. *Id.* He

was then put in a disciplinary confinement cell that leaked sewage from upper tier cells for more than a month, despite making numerous complaints. *Id.* ¶ 28.

Mr. Melendez recently spent multiple days on strip status and is presently in disciplinary confinement. *Id.* ¶¶ 36–37. His cell toilet leaked urine and feces for six days. *Id.* ¶ 36. He currently has a bed, sink, toilet, and nothing else in his cell. *Id.* ¶ 37. He recently received 135 days of disciplinary confinement for allegedly refusing to move to the back of his cell when receiving meal trays and breaking a sprinkler. *Id.*

### C.   Mr. Melendez's Pattern of Self-Injury and the Substantial Risk to His Health

Mr. Melendez is suffering from severe mental distress and physical injury due to his extended isolation and sensory deprivation. Melendez Decl. ¶¶ 23, 39; Kupers Report at 20–21. He is tearful, depressed, and suicidal. Kupers Report at 20. On August 15, 2021, Mr. Melendez inserted two nails into his left arm. Melendez Decl. ¶ 30. An x-ray confirmed the presence of the nails. *Id.* ¶ 32. Mr. Melendez was not taken to a suicide observation cell or transferred to a mental health unit. *Id.* He was instead left alone in his CM I cell for days with an open wound, and the nails still inside of his arm. *Id.*

On August 28, 2021, Mr. Melendez inserted another nail into a vein at his wrist. *Id.* ¶ 34. Upon intervention from Mr. Melendez's attorneys, he was finally transferred to an outside hospital for surgical removal of the three nails. *Id.* ¶ 35. Photographs of the still-open wounds from these injuries are included at Exh. 8.

On September 3, 2021, Mr. Melendez was returned to FSP and retained on CM I status, even though he remained actively suicidal. Melendez Decl. ¶ 36. Since then, Mr. Melendez has continued to engage in self-injury. He tore the stitches on the wound at his wrist and attempted to reopen a vein. *Id.* ¶ 39. When an unidentified person slipped a sharpened piece of metal under his cell door, Mr. Melendez broke it into pieces and swallowed them in full view of correctional officers, who ignored him. *Id.* Mr. Melendez reports experiencing disturbing hallucinations, including voices that command him to kill himself. Kupers Report at 14, 18.

Dr. Terry Kupers, an expert in correctional mental health care, evaluated Mr. Melendez on two separate occasions and conducted a record review. He concludes that ███████████████████████████████████████████████ ███████████ that he is at imminent risk of suicide due to intrusive thoughts of self-harm and death. *Id.* at 13–14, 20. Dr. Kupers met with Mr. Melendez on an emergency basis on September 15 and concluded that he was at an "extremely high risk of suicide" as of that date. *Id.* at 30–31. He found it intolerable that Mr. Melendez was returned to solitary confinement while actively suicidal, because "solitary confinement greatly increases the risk of suicide." *Id.* at 31.

According to Dr. Kupers, "Mr. Melendez needs to be released from solitary confinement and transferred to a carceral setting where the conditions of confinement are much less damaging to his mental health and where adequate mental health treatment is available." *Id.* at 29. Dr. Kupers urges immediately

13

transferring Mr. Melendez to either the Transitional Care Unit ("an inpatient unit for prisoners who need a higher level of mental health care than is available in a general population or solitary confinement unit"), or the Secure Treatment Unit ("a more recently developed setting at Wakulla Correctional facility, designed for prisoners with serious mental illness who need help transitioning out of solitary confinement"). *Id.* at 29–30.

### D.  Defendants' Repeated Failures to Remove Mr. Melendez from CM Status and Protect him from Harm

Defendants are aware of Mr. Melendez's mental illness, the conditions of his confinement, and his multiple recent suicide attempts. *See* Answer ¶ 3. Mr. Melendez filed this lawsuit nearly a year ago, alleging largely the same isolation conditions that he seeks relief from with this motion, and describing his mental health needs in detail. Complaint, D.E. 1 ¶¶ 2–5, 7–9, 26, 32–35, 55, 58–62.[3]

Secretary Inch is responsible for the overall management and operation of FDC, including protecting the constitutional and statutory rights of all people in FDC custody. Answer ¶ 16. He is responsible for the Department's policies and procedures, including those involving the use of solitary confinement. *Id.* Regional Director Palmer is responsible for the management and operation of the prisons in his region, including FSP. *Id.* ¶ 21. He is also responsible for implementing and enforcing FDC policies and procedures at prisons in his region, including FSP. *Id.* Warden Davis has been the warden at FSP since Mr. Melendez returned to that

---

[3] *See also* Am. Compl., D.E. 54 ¶¶ 2–5, 7–9, 28, 30–73, 57–61; 2d Am. Compl., D.E. 134 ¶¶ 2–5, 9–11, 32–58, 61–70, 93, 97, 106–10, 115, 119, 123–25.

facility January 14, 2021. *Id.* ¶ 17. Assistant Warden McClellan has been the assistant warden since Mr. Melendez first arrived at FSP in September 2016. *Id.* ¶ 18. Both defendants are responsible for the management and operation of FSP, including protecting the constitutional and statutory rights of all prisoners. *Id.* ¶¶ 17–18. Both are also responsible for implementing and enforcing FDC policies and procedures at FSP, including those involving imposition of solitary confinement. *Id.* Florida law requires that they personally inspect and tour the CM units at FSP weekly. *Id.*; Fla. Admin. Code R. 33-601.800(15)(a)(8).

Counsel for Mr. Melendez has repeatedly alerted these prison officials to Mr. Melendez's self-injury and suffering in solitary confinement, urging that they remove Mr. Melendez from CM and provide for delivery of inpatient psychiatric services. Declaration of Attorney Maggie E. Filler ("Filler Decl."), Exh. 9 (describing correspondence of July 18, 2018, August 4, 2020, February 11, 2021, April 12, 2021, August 27, 2021, September 8, 2021, September 16, 2021). Yet they have retained Mr. Melendez in isolation on Close Management status, with brief exception for transport to an outside hospital for emergent medical care related to his physical injuries. Melendez Decl. ¶¶ 35–36.

## II.   ARGUMENT

A party seeking a preliminary injunction must show: 1) it has a substantial likelihood of success on the merits, 2) that irreparable injury will result unless the court issues an injunction, 3) the threatened harm to the moving party outweighs damage the proposed injunction might cause the opposing party, and 4) the public

interest favors the issuance of an injunction. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Where "appropriate given the character and objectives of the injunctive proceeding," courts ruling on a preliminary injunction "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Int'l Trad., Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan American Grain Company*, 805 F.2d 23, 26 (1st Cir. 1986)). The evidence available, even at this early stage of the proceedings, supports issuing a preliminary injunction to remove Mr. Melendez from solitary confinement while this litigation proceeds.

### A. Mr. Melendez is likely to succeed on the merits of his claims.

#### 1. Mr. Melendez is likely to succeed on his Eighth Amendment conditions of confinement claims (Counts II.A and II.B).

The Eighth Amendment prohibits cruel and unusual punishment and requires that prison officials ensure that prisoners are held in "humane" conditions. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has created a two-part inquiry to determine whether there has been a violation of the Eighth Amendment. First, the "objective component" asks whether the conditions to which a prisoner has been subjected are sufficiently serious—whether that condition "'pose[s] an unreasonable risk of serious damage to his future health" or safety, *Helling v. McKinney*, 509 U.S. 25, 30, 35 (1993), or denies "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834; *see also Chandler*

*v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The second part asks whether the prison official has been subjectively culpable, showing "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). To show deliberate indifference, a prisoner must demonstrate that the prison officials acted with a culpable state of mind; that official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. A court may infer deliberate indifference when the risk of harm is obvious. *Id.* at 842.

"[T]o be an effective penological tool, solitary confinement should be used sparingly, as a measure of last resort to induce compliance with prison regulations, and . . . reserved for recalcitrant, incorrigible inmates, [where] there is an institutional need to preserve order and prevent chaos." *Hall v. Palmer*, 15-cv-824, 2017 WL 4764345, at *13 (M.D. Fla. Oct. 20, 2017). Mr. Melendez alleges that defendants Inch, Palmer, Davis, and McClellan have done the opposite, "subject[ing] [him] to a substantial risk of serious harm and depriv[ing] him of the minimal civilized measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions," for no valid penological purpose. [D.E. 134, ¶¶ 167, 182]. He will likely succeed on his claims that this conduct violates his Eighth Amendment rights.

> i.  *Mr. Melendez's perpetual state of solitary confinement has deprived him of basic human necessities and poses an unreasonable risk of serious damage to his health.*

"[M]ental health needs are no less serious than physical needs," for Eighth Amendment purposes. *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (quoting *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004)). Mr. Melendez's long-term isolation has resulted in severe psychological harm. Kupers Report at 23–24, 38. At this point, treating Mr. Melendez's mental illness requires transferring him out of solitary confinement. *Id.* at 29–30.

Mr. Melendez attests to his mental suffering, including his history of self-injury and attempted suicide. Melendez Decl. ¶¶ 2, 8, 9, 10, 23, 30, 34, 39. Dr. Kupers confirms that Mr. Melendez is at extremely high risk for suicide. Kupers Report at 14, 20. He found Mr. Melendez to suffer from depression, hallucination, and obsessive thoughts. *Id.* at 18. Mr. Melendez has multiple recent suicide attempts and persistent, present suicidal ideation. *Id.* at 20, 30–31. His mental illness, already present in 2016, has worsened since he was placed in solitary confinement. *Id.* at 21, 28. Prior to being placed on CM I, Mr. Melendez was not so severely depressed, nor did he have constant auditory hallucinations; he also did not experience paranoia or severe loss of sleep. *Id.* at 28. Given these findings, Mr. Melendez's urgent need to be removed from solitary confinement conditions and placed in a facility for inpatient psychiatric care constitutes an objectively serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

Conditions in solitary confinement are also subject to Eighth Amendment scrutiny. *Sheley v. Dugger*, 833 F.2d 1420, 1428–29 (11th Cir. 1987). A district court must consider whether the plaintiff has adequate food, clothing, and

sanitation along with how long they have been isolated to determine whether the confinement meets constitutional standards. *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978)). Courts must also consider the reason for which a prisoner is being subjected to punishment, including whether it is "totally without penological justification." *Rhodes*, 452 U.S. at 346.

Mr. Melendez has been subjected to extreme conditions of confinement that have denied him the basic necessities of human contact and social interaction, outdoor recreation and exercise, basic sanitation, and warmth. *See G.H. by & through Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1116 (N.D. Fla. 2019) ("Courts have recognized exercise, social interaction, environmental stimulation, and sanitation as basic human needs.").

Human contact and social interaction are basic human needs protected by the Eighth Amendment. *See id.* (allegations of deprivation of human needs like social interaction state an Eighth Amendment claim); *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1239 (N.D. Fla. 2019) (same); *Hall*, 2017 WL 4764345 at *14 (severe restriction of human contact suggests risk of serious harm). The damaging effects of prolonged isolation and lack of social interaction are severe. *See U.S. v. Noriega*, 40 F. Supp. 2d 1378, 1379–80 (S.D. Fla. 1999) ("[H]e is denied in large part[] the company of others.  There is little question that this is a more difficult ('harder') type of confinement than in general population.").

Humans require some normal social interactions to function properly. Kupers Report at 8. Extreme long-term isolation leads to anxiety and nervousness,

troubled sleep, fear of impending nervous breakdowns, chronic depression, hallucinations, and suicidal ideation. *Id.* at 6. Mr. Melendez exhibits many of these symptoms, and they pose a serious risk to his health and safety. *Id.* at 15–19. Suicide is twice as prevalent in prison as in the community, and of all successful suicides, approximately fifty percent involve prisoners in some form of isolated confinement. *Id.* at 9. Given Mr. Melendez's history of suicidal ideation and attempted suicide, the continued lack of social interaction and human contact put him at elevated risk for suicide. *Id.* at 20.

Mr. Melendez has also been denied the basic human need of exercise and recreation, as he has been confined to his cell except for infrequent showers and medical care since July 26, 2020. Melendez Decl. ¶¶ 15–19. Courts recognize that deprivation of all outdoor exercise for an extended period without an especially strong security or safety basis is constitutionally suspect. *See, e.g.*, *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979). Because exercise constitutes one of the basic human needs protected by the Eighth Amendment, *Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991), total denial of outdoor recreation or exercise violates constitutional standards. *See Julmice v. Florida Dep't of Corrections*, No. 08-22243-CIV-SEITZ, 2008 WL 11331754, at *2 (S.D. Fla. Sept. 3, 2008) (keeping a prisoner in twenty-four-hour lockdown may violate the Eighth Amendment).

The conditions of Mr. Melendez's confinement are even more severe than contemplated by prison regulations. Mr. Melendez has been unable to participate in outdoor recreation for over a year. Melendez Decl. ¶¶ 15–17. Florida regulations

purport to provide individuals on CM a minimum six hours per week of outdoor exercise, and further restriction of exercise is only permitted if a prisoner has been found guilty of or has a disciplinary hearing pending for a major rule violation. Fla. Admin. Code R. 33-601.800(10)(m).[4] Even then, prisoners cannot have their exercise restricted for longer than fifteen days per incident. *Id.* at R. 33-601.800(10)(m). The Eleventh Circuit has approved denying outdoor recreation to prisoners who stabbed an officer and attempted to escape during recreation, and who therefore posed a legitimate "threat to the safety and security of the prison." *Bass v. Perrin,* 170 F.3d 1312, 1317 (11th Cir. 1999). By contrast, correctional staff have determined that Mr. Melendez's potential risk is only "mild." Class. & Disc. Records at 4 (scoring Mr. Melendez 6 on a scale of 1-60, with >60 being "very severe" risk, and 1–14 being "mild" risk); *see also id.* at 5–6. Defendants' denial of Mr. Melendez's outdoor exercise for over a year, in contravention of state regulations and despite the lack of security risk, is a senseless deprivation of a basic human need. "[W]hen solitary confinement conditions become so severe, the value as a viable prisoner disciplinary tool diminishes and the confinement becomes cruel and unusual punishment." *Hall*, 2017 WL 4764345 at *13.

This circuit also recognizes an Eighth Amendment right to basic sanitation, which includes the right not to be denied the elements of hygiene. *See, e.g.*, *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015). According to FDC policy, CM

---

[4] Major rule violations include assault, battery, threats, rioting, possession or trafficking of weapons or other contraband, and escape.  *Id.* at R. 33-601.800(1)(j).

prisoners should be able to shower three times a week, Fla. Admin. Code R. 33-601.800(10)(e)(1), but officers routinely deny Mr. Melendez this opportunity, including recently for weeks at a time. Melendez Decl. ¶¶ 18, 19. Because Mr. Melendez was forced to go without showering, he developed sores on his legs leading to a staph infection. *Id.* ¶ 18. He was also forced to live for over a month in a cell in which sewage leaked from the ceiling into his cell and pooled near the toilet, and chunks of cement fell onto his bed. *Id.* ¶ 28. The toilet in his recent confinement cell leaked urine and feces for days.  *Id.* ¶ 36.

Mr. Melendez suffers the further indignity of being placed on "strip status" as punishment, during which he is left naked except for his boxer shorts in a cold cell without blankets, sheets, or a mattress. *Id.* ¶¶ 24, 36. These deprivations deny Mr. Melendez the basic human need for warmth. *See Wilson*, 501 U.S. at 304 (describing warmth as a basic human need and citing "low cell temperature at night combined with a failure to issue blankets" as an example of a situation that would fail to satisfy that need); *Saunders v. Sheriff of Brevard Cnty.*, 735 F. App'x 559, 571 (11th Cir. 2018) (same).

Mr. Melendez's solitary confinement is also "arbitrary and 'without penological justification.'" *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018). His current CM classification occurred following a psychological emergency and suicide attempt. Melendez Decl. ¶¶ 8–13; OIG Report at 7–8, 40, 53. Furthermore, the disciplinary tickets that led to Mr. Melendez's post-suicide-attempt CM referral have been overturned. Melendez Decl. ¶ 13; Class. & Disc.

Records at 31–34. Correctional staff recognize that he does not pose a serious risk to security.  Class. & Disc. Records at 4; *see also id.* at 5–6. FDC has alternative housing where Mr. Melendez can receive treatment for his mental illness. Kupers Report at 29–30. Continuing to hold Mr. Melendez in solitary confinement, which has exacerbated his mental illness, rather than transferring him to an appropriate mental health treatment unit, does not serve a legitimate penological purpose.

For these reasons, Mr. Melendez is likely to prevail on the objective prong of his Eighth Amendment conditions of confinement claim.

> ii.    *Prison officials are deliberately indifferent to the severe risk to Mr. Melendez's health.*

Mr. Melendez is also likely to prevail on the second part of his conditions of confinement claim, as defendant prison officials have repeatedly demonstrated deliberate indifference to Mr. Melendez's suffering. The subjective component requires defendants' "subjective knowledge of the risk of serious harm," and failure to "respond reasonably to this risk." *Bennet v. Chitwood*, 519 Fed. App'x 569, 573 (11th Cir. 2013) (citing *Farmer*, 511 U.S. at 837).

Defendants are aware of the risk of serious harm to Mr. Melendez because of his extended isolation and his history of self-harm and self-mutilation. The risks of extended time in solitary confinement are so obvious that Secretary Inch, Regional Director Palmer, Warden Davis and Assistant Warden McClellan cannot claim to be unaware of them. *See, e.g., Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring) ("The human toll wrought by extended terms of isolation long has been understood ... One hundred and twenty-five years ago, this Court

recognized that, even for prisoners sentenced to death, solitary confinement bears 'a further terror and peculiar mark of infamy.'") (quoting *In re Medley*, 134 U.S. 160, 170 (1890)); *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 680 (M.D. La. 2007) ("Any person in the United States who reads or watches television should be aware that lack of adequate exercise, sleep, social isolation, and lack of environmental stimulation are seriously detrimental to a human being's physical and mental health."). Warden Davis and Assistant Warden McClellan are in the solitary confinement units regularly conducting rounds and observing conditions, *see* Answer ¶¶ 17, 18, and Mr. Melendez has an extensive history of filing grievances and complaints seeking help. Kupers Report at 17–18.

Defendants have also long been aware of the ongoing harm to Mr. Melendez, because of Mr. Melendez's ongoing efforts to remediate his condition via litigation, and the repeated notice from his counsel. *See* Filler Decl. ¶¶ 2–9. Counsel for Mr. Melendez wrote to the former FSP Warden, Barry Reddish, on July 18, 2018, notifying him that "Mr. Melendez ha[d] been in close management since September 2016," "reports spending 24 hours a day in his cell," and that "his mental health ha[d] deteriorated substantially." Filler Decl. ¶ 2, Att. A. Counsel reported that Mr. Melendez had a psychological crisis in solitary confinement on or about July 16, 2018, that officers refused to take him to the medical unit, and that Mr. Melendez then punctured a vein in his arm with a foreign object. *Id.*; *see also* Incident Report (documenting this incident of self-harm). Assistant Warden McClellan acknowledged receipt of this letter. Filler Decl. ¶ 3, Att. B.

By letter dated August 4, 2020, counsel notified Regional Director Palmer of Mr. Melendez's July 28, 2020 self-injury, the subsequent assault Mr. Melendez suffered in the medical unit, Mr. Melendez's "multiple instances of self-mutilation" in isolation, and his need for an intensive psychiatric care facility. *Id.* ¶ 4, Att. C. The correspondence specifically requested that Regional Director Palmer ensure Mr. Melendez not be punished or placed in isolation for these events. *Id.* Since Mr. Melendez's return to FSP and his recent self-injury, counsel has continued to notify defendants of the danger to Mr. Melendez. *Id.* ¶¶ 5–9. Additionally, Mr. Melendez recently required transport to an outside hospital for surgical removal of nails, which any responsible prison administrator can be expected to know. Melendez Decl. ¶ 35; Medical Records at 12, 15.

Despite this knowledge, Defendants have refused act to remove Mr. Melendez from solitary confinement. Assistant Warden McClellan chaired the ICT hearing directly following Mr. Melendez's July 2018 incident of self-harm, and he elected to continue Mr. Melendez in solitary confinement. Melendez Decl. ¶ 6. The defendants proceeded with Mr. Melendez's 2020 referral to CM, even after counsel explained the circumstances of the July 28 self-injury and the assault on Mr. Melendez to Regional Director Palmer. In light of this history, and Mr. Melendez's ongoing self-injury, the defendants' insistence on retaining Mr. Melendez is the definition of deliberate indifference.

For these reasons, Mr. Melendez is likely to prevail on his Eighth Amendment claims.

### 2. Mr. Melendez is Likely to Prevail on the Merits of his Disability Discrimination Claims.

Mr. Melendez should succeed on his disability discrimination claims as well. To prevail under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA), he will have to establish "(1) that he is a qualified individual with a disability, (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity, and (3) the exclusion, denial or benefit, or discrimination was by reason of [his] disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). "With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005).[5]

Mr. Melendez is likely to show that he is a qualified individual with a disability, defined as a "physical or mental impairment that substantially limits one or more of" an individual's "major life activities." 42 U.S.C. § 12102(1). Major life activities include the ability to take care of oneself and one's major bodily functions, including brain functions. 42 U.S.C. § 12102(2)(A), (B). ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[5] Defendants admit that FDC receives federal funding, so this exception does not apply. Answer ¶ 335.

███████████   His multiple suicide attempts show "that his mental illness substantially limits his ability to take care of himself." *G.H.*, 424 F. Supp.3d at 1119.

Mr. Melendez is also likely to demonstrate that he was discriminated against. On CM I, he is excluded from participating in educational programming, congregate religious services, congregate meals, and work opportunities. *See* Melendez Decl. ¶¶ 14, 27, 40; Answer ¶¶ 52–54; Fla. Admin. Code R. 33-601.800(10)(h), (i). This exclusion from prison programming, services, and benefits constitutes discrimination. *See G.H.*, 424 F. Supp. 3d at 1120 (complaint that alleged failure to adjust isolation and discipline rules to accommodate plaintiffs' disabilities, including by not placing kids with mental and emotional disabilities in isolation, stated ADA and RA claims).

Mr. Melendez will likely show the discrimination was on account of his disability, as well. The ADA "imposes a 'but-for' liability standard," meaning that disability was "a factor that made a difference in the outcome." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996). Unjustified isolation based on mental illness amounts to discrimination on account of disability. *Stiles v. Judd*, 12-cv-02375, 2013 WL 6185404, at *2 (M.D. Fla. Nov. 25, 2013) (estate of decedent who was kept in solitary confinement after attempting suicide stated claim that he was unjustly isolated due to his mental illness) (citing *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 587, 597 (1999)).

Mr. Melendez was in a psychiatric crisis when the events occurred that led to his CM classification: On July 26, 2020, he engaged in self-injury that required

outside hospital transportation to receive care for his wounds; he returned to the hospital on July 27, 2020, after harming himself again; then on July 28, 2020, he inserted wire into a vein in his arm. Melendez Decl. ¶¶ 8–11; ███████████████

████████ The conduct allegations that led to his CM referral were from this same period of July 26 and 28, 2020. Class. & Disc. Records at 30. The narrative of the July 28, 2020 incident that formed the basis of his placement on CM status reveals that Mr. Melendez was in the emergency room awaiting medical treatment for self-injury and was barely conscious at the time. OIG Reports at 7–8. And during the July 26, 2020 incident, he was attempting to declare a psychological emergency. *Id.* at 40, 53. Mr. Melendez's 2016 referral to CM was a result of his mental illness, as well; he was charged with assault for cutting himself during a psychiatric crisis, and then bleeding on responding officers. ████████████████████████ ███████████████████████████████████████████████ Class. & Disc. Records at 23 (reflecting 2016 CM classification for bleeding on officers).

Defendants also use minor infractions resulting from his mental illness as a reason to retain him on CM. *See G.H.*, 424 F. Supp. 3d at 1120 (finding that allegation that plaintiff was retained in solitary for behaviors related to his disability constituted claim of discrimination on account of disability). At his April 2021 CM review, the classification officer cited a February 23, 2021 disciplinary charge issued because Mr. Melendez purportedly "refused to walk from medical back to wing requiring escort chair" to justify continuing his isolation. Class. & Disc. Records at 27. ██████████████████████████

███████████████████████████████████

██████████████████████████████████████; *see*

*also* Filler Decl., Att. E at 2.[6] For these reasons, Mr. Melendez is likely to prove that his extended solitary confinement is due to his mental illness. Defendants isolated him and denied services to Mr. Melendez because of his disability; the conduct allegations that resulted in his placement on CM status were direct symptoms of his mental illness that occurred during mental health crises.

Additionally, Mr. Melendez is likely to succeed in showing defendants failed to reasonably accommodate his mental illness. *See Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 992 (11th Cir. 2015) ("[A]n ADA claim may proceed on the theory that the Defendant failed to reasonably accommodate the Plaintiffs' disability."). Whether a modification is reasonable is a fact-specific inquiry that depends on the circumstances of the case. *Bircoll*, 480 F.3d at 1085–86; *see also* 42 U.S.C. § 12111(9)(A) ("'reasonable accommodation' may include ... making existing facilities ... readily accessible to and usable by individuals with disabilities"). "[F]ailure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and the [entity] cannot show undue hardship." *Robinson v. RockTenn CP*, 986 F. Supp. 2d 1287, 1310 (N.D. Ala. 2013) (citing *Holly v. Clairson Industs.*, 492 F.3d 1247, 1262 (11th Cir. 2007)).

---

[6] The other two disciplinary reports cited in the April 2021 CM referral were minor charges for swearing at an officer (March 16, 2021) and for refusing an order to stop tampering with a sprinkler (March 29, 2021). Class. & Disc. Records at 27.

Transfer within FDC, to another unit that already exists to care for prisoners, does not pose an undue burden to defendants. *See Lonergan*, 623 F. App'x at 993–94 (rejecting argument that transfer to another prison is per se unreasonable under the ADA); *Wolfe v. Fla. Dep't of Corr.*, 2012 WL 4052334, at *5 (M.D. Fla. Sept. 14, 2012) (jury could find that "FDOC and its agents were deliberately indifferent to Plaintiff's need for a reasonable accommodation" by failing to transfer him to a housing area that provided better management of his asthma).

Despite the obvious effects of isolation on Mr. Melendez's mental illness, prison officials have failed to accommodate his disability by releasing him from CM or transferring him to a mental health unit. On this evidence, Mr. Melendez's disability discrimination claims will likely succeed.

### 3. Mr. Melendez is Likely to Prevail on the Merits of his Due Process Claims.

Mr. Melendez also brings official capacity procedural due process claims against defendants Inch, Palmer, Davis, and McClellan [Counts IV.A & IV.B] for his classification to CM and for the failure to provide meaningful periodic review of his isolation. Courts "examine procedural due process questions in two steps; the first asks whether there exists a liberty or property interest which has been interfered with by the State[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Davis v. Inch*, 17-cv-820, 2019 WL 1400465, at *11 (M.D. Fla. Mar. 28, 2019) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Mr. Melendez's likelihood

of success on his procedural due process claims is separate and independent grounds for granting an injunction to remove him from CM.

> ### i. *Mr. Melendez's consignment to CM constitutes an atypical and significant deprivation of his liberty.*

The right to due process attaches when a prisoner faces deprivation of a constitutionally protected liberty interest. *Davis*, 2019 WL 1400465, at *11. The Eleventh Circuit recognizes that a prisoner can be deprived of such an interest when "the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit 'imposes atypical and significant hardship in relation to the ordinary incidents of prison life.'" *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)).

Whether the isolation and restrictions that accompany CM status constitutes an "atypical and significant hardship" depends on considerations such as the length and conditions of confinement. *See Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004) (confining plaintiff to harsh segregation conditions, where he was locked in a small cell with minimal contact with others for more than 500 days, was atypical and significant); *Bass*, 170 F.3d at 1318 (holding that deprivation of yard time is enough hardship on a prisoner already in CM as to qualify as a constitutionally protected liberty interest). Courts also consider whether the deprivation of liberty impacts the length of incarceration. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (prisoner's disqualification from parole consideration contributed to atypical and significant nature of administrative segregation).

Mr. Melendez's confinement to CM is indefinite. He has been in constant isolation since July 26, 2020 (423 days), and on CM status since October 19, 2020 (338 days). The indefinite and extended nature of his confinement to CM support finding an atypical and significant deprivation.

Additionally, the conditions of Mr. Melendez's solitary confinement are extreme. He is restricted from speaking with other prisoners, unable to access the yard, unable to shower for long stretches, and required to submit to restraints and a strip search when he leaves his cell. Melendez Decl. ¶ 14–19; Fla. Admin. Code R. 33-601.800(14)(a). He has no access to congregate meals or congregate religious services, is restricted to one phone call a month, and cannot access a tablet to email family. *See* Melendez Decl. ¶¶ 14, 26, 27, 40. He cannot work on legal matters in the law library, work or go to school programs. *See id.* ¶¶ 14, 27, 40; Answer ¶¶ 53–54; Fla. Admin. Code R. 33-601.800(10)(i) & (13)(b) (restricting CM prisoners' access to the law library and jobs).

Mr. Melendez is also regularly deprived of the minimal property he retains in isolation. Melendez Decl. ¶¶ 14, 24, 36. Since returning from the hospital on September 3, 2021, he has had over eight days of strip status, without a mattress, pillow, blanket, warm clothes, or his property. *Id.* ¶ 36. These conditions are significantly more restrictive in every way imaginable than those in the general population in FDC. *See id.* ¶ 40. As such, Defendants are required to provide Mr. Melendez due process protections in imposing them.

ii.        *Mr. Melendez's CM Classification Violates Due Process*

When a liberty interest is at stake, prison officials imposing administrative segregation must provide a prisoner with notice of the charges, an opportunity to present his views, and an "informal, nonadversary evidentiary review" of the confinement's justification. *Quintanilla*, 730 F. App'x at 744 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). Once confinement begins, there must be "some sort of periodic review of the confinement." *Magluta*, 375 F.3d at 1279, n. 7 (quoting *Hewitt*, 459 U.S. at 477 n.9). Such review is required in order that "administrative segregation … not be used as a pretext for indefinite confinement." *Quintanilla*, 730 F. App'x at 744. Thus the periodic review "must be meaningful; it cannot be a sham or a pretext." *Id.* (quoting *Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012)). Reviewing officials must consider whether confinement in administrative segregation remains necessary given current facts and valid administrative justifications. *Id.*

Mr. Melendez was initially referred to CM on August 21, 2020, based on four disciplinary reports from July 26 and 28, 2020. Class. & Disc. Records at 25. The August 21 referral specifically referenced those reports, the most serious of which was an alleged battery on an officer "while in the emergency room awaiting medical treatment." *Id.* After Mr. Melendez successfully appealed all four disciplinary charges and had them overturned, he challenged his CM referral. *Id.* at 20–22. The CM referral was reissued September 29, 2020 without the disciplinary findings, but still relying on those same assault allegations. *Id.* at 30, 35. That prison officials

overturned the disciplinary charges against Mr. Melendez for this conduct but relied on the same alleged conduct to classify him to confinement in CM establishes a likelihood that Mr. Melendez will prove his due process rights were violated regarding the CM classification.

Mr. Melendez is also likely to show that he has not received meaningful periodic review of the ongoing necessity of his isolation. Florida regulations require that prison officials regularly review his CM status with the goal of returning him to the general population. Fla. Admin. Code R. 33-601.800(16)(a). These reviews are supposed to occur every week after the initial classification, and then monthly, with six-month hearings before the ICT. *Id.*; Answer ¶ 35. Mr. Melendez is unaware of weekly or monthly reviews of his segregation, which means that if they occur, he cannot participate to advocate for his release or to learn how to return to general population. Melendez Decl. ¶ 6. In practice, the classification officer cites the initial reason for confinement and any disciplinary reports since that time as the justification for retaining Mr. Melendez in confinement. Class. & Disc. Records at 27 (recommending retaining Mr. Melendez on CM I based on "severity of subject's actions of battery on staff and spoken threats to staff in conjunction with his continued disruptive behavior during the review period"). The classification officer does not consider other factors such as Mr. Melendez's self-injury and mental health that would tend to explain the disciplinary reports, and which suggest that a less restrictive environment would be more appropriate

for Mr. Melendez's security needs. For these reasons, Mr. Melendez is likely to prevail on his due process claims, as well.

### B.   Mr. Melendez will suffer further irreparable harm if the injunction is denied.

Irreparable harm exists where no amount of money can compensate for the harm incurred. *Cabral v. Olsten Corp.*, 843 F. Supp. 701, 703 (M.D. Fla. 1994) (citing *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)). The irreparable injury requirement for an injunction "can be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (citing *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005)). In this case, irreparable harm has already occurred, and is ongoing. Monetary damages could never adequately compensate Mr. Melendez for his mental anguish, for the bodily harm he has already suffered, and for the future harm he will experience if left in solitary confinement.

Dr. Kupers warns that Mr. Melendez is at extremely high risk of suicide and other serious injury due to his worsening mental illness. Kupers Report at 3, 20–21, 30–31. He found that Mr. Melendez's mental illness has been exacerbated by the extreme stress of solitary confinement and the deprivations he has endured, including his social isolation, lack of recreation, and lack of adequate mental health care. *Id.* at 21, 23–26. Since entering solitary confinement in 2016, Mr. Melendez's depression has worsened, his thoughts of suicide are more frequent, and he has auditory hallucinations regularly. *Id.* at 21. He is suffering a severe mental breakdown that is disabling and dangerous to his health. *Id.* at 23–24. He feels

intense despair and paranoia, and he continues to self-harm. *Id.* at 23–24, 30–31. He suffers persistent sleep deprivation, fearing that officers will enter his cell and beat him. *Id.* at 13. He has persistent suicidal ideation. *Id.* at 13–14.

The mental health treatment available at FSP does not mitigate the risk to Mr. Melendez from ongoing isolation. *See Finley v. Huss*, 723 F. App'x 294, 298–99 (6th Cir. 2018) (explaining that where psychiatrist finds that solitary confinement will aggravate a mental-health disorder, claiming mental health treatment makes it permissible is "like bandaging a person's broken leg but then taking away his crutches"). Solitary confinement greatly increases the harm to Mr. Melendez, meaning that he needs to be removed from such conditions to recover. Kupers Report at 31. Moreover, Dr. Kupers has concluded that Mr. Melendez's mental health treatment at FSP is "grossly deficient." *Id.* at 26. He found that Mr. Melendez's depression, suicidal incidents and paranoia are underreported or ignored by mental health staff. *Id.* at 28. For instance, the January 28, 2021 Behavioral Risk Assessment makes no mention of Mr. Melendez's multiple prior incidents of suicide attempts and self-harm. *Id.* at 29; Class. & Disc. Records at 2.

Mr. Melendez is also at immediate risk of further irreparable harm because of the impact that extended solitary confinement has on the brain. Research has shown that solitary confinement is a form of trauma that is accompanied by physical changes to the brain's neurological pathways. Kupers Report at 9–10. Neuroscientists have reported findings of structural changes in the region of the brain responsible for memory, spatial orientation, and emotion regulation with

prolonged solitary confinement. *Id.* at 11. This indicates that Mr. Melendez has been and will continue to be irreparably harmed neurologically by his extended period of solitary confinement.

Mr. Melendez experiences daily mental pain and anguish from his ongoing isolation, displaying symptoms of paranoia, anger, despair, memory loss, and problems with concentration. *Id.* at 23–24. He is enduring intrusive thoughts and command hallucinations directing him to self-harm. *Id.* at 14; Melendez Decl. ¶ 16. There is no remedy at law for the harms Mr. Melendez will suffer from the ongoing violations of his rights.

### C. The balance of the harms and the public interest favor granting the preliminary injunction.

The balance of the harms weighs strongly in favor of an injunction. Mr. Melendez is at "extremely high risk of suicide" and further self-injury. Kupers Report at 30. Where constitutional rights are at stake, the balance of harms will generally favor the movant. *See, e.g.*, *Citizens To End Animal Suffering And Exploitation v. Faneuil Hall Marketplace,* 745 F. Supp. 65 (D. Mass. 1990). Here, Mr. Melendez has demonstrated the likelihood of severe and irreparable harm from continued violations of his Eighth Amendment and due process rights.

By contrast, it is not burdensome for Defendants to transfer Mr. Melendez for inpatient mental health treatment. Mr. Melendez is a weak and ailing 62-year-old man, who poses a danger only to himself. Class. & Disc. Reports at 2–6. Dr. Kupers has identified two units in FDC with inpatient mental health treatment. Kupers Report at 29–30. That these options exist within FDC lessens the burden.

The public has a strong interest in protecting constitutional rights, particularly the rights of vulnerable people in state-run institutions. *Cf. Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir. 1983) (referencing the strong public interest in protecting First Amendment values); *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (noting that it is always in the public interest to prevent the violation of constitutional rights).

The public is also better served when prisoners receive rehabilitative care, not punishment.[7] Mr. Melendez is due to be released in less than three years.[8] The public interest will be furthered by addressing Mr. Melendez's mental health needs and engaging him in rehabilitative programming that will allow him to become a productive member of society. For these reasons, the public interest favors issuance of an injunction to provide Mr. Melendez the mental health care he needs.

### D.   The requested injunction meets the PLRA's needs-narrowness-intrusiveness requirements.

"[C]ourts can, and routinely do, address violations of constitutional rights and issue prospective relief to remedy violations in a civil action challenging prison conditions." *G.H. by & through Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1115 (N.D. Fla. 2019). The Prison Litigation Reform Act ("PLRA") requires that such relief "be narrowly drawn, extend no further than necessary to correct the harm

---

[7] The FDC website page on programs and re-entry explains that FDC programming aims to "increase[ ] security and public safety by providing programming for productive learning, positively transforming behaviors, and teaching pro-social skills that assist[ ] with re-integration into communities." http://www.dc.state.fl.us/development/index.html (last accessed September 16, 2021).

[8] http://www.dc.state.fl.us/offenderSearch/ (last accessed September 20, 2021) (reflecting release date of June 19, 2024).

the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

The requested injunction extends no further than necessary because Mr. Melendez needs to be removed from CM to avoid further self-harm and suicide. Kupers Report at 29–31. No lesser remedy could prevent this harm. *Id.* at 3, 30–31. The requested injunction is also the least intrusive because the defendants have latitude to determine where to transfer Mr. Melendez, so long as the facility has appropriate, inpatient mental health treatment and is not solitary confinement.

## CONCLUSION

Mr. Melendez has met the requirements for preliminary injunctive relief, and this Court should order that the defendants remove Mr. Melendez from Close Management and transfer him to a facility for inpatient mental health care.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ Lee D. Wedekind, III*

Lee D. Wedekind, III
Florida Bar Number 670588
Kelly Dunn Waters
Florida Bar Number 105871
50 North Laura Street, Suite 4100
Jacksonville, FL 32202
(904) 665-3652 (direct)
(904) 665-3699 (fax)
lee.wedekind@nelsonmullins.com
kelly.waters@nelsonmullins.com
allison.abbott@nelsonmullins.com

*and*

Maggie E. Filler (*Admitted pro hac vice*)
Roderick and Solange MacArthur
Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, Illinois 60611
(312) 503-0899 (direct)
(312) 503-0891 (fax)
maggie.filler@macarthurjustice.org

Attorneys and Trial Counsel for
William H. Melendez

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on September 27, 2021.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Len T. Hackett, Esq.
Greg Henderson, Esq.
Vernis & Bowling of
North Florida, P.A.
4309 Salisbury Road
Jacksonville, FL 32216
lhackett@florida-law.com
ghenderson@florida-law.com
*Attorneys for Defendants Florida Department of Corrections; Marks S. Inch; Barry Reddish; Erich Hummel; John Palmer; Classifications Officer P. Hunter; Ronnie Woodall; Kevin Tomlinson*

Mark G. Alexander, Esq.
David E. Chauncey, Esq.
Alexander Degance Barnett P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
mark.alexander@adblegal.com
david.chauncey@adblegal.com
mailbox@adblegal.com
*Attorneys for Defendants Daniel Philbert; Billy Folsom; Robert Brown; Charles Nosbisch; Jamaal Chandler; Robert Atteberry; Terry Holm; Justin Moreland; Matthew Geiger; Terry Bryant; Agderemme Oliva; Eugene Williams*

　　　　*/s/ Lee D. Wedekind, III*
Attorney

4837-5198-6428