UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM H. MELENDEZ,

        Plaintiff,

v.                              Case No. 3:20-cv-01023-BJD-JBT

MARK S. INCH, et al.,

        Defendants.

_____

## ORDER

This cause came before the Court for a hearing on Plaintiff's emergency motion for preliminary injunction (Docs. 171, S-179; Pl. Motion) on October 6, 2021.[1] Finding Plaintiff carried his burden, the Court granted Plaintiff's motion. See Endorsed Order (Doc. 189). This written Order summarizes the Court's reasoning.

As relevant to the emergency motion, Plaintiff is proceeding on a second amended complaint (Doc. 134; SAC) against Defendants Inch, Palmer, Davis, McClellan, and the Florida Department of Corrections (FDOC),[2] alleging he has been subjected to cruel and unusual punishment in violation of the Eighth

---

[1] The hearing transcript is currently docketed under seal (Doc. S-198; Hng. Tr.).

[2] The four individual Defendants will be referred to collectively as "Supervisory Defendants."

Amendment by being held in "continuous solitary confinement since [September 13, 2016], except for a brief four-month period," while at New River Correctional Institution (NRCI) and Florida State Prison (FSP). <u>See</u> Motion at 1. <u>See also</u> SAC Counts II.A, II.B.

### Preliminary Injunction Standard

A preliminary injunction is an extraordinary and drastic remedy. <u>Wreal, LLC v. Amazon.com, Inc.</u>, 840 F.3d 1244, 1247 (11th Cir. 2016) (quoting <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000)). To demonstrate entitlement to injunctive relief, a movant bears the burden to show the following:

> (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.

<u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1223, 1225-26 (11th Cir. 2005). With respect to the second prerequisite, "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" <u>Siegel</u>, 234 F.3d at 1176.

The Prison Litigation Reform Act (PLRA) "adds to the preexisting limits on injunctive relief," <u>see</u> <u>Ga. Advoc. Office v. Jackson</u>, 4 F.4th 1200, 1208 (11th Cir. 2021), providing that "[p]reliminary injunctive relief [related to prison conditions] must be narrowly drawn, extend no further than necessary to

correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Under this section, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." Id.

Upon careful consideration of Plaintiff's evidence,[3] Defendants' rebuttal evidence, and the parties' arguments at the hearing, the Court finds Plaintiff has met his burden on the four equitable considerations for preliminary injunctive relief.

**Eighth Amendment Claim: Likelihood of Success on the Merits**

Plaintiff demonstrates a likelihood of success on the merits of his Eighth Amendment claim against the FDOC and the Supervisory Defendants. Prison conditions need not be comfortable to satisfy Eighth Amendment standards, but they must not "involve the wanton and unnecessary infliction of pain."

---

[3] Plaintiff's evidence appears at different places on the docket. With his motion, Plaintiff filed nine exhibits (Docs. 171-1 through 171-9; Pl. Exs. 1-9), one of which is redacted and filed in full under seal (Doc. S-179-1 (exhibit 1, expert report)) and another one which is filed under seal only (Doc. S-179-2 (exhibit 3, medical records)). With his reply (Doc. 187; Reply), Plaintiff filed three more exhibits (Docs. 187-1 through 187-3; Pl. Reply Exs. 1-3). Additionally, at the hearing on Plaintiff's motion, Plaintiff tendered three exhibits, which Plaintiff obtained through expedited discovery conducted after he filed his emergency motion (Docs. 190-1 through 190-3; Pl. Hng. Ex. 1-3). Defendants did not object to Court's consideration of the exhibits offered at the hearing.

Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). A prisoner demonstrates an Eighth Amendment violation when a condition of his confinement is sufficiently serious or extreme as to pose an "unreasonable risk of serious damage to his future health or safety." Id. (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). Conditions of confinement that alone do not offend Eighth Amendment principles may in combination amount to a violation "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Wilson v. Seiter, 501 U.S. 294, 304 (1991). The prisoner need not await until tragedy strikes to have a valid or ripe Eighth Amendment claim. Id.

Solitary confinement as a form of punishment is not prohibited by the Eighth Amendment. But courts considering whether conditions of confinement are cruel and unusual are guided by "evolving standards of decency that mark the progress of a maturing society." Chandler, 379 F.3d at 1289. As such, the use of solitary confinement as a valid penological tool is subject to Eighth Amendment scrutiny. Sheley v. Dugger, 833 F.2d 1420, 1428-29 (11th Cir. 1987) (citing Hutto v. Finney, 437 U.S. 678, 686 (1978)). As particularly relevant here, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." Id. (quoting Hutto,

437 U.S. at 686). See also Gates v. Collier, 501 F.2d 1291, 1304 (5th Cir. 1974) ("There is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment.").[4]

Indeed, justices of the Supreme Court recently have questioned the constitutionality of lengthy terms of solitary confinement. See, e.g., Apodaca v. Raemisch, 139 S. Ct. 5, 6 (2018) (Sotomayor, J., respecting denial of certiorari) ("Courts and corrections officials must . . . remain alert to the clear constitutional problems raised by keeping prisoners ... in 'near-total isolation' from the living world . . . in what comes perilously close to a penal tomb." (internal citation omitted)); Ruiz v. Texas, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from the denial of a stay of execution because the record presented "an appropriate case" for the Court to "determine whether extended solitary confinement survives Eighth Amendment scrutiny"); Davis v. Ayala, 576 U.S. 257, 289 (2015) (Kenney, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." (emphasis added)). See also Buntion v. Lumpkin, --- S. Ct. ---, No. 20-8043, 2021 WL 4507574, at *1 (Oct. 4, 2021)

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

(Breyer, J., dissenting) (reiterating that the practice of condemning death row inmates to lengthy periods of solitary confinement warrants constitutional inquiry as it subjects inmates to "dehumanizing conditions of confinement").

An Eighth Amendment challenge to the conditions of confinement also has a subjective component. See Swain v. Junior, 958 F.3d 1081, 1087 (11th Cir. 2020) (citing Farmer v. Brennan, 511 U.S. 825, 846 (1994)). To hold prison officials responsible for cruel and unusual prison conditions, a prisoner must demonstrate the prison officials "acted with a sufficiently culpable state of mind with regard to the condition" or conditions. Chandler, 379 F.3d at 1289 (quoting in part Hudson, 503 U.S. at 8).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. (quoting with alteration Farmer, 511 U.S. at 837). "Whether prison officials had the requisite awareness of the risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Goodman v.

6

Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting Farmer, 511 U.S. at 842).

Plaintiff does not object to the use of solitary confinement as a penological tool in a general sense. Rather, Plaintiff complains that his extended commitment to solitary confinement deprives him of the most basic constitutional guarantees of humane treatment. Plaintiff's evidence shows he has spent the greater part of the last five years on close management (CM) status at FSP and NRCI. "Close management" is defined as "the separation of an inmate apart [sic] from the general population, for reasons of security or the order and effective management of the institution, when the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code R. 33-601.800(1)(a).

The FDOC utilizes three levels of CM confinement status: I, II, and III. Fla. Admin. Code R. 33-601.800(1)(b). CMI is the most restrictive setting. Fla. Admin. Code R. 33-601.800(2)(a). An inmate relegated to CMI status spends most of his time inside his cell, with phone and visitation privileges restricted. Fla. Admin. Code R. 33-601.800(10), (11). Inmates on CMI status are entitled to six hours per week of outdoor exercise, with restrictions permissible for bad behavior. Fla. Admin. Code R. 33-601.800(10)(m).

7

The Institutional Classification Team (ICT) is to conduct regular reviews of an inmate's CM status. Fla. Admin. Code R. 33-601.800(16)(a). Once a week for the first sixty days and then once every thirty days thereafter, an ICT member—consisting of the warden, an assistant warden, chief of security, or classification supervisor—must review each inmate on CM status, with the purpose being "to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely." Id.

After an inmate is on CM status for six months, "the classification officer shall interview the inmate and shall prepare a formal assessment and evaluation." Fla. Admin. Code R. 33-601.800(16)(c). The ICT then reviews the classification supervisor's recommendation, along with other materials, including the inmate's mental health evaluations. Fla. Admin. Code R. 33-601.800(16)(d). The inmate shall be present for the ICT review. Id. The State Classification Office (SCO) is responsible for reviewing ICT recommendations and "shall conduct an onsite interview with each inmate at least once every six months." Fla. Admin. Code R. 33-601.800(1)(s), (16)(e).

In addition to the required status reviews, inmates on CM are to have regular contact with staff. Notably, the warden and assistant wardens "are required to officially inspect and tour the CM unit" weekly. Fla. Admin. Code

R. 33-601.800(15)(a)(8). All staff conducting rounds of the CM unit are to "document his or her visit on Form DC6-229 noting any discussion of significance, any action or behavior of the inmate, or any important information that may have an influence or effect on the inmates' status of confinement." Fla. Admin. Code R. 33-601.800(15)(a).

When Plaintiff filed his emergency motion, he had been on CMI status since October 19, 2020, based on disciplinary charges that were overturned.[5] See Pl. Ex. 2 ¶ 13; Pl. Ex. 5 at 36-37, 50-51; Pl. Ex. 6 at 26-28, 32-35. Through October 6, 2021 (the date of the hearing), Plaintiff had spent 352 consecutive days in CMI status. Before this most recent stint in solitary confinement, Plaintiff was consigned to CMI status from September 13, 2016, through June 17, 2019 (1,007 days, or nearly three years). See Pl. Ex. 6 at 24-26. At that time, his status was downgraded to CMII and then CMIII, and he successfully completed the CM step-down program on March 23, 2020. Id. at 26. See also Pl. Ex. 2 ¶ 7. Plaintiff remained in the general population from March 23, 2020, until July 2020, when he was placed in administrative confinement, a form of

---

[5] The Court granted Plaintiff's emergency motion for injunctive relief because Plaintiff demonstrated the four equitable considerations as to his Eighth Amendment claim. The Court did not make a finding as to Plaintiff's likelihood of success on the merits of his due process claim. But relevant to whether Plaintiff has suffered cruel and unusual punishment is Defendants' reason for imposing punishment. See Rhodes, 452 U.S. at 346 ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'").

solitary confinement, because of the conduct that resulted in the to-be-overturned disciplinary charges. See Hng. Tr. at 49. See also Pl. Ex. 5 at 30.

Plaintiff offers the declaration of Dan Pacholke, an expert in penology, who opines, "There is no sound penological purpose served by continuing [Plaintiff] on [CM]." See Pl. Reply Ex. 3 ¶ 8. He avers "solitary confinement should be used as a last resort, when all other less restrictive forms of behavior management have failed or are demonstrably unworkable, and . . . it should be used for the shortest period of time possible." Id. ¶ 7. This opinion aligns with the stated purpose of regular reviews for inmates on CM status: "to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely." Fla. Admin. Code R. 33-601.800(16)(a).

Mr. Pacholke's opinion that solitary confinement should be used sparingly and for the shortest time possible also aligns with Eighth Amendment jurisprudence that harsh conditions may become cruel and unusual if they persist for long periods of time without penological justification. See, e.g., Hutto, 437 U.S. at 686-87 ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); Gates, 501 F.2d at 1304.

10

A board-certified psychiatrist, Terry A. Kupers, M.D., M.S.P., interviewed Plaintiff twice within the last six months and reviewed, among other things, Plaintiff's prison medical records. Dr. Kupers opines as follows:

> This is a very depressed man with anger problems and paranoia related to his mental illness, and he is having repeated violent run-ins with custody staff. Solitary confinement both exacerbates his mental illness and creates daily situations where he is in conflict with custody staff, and therefore he needs to be transferred out of solitary confinement to a unit where more intensive mental health treatment is available.
>
> ...
>
> [Plaintiff] suffers from serious mental illness and is at very high risk of suicide. . . . [He] suffers from Major Depressive Disorder with psychotic features.
>
> ...
>
> The response of mental health to [Plaintiff's] suicide attempts is to return him to a solitary confinement cell. This is like throwing gasoline on a fire: extremely dangerous. . . . Sound psychiatric care dictates that individuals who are suicidal must not be left alone. ... With fifty percent of prison suicides occurring among the single digit percent of prisoners in solitary confinement, the significant causal relationship between solitary confinement and suicide is clear as day.
>
> ...
>
> [Plaintiff] is severely depressed, is paranoid about being assaulted by officers, and has very low self-esteem and no hope for the future. In other words, he suffers from Major Depressive Disorder worsened considerably by his years of solitary confinement.

11

See Pl. Ex. 1 at 19, 21-22, 29. According to Dr. Kupers, "[Plaintiff] thinks about suicide all the time," daily. Id. at 14, 16. Dr. Kupers notes Plaintiff attempted suicide on the following dates: December 26, 2013 (swallowed a razor blade); December 31, 2013 (chewed through his IV and sucked blood); January 2, 2014 (went on a hunger strike); August 24, 2016 (punctured his vein); July 17, 2018 (cut his arm with something sharp); and July 2020 (inserted metal into his arm requiring transport to a hospital). Id. at 14-15.

Most recently, in August 2021, Plaintiff "inserted parts of a battery into the veins in his arm[], causing serious blood loss." Id. at 15. Plaintiff was sent to the hospital to have the foreign objects surgically removed. The discharge diagnosis included "depression/mood disorder," and it was noted that Plaintiff "needs serious psych evaluation" for his self-mutilation and depression. See Pl. Hng. Ex. 1 at 5, 16.

Dr. Kupers notes that "[d]espite [Plaintiff's] repeated and recent instances of self-harm, DOC mental health staff do not recognize that he is at risk of self injury." See Pl. Ex. 1 at 20. As a specific example, Dr. Kupers explains clinical notes from July 26, 2020, and July 27, 2020, reveal Plaintiff inserted a foreign object into his arm, but a January 28, 2021 behavioral risk assessment provides there is "no reference to self-injury, suicide attempts []or depression" in Plaintiff's records. Id. at 20, 29. When Dr. Kupers last

interviewed Plaintiff, on September 15, 2021, Plaintiff was "at continuing extremely high risk of suicide." Id. at 31-32.

Dr. Emanoilidis, a clinical psychologist and mental health director at FSP, offered an affidavit in opposition to Plaintiff's motion for injunctive relief (Doc. 182-1; Def. Ex. 2). Dr. Emanoilidis, who has not personally evaluated Plaintiff,[6] opines Plaintiff "is not currently an imminent risk for serious self-harm and is not actively suicidal." See Def. Ex. 2 at 6. Dr. Emanoilidis concludes Plaintiff's incidents of self-harm are self-serving in that Plaintiff uses them "instrumentally to get medical treatment, placed on [self-harm observation status], and for facility transfers." Id. According to Dr. Emanoilidis, Plaintiff himself admitted during his last full psychiatric evaluation, that his suicide attempts "were reactionary to security and instrumental at times." Id. at 5. This last full psychiatric evaluation was conducted nearly a year ago, on December 29, 2020. Id.

Dr. Emanoilidis opines Plaintiff "is currently not in crisis," and his mental health needs are being met at FSP because he is offered "weekly group therapy, individual therapy/case management every 60 days, weekly mental

---

[6] Dr. Emanoilidis avers he has had "several personal interactions" with Plaintiff. See Def. Ex. 2 at 2. Plaintiff avers that his "meetings with the mental health staff are usually short," and he has "never spoken to Dr. Emanoilidis for longer than ten minutes." See Pl. Reply Ex. 2 ¶ 3.

health rounds, and multidisciplinary service team contacts as needed." Id. But, Dr. Emanoilidis observes, the "records show [Plaintiff] has refused every single weekly group therapy offered and 50% of individual therapy/case management/mental health screenings offered in the past three months." Id. at 7.

The Court finds Dr. Kupers' expert report is convincing and credible and entitled to significant weight in the absence of a contradictory opinion based on an evaluation of Plaintiff's present mental and physical state. Importantly, Dr. Emanoilidis has not personally evaluated Plaintiff. And Plaintiff avers he has not spent more than ten minutes talking to Dr. Emanoilidis, see Pl. Reply Ex. 2 ¶ 3, a point Dr. Emanoilidis does not dispute. Dr. Kupers explains his opinions were formulated after personally evaluating Plaintiff for nearly five hours, most recently on September 15, 2021, and are informed by extensive research on the mental and physical effects of long-term solitary confinement on prisoners. See Pl. Ex. 1 at 4-13.

Dr. Emanoilidis, on the other hand, opines on Plaintiff's current mental health condition primarily based on the limited "interactions" he has had with Plaintiff, the results of Plaintiff's last full psychiatric evaluation conducted on December 29, 2020, and a review of Plaintiff's records prepared by mental health clinicians who, it appears, have "spent very little time examining"

Plaintiff and underreport or downplay his "serious psychopathology." See Pl. Reply Ex. 1 ¶ 2. Even accepting that Plaintiff conceded in December 2020 that his suicide attempts were "instrumental at times," see Def. Ex. 2 at 5, Dr. Emanoilidis does not address or square his opinion with the research that shows "the risk of suicide and self-harm in solitary confinement is alarmingly high," see Pl. Reply Ex. 1 ¶ 4, or the fact that Plaintiff has engaged in additional, recent acts of self-harm. Indeed, Dr. Emanoilidis does not discuss or even mention Plaintiff's most recent incident of self-mutilation, which landed him in the hospital and prompted the hospital medical providers to conclude Plaintiff needs a psych evaluation. See Def. Ex. 2.

Moreover, Defendants do not provide the records that allegedly show Plaintiff has refused half of the individual sessions or mental health screenings he was offered in the last three months. However, Plaintiff concedes he does not attend group therapy because he finds it unhelpful for his issues. See Pl. Ex. 1 at 19-20. Plaintiff does dispute Dr. Emanoilidis's assertion that he missed some of his individual therapy sessions. See Pl. Reply Ex. 2 ¶ 4.[7] Regardless, even accepting as true that Plaintiff declined half of his individual therapy sessions, the Court remains troubled by the fact that prison officials downplay

---

[7] Plaintiff contends he asked the mental health counselor about the suggestion that Plaintiff had refused to see him (the counselor). See Pl. Reply Ex. ¶ 6. The counselor agreed that Plaintiff had not refused "any of the sessions with [him]." Id.

or ignore Plaintiff's suicidal gestures and return Plaintiff to solitary confinement after such incidents. If Plaintiff is as depressed and suicidal as Dr. Kupers describes and as Plaintiff's incidents of self-harm suggest, it is concerning that mental health professionals at FSP do not intervene when Plaintiff unilaterally refuses mental health treatment.

It is also concerning that prison mental health professionals do not recognize or record the extent of Plaintiff's psychosis. As explained in his report, Dr. Kupers found particularly noteworthy that "there is little or no mention in [Plaintiff's] mental health chart of the severe paranoia, depression and almost constant suicide ideation that plague him." See Pl. Ex. 1 at 26. Dr. Kupers reports that Plaintiff says he tells "mental health staff about his suicidality, but . . . they do not do anything for him," and instead return him to his solitary confinement cell after his suicide attempts, which is like "throwing gasoline on a fire." Id. at 21, 27. Dr. Kupers notes: "The only sense I can make of the underreporting and ignoring of a significant amount of evidence of [Plaintiff's] depression, suicidality and paranoia is that medical and mental health staff are unacceptably insensitive to his reportage, minimize the extent of his emotional disorder and pain, or they are purposely falsifying the record." Id. at 30.

A striking example of prison officials' failure to acknowledge or document the severity of Plaintiff's mental state relates to Plaintiff's August 2021 suicidal gesture.[8] On August 19, 2021, the Multidisciplinary Service Team (MDST) convened a meeting to review Plaintiff's "treatment progress," and Plaintiff was present. See Pl. Hng. Ex. 3. Plaintiff explains that, at the time, he had "two nails in [his] arm," which he inserted himself only days before in an act of "self-mutilation." See Pl. Reply Ex. 2 ¶ 5. Despite Plaintiff having nails in his arm from a recent incident of self-harm, no mention is made of that fact in the MDST report, and a psychiatrist who was present for the meeting determined Plaintiff did not need medication. See Pl. Hng. Ex. 3. No basis for this conclusion is provided, and it appears the psychiatrist who was present did not evaluate Plaintiff.

Plaintiff also avers he told the MDST that he was hearing voices. See Pl. Reply Ex. 2 ¶ 5. According to Plaintiff, "a member of mental health staff replied that what [he] was hearing was not hallucinations but [his] conscience." Id. Dr. Emanoilidis signed off on the MDST report as the Psychological Services

---

[8] Whether Plaintiff actually was intent on ending his life is beside the point. Plaintiff's repeated self-harming behavior is concerning and symptomatic of serious mental illness. Even more, FDOC's own records define a "suicidal gesture" as the following: "Any act which is interpreted as an intent to cause self-harm but would not have resulted in death." See Pl. Ex. 3 at 7. The example provided—"[s]cratching wrist with a paper clip or plastic knife"—is far less extreme than the behavior Plaintiff has exhibited. Id.

Director. Plaintiff was returned to his solitary-confinement cell after the MDST meeting; he was not immediately taken to the medical unit or sent to the hospital. When Plaintiff eventually was sent to the hospital, the doctor who evaluated him recognized his serious need for psychiatric intervention, bolstering Dr. Kupers' opinion as to Plaintiff's mental state as of September 2021. See Pl. Hng. Ex. 1 at 5, 16.

Not only has Plaintiff been consigned to CMI status for an inordinately long period of time, his conditions in solitary confinement, in combination, suggest he has been deprived of "the minimal civilized measure of life's necessities," including human interaction and socialization, exercise, and regular opportunities to cleanse himself. See Rhodes, 452 U.S. at 347. See also Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005) (holding inmates had a liberty interest in avoiding prolonged periods of solitary confinement in which they were "deprived of almost any environment or sensory stimuli and of almost all human contact").

At the hearing, Plaintiff's attorney described Plaintiff's CMI cell as being "three paces long" with no view of the outside. See Hng. Tr. at 8. Plaintiff himself avers that, on CMI status, his opportunity to interact with others is severely restricted. See Pl. Ex. 2 ¶¶ 14, 16-17. He contends that despite the rules governing CM inmates, he has not been permitted to exercise outdoors

since July 26, 2020, and as of September 24, 2021, he had not showered in four weeks, which led to a staph infection in his legs. Id. ¶¶ 17-19. On CMI status, Plaintiff gets very little sleep. He lies "awake at night afraid that the officers will enter [his] cell and assault [him]." Id. ¶ 23. Defendants offer no evidence to rebut these assertions.

As summarized, there is evidence showing Plaintiff's lengthy confinement in CMI housing poses a substantial risk of serious harm to his mental and physical health. Plaintiff has reported experiencing the kinds of mental torment known to plague prisoners who are held in solitary confinement for extended periods of time: depression; hallucinations; suicidal thoughts; self-mutilation; memory loss; sleep deprivation; paranoia; obsessive thoughts; and anger. See Pl. Ex. 1 at 14-18. Cf. Ruiz, 137 S. Ct. at 1247 (Breyer, J., dissenting) (describing some of the symptoms prisoners commonly experience when confined alone for long periods of time: "anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty").

Additionally, the Court finds Plaintiff is likely to establish that the FDOC and the Supervisory Defendants were deliberately indifferent to the risk of harm Plaintiff faced by the very fact that the risk was obvious. The risks of harm—both mentally and physically—associated with prolonged periods of

isolation are well known, certainly by corrections officials tasked with promulgating and enforcing rules for the safety and well-being of inmates and staff. Dr. Kupers explains, "There is a large literature on the effects of long-term (greater than fifteen days) solitary confinement or isolative confinement in units such as the ones at [FSP]." See Pl. Ex. 1 at 6. He continues with the following observation:

> It is stunningly clear, and there is an evolving consensus in the community of researchers, mental health clinicians[,] and correctional administrators, that for prisoners prone to serious mental illness, time served in isolation and idleness greatly exacerbates the mental illness, worsens the disability and prognosis, and too often results in suicide.

Id. at 9.

In addition to the commentary by Supreme Court Justices cited earlier in this Order, circuit court judges have cited to and discussed research findings similar to those Dr. Kupers mentions. See, e.g., Porter v. Clarke, 923 F.3d 348, 356 (4th Cir. 2019), as amended (May 6, 2019) (noting and summarizing an "extensive—and growing—body of literature" establishing the psychological impact of prolonged terms of solitary confinement); Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 566 (3d Cir. 2017) (summarizing the "robust body of scientific research on the effects of solitary confinement" and noting the results of such studies are "neither surprising, nor novel");

Palakovic v. Wetzel, 854 F.3d 209, 226 (3d Cir. 2017) (noting an "increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health"); Incumaa v. Stirling, 791 F.3d 517, 534 (4th Cir. 2015), as amended (July 7, 2015) ("Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized.").

In addition, the FSP warden and assistant wardens are aware of Plaintiff's extended stay in CMI status given their obligation to visit CM units weekly and given the warden or assistant warden is a member of the ICT. See Fla. Admin. Code R. 33-601.800(1), (15). Finally, before Plaintiff instituted this action, his attorney sent a letter to the then-warden of FSP, Barry Reddish, and the Bureau Chief for the Bureau of Policy Management and Inmate Appeals in Tallahassee, describing Plaintiff's mental deterioration after having spent about two years in solitary confinement. See Pl. Ex. 9 at 7-10. Plaintiff's attorney summarized some of the grievances Plaintiff had filed complaining about the ill-effects CM status was having on him. Id. at 8-9. His attorney also reported that he was, at the time, on a hunger strike and recently declared a psychological crisis. Id. at 7-8. Assistant Warden McClellan acknowledged receipt of the letter. Id. at 12.

21

### Other Equitable Considerations for Injunctive Relief

As to the remaining equitable considerations guiding this Court's ruling, Plaintiff demonstrates he faces a threat of irreparable harm in the absence of Court intervention. Doctors who recently evaluated Plaintiff note he is suicidal, see Pl. Ex. 1 at 31-32, and in need of a psychological evaluation given his self-mutilating behavior and depression, id.; Pl. Hng. Ex. 1 at 5, 16. There is no more irreparable injury to prevent than death. Moreover, the balance of equities tips in Plaintiff's favor: absent Court intervention, Plaintiff faced a grave risk of harm, yet the impact on the FDOC is minor given the FDOC already maintains correctional facilities equipped to treat mentally ill prisoners.[9] Finally, it is in the public interest to ensure prisoners with mental illness are humanely treated in accordance with Constitutional dictates.

The relief the Court ordered (Doc. 189) is narrowly drawn and extends no further than necessary to address the harm Plaintiff was facing when he filed his emergency motion and when the Court conducted a hearing on that motion. Specifically, ordering that the FDOC transfer Plaintiff to a suitable mental health unit for inpatient psychiatric treatment is a minor intrusion into the FDOC's management of its prisons compared to the risk of harm Plaintiff

---

[9] Defendants notified the Court on October 8, 2021, that they transferred Plaintiff to an inpatient mental health unit, and staff at FSP video recorded Plaintiff's transportation. See Notice (Doc. 201).

faced if he remained in CMI status at FSP. Additionally, the directive to video record all of Plaintiff's interactions with staff on account of Plaintiff's physical and mental health or problematic behavior and transportation serves to ensure Plaintiff's rights are not further infringed but also serves to safeguard prison staff who interact with him. Having a video record of Plaintiff's behavior and staff response to his behavior will benefit both parties and the Court as the case proceeds.

The Court is mindful that judges should afford deference to prison administrators in ensuring the orderly operation of corrections facilities and the safety of those who live and work in those facilities. However, that deference does not mean district judges may not or should not intervene when presented with convincing evidence that a prisoner's constitutional rights likely are being infringed. See Sheley, 833 F.2d at 1423. This is just such a case.

By **November 15, 2021**, the parties shall confer and submit a proposed case management report so the Court may set appropriate deadlines for the completion of this case. The Court encourages the parties to discuss the possibility of settlement and to immediately notify the Court if those discussions are fruitful.

**DONE AND ORDERED** at Jacksonville, Florida, this 15th day of
October 2021.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6 10/14
c:
Counsel of Record

24