UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM H. MELENDEZ,

      Plaintiff,

v.

Case No. 3:20-cv-01023-BJD-JBT

RICKY DIXON, et al.,

      Defendants.

_____

## ORDER

This cause came before the Court for a three-day evidentiary hearing on Plaintiff's emergency motion for preliminary injunction and temporary restraining order (Docs. 220, 225; Pl. Motion).[1] This emergency motion comes after the Court previously granted Plaintiff's first emergency motion for injunctive relief and directed Defendants Inch (now Dixon, as the Secretary of the Florida Department of Corrections (FDOC)), Palmer, Davis, and McClellan to, among other things, "immediately transfer Plaintiff . . . to a suitable mental health unit for inpatient psychiatric treatment where [he] shall remain until a qualified, licensed mental health provider at the transferee institution

---

[1] The primary distinction between a temporary restraining order and a preliminary injunction is that the former is issued ex parte, while the latter requires "notice to the adverse party." Fed. R. Civ. P. 65(a), (b). See also M.D. Fla. R. 6.01, 6.02 (describing the requirements for the issuance of temporary restraining orders and preliminary injunctions).

determines Plaintiff is medically and psychologically capable of returning to the general population." See Orders (Docs. 189, 203).

In accordance with the Court's Orders, Plaintiff was transferred to the crisis stabilization unit (CSU) at Suwannee Correctional Institution (SCI) on October 8, 2021. Doc. 220-2 ¶ 2. After initial evaluations and treatment, Plaintiff was transferred to the transitional care unit (TCU) on October 22, 2021. Id. ¶¶ 7-8. Plaintiff was released from the TCU on November 9, 2021. Id. ¶ 14. Upon release from the TCU, Plaintiff was placed on administrative confinement status, but there is a paper by his cell door that reads "house alone" and "CM I." Id. ¶¶ 15, 16. See also Doc. 220-1 at 5 (email from the FDOC's appellate counsel to Plaintiff's counsel advising that the FDOC planned to return Plaintiff to CM "based on security interests," despite the Court's endorsed Order that Plaintiff should be returned to the general population). Plaintiff contends his "current conditions of confinement are indistinguishable from the conditions . . . from which the Court ordered him transferred." See Doc. 225 at 15. See also Doc. 220-2 ¶¶ 17-23.

In his present motion, Plaintiff seeks the following relief: (1) return to the TCU for inpatient mental health care; (2) appointment of an independent

mental health expert;[2] (3) notice and independent review before he is discharged from the TCU; and (4) for Defendants to be barred in the future from holding him in solitary confinement under the conditions he experienced in the past. See Pl. Motion at 1-2. Plaintiff also asks the Court to transfer him to a TCU while the motion is under review. Id.

After hearing and weighing all the evidence presented at the evidentiary hearing,[3] the Court, by oral pronouncement and endorsed order, directed the Florida Department of Corrections (FDOC)[4] to do the following:

> return Plaintiff to a general population housing status forthwith, meaning as quickly as can be done safely. Upon the FDOC's decision on where to house Plaintiff, the FDOC or its counsel shall notify Plaintiff's attorney of that decision. If Plaintiff engages in conduct that warrants a recommendation for CM status, the FDOC shall immediately begin the ICT process and record by video and audio any ICT hearings pertaining to Plaintiff's housing status. Any video and audio recordings shall be retained and preserved until further Order of the Court and shall remain confidential, that is to say for attorneys' and

---

[2] Plaintiff's separate motion for appointment of a neutral expert is pending and opposed. See Docs. 209, 211.

[3] The evidentiary hearing transcript is docketed (but not public) in three volumes (Docs. 248-250). The Court will cite the transcript as "Hng. Tr." followed by a roman numeral designation for the volume (I, II, or III). Page numbers are those assigned by the Court's electronic management system.

[4] The FDOC is the agency with custody over Plaintiff. However, as explained in this Order, the Court found Plaintiff likely to succeed on his Eighth Amendment claims as raised in his second amended complaint (Doc. 134; Am. Compl.). Those claims are against the Secretary of the FDOC (and others), in an official capacity. See Am. Compl., Count II.A.

3

> necessary FDOC staff's eyes only and be immediately provided to counsel and filed with the Court under seal immediately after said ICT hearings. Any mental health examinations that may be conducted or used in connection with the ICT process shall be video and audio recorded and preserved and treated confidentially (for attorneys' and necessary FDOC staff's eyes only) and filed with the Court under seal.

Doc. 242. The Court also afforded the parties ten days to submit written closing arguments or findings of fact and conclusions of law as to any other relief requested. Id.

The FDOC now requests that the Court exercise its inherent power to stay these proceedings pending resolution of an interlocutory appeal (Doc. 245; FDOC Motion). The FDOC filed a notice of appeal on the same day it filed its emergency motion (Doc. 244). In its motion, the FDOC argues it is likely to succeed on appeal, warranting a stay in this Court. See FDOC Motion at 3-4. In support, the FDOC rehashes arguments this Court carefully considered when ruling on Plaintiff's emergency motion for injunctive relief. Specifically, the FDOC repeats that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his claims. Id. at 4. Additionally, the FDOC says the Court's Order violates the separation of powers, contravenes the limitations on injunctive relief set forth in the Prison Litigation Reform Act (PLRA), and grants Plaintiff relief he did not seek. Id. at 9, 14, 16.

4

The FDOC asserts it will suffer irreparably injury in the absence of a stay because, through the Court's Order, it has been deprived the "ability to effectively manage prison administration and security." Id. at 20. Additionally, the FDOC notes the Court's Order does not "preserve the status quo," contrary to the purpose of a preliminary injunction. Id. at 20-21. Finally, the FDOC contends a stay will not substantially injure Plaintiff because the evidence shows he is receiving the mental health care he requires while in CM status, and the public's interest lies in favor of a stay. Id. at 21-22.

In response (Doc. 252; Pl. Resp.), Plaintiff contends the FDOC's motion is premature because the Court has not issued its written Order and the parties have until February 3, 2022, to file additional briefing on Plaintiff's emergency motion. See Pl. Resp. at 3-4. As to the merits, Plaintiff asserts the FDOC is not likely to succeed on appeal because Plaintiff satisfied the requirements to obtain injunctive relief. Id. at 4-5, 11.

The parties agree on the standard to obtain a stay. See FDOC Motion at 3, 4; Pl. Resp. at 3. Whether a stay is warranted is inextricably intertwined with the Court's ruling that Plaintiff demonstrated entitlement to injunctive relief. In other words, if the Court finds the FDOC is likely to succeed on appeal—one of the elements favoring a stay—the Court would have to conclude its decision to partially grant Plaintiff's emergency motion was incorrect.

For the reasons stated previously, see Order (Doc. 203), and based on the evidence the Court heard over three days, Plaintiff demonstrates a likelihood of success on the merits of his Eighth Amendment claim.[5] Plaintiff is proceeding on a second amended complaint in which he complains that he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment, by being held in CM status from September 13, 2016, through July 12, 2021 (the day he filed the complaint), except for a four-month period. See Am. Compl. ¶¶ 1, 32, 36 Counts II.A, II.B. In his complaint, Plaintiff alleges as follows:

> Throughout Mr. Melendez's solitary confinement . . . the named Defendants have intentionally deprived Mr. Melendez of basic human needs such as human contact, social interaction, physical exercise, his mental health [sic], and environmental stimulation.
>
> . . .
>
> Mr. Melendez has been inhumanely caged.
>
> . . .
> While in isolation, Mr. Melendez's mental and physical health have declined dramatically. His major depressive disorder has been exacerbated, and he has engaged in dangerous cutting.
>
> . . .

---

[5] The Court incorporates by reference the Eighth Amendment conditions-of-confinement precedent set forth in its prior Order granting Plaintiff injunctive relief. See Order (Doc. 203) at 3-6.

> FDOC's outdated system of solitary confinement isolates vulnerable people suffering from a heightened risk of harm, including people who suffer from physical and mental health issues.

Id. ¶¶ 5, 9, 10, 11. See also id. ¶¶ 39-40, 45-55 (describing the conditions in solitary confinement in relation to the conditions in general population); ¶¶ 165-94 (Eighth Amendment claims alleging FDOC's isolation-related practices of "excessive periods of isolation in deplorable conditions" have "deprived [Plaintiff] of the minimal civilized measures of life's necessities and basic human dignity").

In explanation of the "excessive periods of isolation" he endured, Plaintiff alleges in his complaint that he "was not allowed outdoor recreation in the entirety of his isolation on CM I and CM II," contrary to the relevant provision of the Florida Administrative Code (FAC), which mandates that prisoners on CM should receive up to six hours of recreation outside of their cell per week. Id. ¶¶ 40, 41 (citing Fla. Admin. Code r. 33-601.800(10)(m)). Additionally, Plaintiff alleges he oftentimes was denied the minimum number of weekly showers provided for under the FAC, was denied contact visitation with his family, and, while in CM I, could not possess a tablet for entertainment. Id. ¶¶ 43, 47, 48, 50. See also id. ¶¶ 53-56 (describing other restrictions associated with CM, which limit out-of-cell opportunities and interaction with others).

Plaintiff offered proof of these allegations in support of his emergency motion. Plaintiff's expert on solitary confinement, Dan Pacholke, testified that inmates in CM I status rarely are afforded out-of-cell time. Hng. Tr. I at 181. Mr. Pacholke reviewed Plaintiff's FDOC records of his confinement status and observed, "[Plaintiff] very rarely gets out of his cell and has participated in little to no recreation and little to no therapeutic programming or classes, probably with the exception of when he was in TSU or CSU." Id. at 187-88.

Plaintiff himself testified that he had little to no out-of-cell time while in CM status at Florida State Prison (FSP). During that time, he would spend nearly 24 hours per day inside his cell with little to occupy himself. Id. at 37-38. Plaintiff testified that prison officials did not permit him to keep his walker when he entered FSP, telling him he would not be needing it, likely because he would not be out of his cell enough to justify him having it. See id. at 36. Plaintiff would request outdoor recreation, but his requests usually were ignored, or officers would "find excuses" to deny his request. Id. He said he "never got rec, never." Id.

In an exhibit provided with his emergency motion, Plaintiff's attorneys summarized 819 pages of special housing unit records, which show that over a period of 2,527 days, Plaintiff was allowed outdoor recreation only 20 times, and 14 of those instances were when he was housed on the least restrictive CM

status (CM III). See Doc. 220-8. Plaintiff contends there is "no recorded instance of [him] receiving any outdoor recreation, dayroom, or phone access from November 9, 2016 through June 17, 2019, when [he] was on CM I at FSP." See Pl. Motion at 17 (emphasis in original) (citing Doc. 220-8 and supporting records). The records further reflect that Plaintiff received the minimum-required three showers per week only 195 out of 361 weeks. Id.[6] At the evidentiary hearing, Plaintiff showed the Court black marks that remain on his legs from having developed a staph infection because he was denied showers so often. Hng. Tr. I at 37.

The FDOC contends its emergency motion that "Plaintiff, in accordance with the policies and procedures . . . receives the privileges to which he is entitled based on his current housing status." See Def. Motion at 6. But, as summarized, the evidence contradicts this statement. Defendants offered no evidence or testimony disputing Plaintiff's evidence, which establishes he had little to no out-of-cell time for years while housed in CM I status at FSP, in contradiction to the policies set forth in the FAC. In fact, defense witness Carl Wesley Kirkland, Jr., deputy director of institutional operations for the FDOC, acknowledged that correctional staff are required to document the

---

[6] Plaintiff's attorneys did not provide the 819 pages of special housing unit records but rather summarized them. See Doc. 220-8.

programming or privileges inmates on CM status receive. Hng. Tr. II at 148. Defendants offered no documentation to rebut that Plaintiff did not receive the minimum out-of-cell time to which he was entitled while housed in CM I status at FSP.

Accordingly, in accordance with the Court's prior ruling, Plaintiff demonstrates a likelihood of success on the merits of his Eighth Amendment claim. The FDOC officials, in their official capacities, subjected Plaintiff to cruel and unusual conditions of confinement, and, for the reasons stated in the Court's October 15, 2021 Order, those officials had subjective knowledge of the risk Plaintiff faced. See Order (Doc. 203) at 19-21.

Further, the Court finds Plaintiff will suffer irreparable harm in the absence of injunctive relief, and the harm he faces outweighs any harm the FDOC may incur in complying with the Court's Order. The mental health experts disagree on whether Plaintiff is legitimately suicidal or harms himself for "secondary gain." However, there is no dispute that Plaintiff has engaged in multiple acts of self-harm—some requiring emergency treatment. Whether Plaintiff's past acts of self-harm can best be described as "instrumental" or as a true desire to die, acts of self-harm can result in death, Hng. Tr. I at 218, 222; Hng. Tr. III at 41, even if death may not be "probable" based on Plaintiff's history and mental health assessments, Hng. Tr. III at 41.

Plaintiff currently is housed in administrative confinement, which is a more restrictive housing status than CM I, Hng. Tr. II at 137, 145, 149. Whether Plaintiff carries through on any present or future thoughts of self-harm or suicide, he has stated under oath that he thinks about self-harm "a lot," and, within the past month, he came close to cutting himself but changed his mind after thinking about his sister. Hng. Tr. I at 76, 77. As Plaintiff's psychiatric expert, Dr. Terry Kupers, stated, "Death is a very severe and irreversible outcome of [mental illness]." Hng. Tr. II at 12.

Given the Court finds evidence of a past and continuing constitutional violation, granting Plaintiff's emergency motion in part by ordering his transfer to the general population serves the public interest. Moreover, the relief the Court has granted is narrowly tailored, extends no further than necessary, and is the least intrusive means to correct the violation. See 18 U.S.C. § 3626(a). Indeed, Plaintiff sought much broader relief than what the Court granted. For instance, Plaintiff sought transfer to the TCU and for an independent expert to weigh in before Plaintiff was released from the TCU. However, Plaintiff's own psychiatric expert, Dr. Kupers, testified he does not disagree with Dr. Greenfield's assessment that Plaintiff does not currently require inpatient treatment—at least not long-term inpatient treatment. Hng. Tr. II at 21.

Accordingly, the relief granted is tailored to the address the constitutional violation. The evidence indisputably shows that Plaintiff has spent a majority of the last five years in CM I status with little to no out-of-cell time. Moreover, there is no dispute that solitary confinement should not be a long-term housing solution for inmates. Hng. Tr. I at 177, 180; Hng. Tr. II at 214. The FAC provides as follows with respect to the use of CM: "The purposes of [the ICT review] shall be to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely." Fla. Admin. Code r. 33-601.800(16)(a). In accordance with this FAC provision, the FDOC's expert on restrictive housing, Dr. Ryan Labrecque, agreed that restrictive housing should be used only when necessary, such as when an inmate poses a threat or is a safety risk. Hng. Tr. III at 170-72, 180-81. He testified that solitary confinement should not extend longer than necessary to address the threat or safety issue that initially justified its use, saying, "[i]t's not good to have [inmates] in [restrictive housing] for very long periods of time." Id. at 216-17, 219-20, 223.

The relief granted also is narrowly tailored to address the harm because, as Plaintiff states in his motion, the FDOC's "own witnesses and the correctional records demonstrate[] unequivocally that [Plaintiff's] consignment

to solitary conditions is <u>not</u> currently warranted." Pl. Motion at 14 (emphasis in original). At the evidentiary hearing, in fact, no FDOC witness could explain why a CM or administrative confinement status is currently justified based on Plaintiff's present risk assessment. On the contrary, Plaintiff's security evaluations for the months of September and October were satisfactory and above satisfactory. <u>Id.</u> at 138-39. <u>See also</u> Doc. 220-11 at 2-3. The FDOC's own clinicians indicate Plaintiff "has demonstrated he has the coping resources to manage CM [close management] or GP [general population] environments." Doc. 225-1 at 50. Additionally, Dr. Greenfield testified that Plaintiff is able to care for himself and follows the rules. Hng. Tr. III at 90.

Moreover, the Court has not directed the FDOC to keep Plaintiff in the general population regardless of his future behavior. To that end, the Court's Order in no way prevents the FDOC from managing its prisons or enforcing rules designed to protect inmates and staff. For instance, if Plaintiff engages in future behavior that warrants the imposition of disciplinary measures, the FDOC, of course, is entitled to impose disciplinary measures on Plaintiff in accordance with FDOC policies. The Court's directive that any such ICT hearings be recorded, along with any mental health evaluations that may be conducted or used in connection with a future ICT process, similarly is narrowly tailored to address the constitutional violation and is the least

13

intrusive means of developing a record for the parties and the Court should future violations occur.

The FDOC contends the Court has ordered relief Plaintiff did not seek. See FDOC Motion at 16. This is not accurate. Not only is the relief granted narrowly tailored to correct the constitutional violation, but it also is consistent with the relief Plaintiff seeks both in his amended complaint and in his motion. See generally Am. Compl; Pl. Motion at 2 (requesting that the FDOC be barred from holding Plaintiff in solitary confinement conditions such that he is held in his cell for more than 22 hours per day with little to no meaningful contact with others).

The Court is not unsympathetic to the FDOC's extraordinary responsibility to administer safe prisons under immense pressures. But "the unenviable task of keeping dangerous men in safe custody" must be accomplished "under humane conditions." See Farmer v. Brennan, 511 U.S. 825, 845 (1970). When a court is confronted with convincing evidence of inhumane conditions, "court-ordered correction of [those] inhumane prison conditions" is appropriate. Id. This is especially true when prison officials have been informed their practices have infringed or are infringing an inmate's constitutional rights, but those officials persist in that conduct. Id. ("In a suit . . . [that] seeks injunctive relief to prevent a substantial risk of serious injury

14

from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct.'").

Aside from suggesting the Court is encroaching on the FDOC's administrative authority, see FDOC Motion at 16, 22, the FDOC fails to show how the Court's Order would adversely impact the "public safety or the operation of [the] criminal justice system." See 18 U.S.C. § 3626(a)(2).

For the reasons stated herein, on the record at the evidentiary hearing, and in the Court's prior Order granting Plaintiff injunctive relief (Doc. 203), it is

**ORDERED:**

1. Plaintiff's emergency motion for injunctive relief (Docs. 220, 225) is **GRANTED in part** to the extent the FDOC must return Plaintiff to a general population housing status forthwith, meaning as quickly as can be done safely. Upon the FDOC's decision on where to house Plaintiff, the FDOC or its counsel shall notify Plaintiff's attorney of that decision. If Plaintiff engages in conduct that warrants a recommendation for CM status, the FDOC shall immediately begin the ICT process and record by video and audio any ICT hearings pertaining to Plaintiff's housing status. Any video and audio recordings shall be retained and preserved until further Order of the Court and

shall remain confidential, that is to say for attorneys' and necessary FDOC staff's eyes only and be immediately provided to counsel and filed with the Court under seal immediately after said ICT hearings. Any mental health examinations that may be conducted or used in connection with the ICT process shall be video and audio recorded and preserved and treated confidentially (for attorneys' and necessary FDOC staff's eyes only) and filed with the Court under seal.

2. The FDOC's emergency motion to stay (Doc. 245) is **DENIED**.

3. The parties' closing arguments or proposed findings of fact and conclusions of law are due by **Thursday, February 3, 2022**. The Court defers ruling on any other prospective injunctive relief Plaintiff seeks pending receipt of the parties' additional briefing.

4. The FDOC shall immediately file a notice advising of Plaintiff's current housing status and location.

**DONE AND ORDERED** at Jacksonville, Florida, this 31st day of January 2022.

                                                                     _____
                                                                     BRIAN J. DAVIS
                                                                     United States District Judge

Jax-6 1/31
c:
Counsel of Record