[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13455

Non-Argument Calendar

_____

WILLIAM H. MELENDEZ,

                                                    Plaintiff-Appellee,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

JOHN PALMER,

Assistant Regional Director,

STATE OF FLORIDA DEPARTMENT OF CORRECTIONS,

an agency of the State of Florida,

DONALD DAVIS,

JEFFREY R. MCCLELLAN,

2                    Opinion of the Court                21-13455

                                        Defendants-Appellants,


WARDEN, FLORIDA STATE PRISON, et al.,


                                                    Defendants.


_____


Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:20-cv-01023-BJD-JBT

_____


_____


No. 22-10306

Non-Argument Calendar

_____


WILLIAM HOWER MELENDEZ,

                                            Plaintiff-Appellee,

*versus*

STATE OF FLORIDA DEPARTMENT OF CORRECTIONS,
an agency of the State of Florida,

Defendant-Appellant,

WARDEN, et al.,

Defendants.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:20-cv-01023-BJD-JBT

————————————————

Before JORDAN, NEWSOM, and LAGOA, Circuit Judges.

PER CURIAM:

These consolidated cases concern the appeals of two district court orders granting William Melendez's first and second motions for preliminary injunction against the Florida Department of Corrections ("FDC"), Mark Inch, in his official capacity as the Secretary of FDC, and various FDC officers and officials (collectively, "Defendants"). For the reasons explained below, we conclude that Defendants' appeal as to the first preliminary injunction is moot and that no exception to mootness applies. We therefore dismiss the appeal as to case number 21-13455. As to the second preliminary injunction, we conclude that the district

court did not abuse its discretion in granting Melendez's motion. We therefore affirm the appeal as to case number 22-10306.

## I.    BACKGROUND

Melendez, a sixty-two-year-old inmate in Florida state prison, filed a second amended complaint for damages and injunctive relief against Defendants and other nonparty state officials.  In his complaint, Melendez brought claims under 42 U.S.C. § 1983, alleging violations under the First, Eighth, and Fourteenth Amendments, as well as violations of the Americans with Disabilities Act and the Rehabilitation Act of 1973.

Of relevance to this appeal, Melendez alleged that Defendants had held him in solitary confinement continuously, except for a four-month period, since he attempted suicide on August 24, 2016.  During his term of solitary confinement, Melendez alleged that he was classified as "Close Management" ("CM"), which is used by FDC to isolate inmates that FDC has determined cannot remain in the general prison population without abusing the rights and privileges of others.  He alleged that he had remained in the most restrictive level of CM, "CM I," for most of his confinement.  He additionally alleged that Defendants, through their isolation-related practices and policies, had "subjected [him] to a substantial risk of serious harm and deprived him of the minimal civilized measure of life's necessities and basic human dignity by exposing him to excessive periods of isolation in deplorable conditions."  He further alleged that Defendants were aware of these deprivations and remained deliberately indifferent to them and

had not acted to reduce or eliminate the risk posed by them, all in violation of the Eighth Amendment.  Defendants filed an answer generally denying Melendez's allegations.

## A.  First Preliminary Injunction (Case No. 21-13455)

On September 27, 2021, Melendez filed his first motion for preliminary injunction, alleging that he was "in existential crisis, having recently made multiple attempts to kill himself," and needed "immediate inpatient psychiatric treatment."  He claimed that a mental health expert had evaluated him and determined that he was "at an extremely high risk of suicide" and required "prompt transfer to an inpatient treatment unit."  Melendez argued that he satisfied the four-part test for issuing a preliminary injunction because: (1) he was likely to succeed on the merits of his claims; (2) he would suffer irreparable harm if the injunction was not granted, as he was at extremely high risk of suicide and other serious injury due to his ongoing isolation and subsequently worsening mental illness; (3) the balance of harms and the public interest favored granting the injunction; and (4) the injunction met the Prison Litigation Reform Act's ("PLRA") "needs-narrowness-intrusiveness requirements."  In support of his motion, Melendez submitted: (1) reports authored by Dr. Terry Kupers, a board-certified psychiatrist who had twice evaluated Melendez, as recently as September 15, 2021, and diagnosed him with "major depressive disorder with psychotic features (including paranoia) and very high suicide risk"; (2) Melendez's declarations; (3) FDC records documenting Melendez's self-harm; (4) dis-

ciplinary and classification records; and (5) a declaration from Dan Pacholke, a veteran correctional administrator, who opined that CM was not appropriate housing for Melendez. Melendez requested an evidentiary hearing.

The district court ordered Defendants to respond to the first preliminary injunction motion and set a hearing for October 6, 2021. The district court denied Melendez's request for an evidentiary hearing because the motion did not appear to involve "bitterly contested" facts or require it to make credibility determinations.

Defendants responded, arguing that Melendez did not have a "serious mental illness" but suffered from "a generalized anxiety disorder and an antisocial personality disorder." They argued that Melendez was not actively suicidal, that he inflicted self-harm for secondary gain, that he was being offered mental health services consistent with his diagnoses, and that a higher level of care was not warranted. Defendants further argued that Melendez failed to satisfy the elements for an injunction, contending that the evidence showed he had repeatedly demonstrated an inability to live in the general population ("GP") of the prison without abusing the rights and privileges of others. They submitted the following evidence in support of their response: (1) an affidavit from Assistant Warden Jeffrey McClellan that summarized Melendez's disciplinary history and CM classification (with attached records); (2) records listing FDC's reviews of Melendez's placement in solitary confinement; (3) a request for judicial notice of an expert report

from another case; and (4) a report from FDC mental health director Dr. George Emanoilidis. Melendez filed a reply to Defendants' response.

Following the hearing on the first preliminary injunction motion, the district court made the following findings: (1) Melendez was likely to succeed on his Eighth Amendment claim as to his conditions of confinement based on the record evidence; (2) Melendez showed irreparable harm, specifically death; (3) Melendez's transfer to a psychiatric hospital within FDC was a "miniscule, if nonexistent" harm to Defendants; and (4) the public interest favored adequate treatment of mentally ill people." The district court entered an endorsed order the same day granting the first motion for preliminary injunction. The district court directed Defendants to immediately transfer Melendez from CM to "a suitable mental health unit for inpatient psychiatric treatment where [he] shall remain until a qualified licensed mental health provider at the transferee institution determines [he] is medically and psychologically capable of returning to [GP]" and to "video record all of [his] interactions with staff on account of [his] physical or mental health or problematic behavior and transportation until [he] is transferred to an inpatient psychiatric facility and upon his return therefrom."

Then, on October 15, 2021, the district court issued a written order explaining its findings and reasoning for granting the injunction. First, the district court found that Melendez had demonstrated a likelihood of success as to his Eighth Amendment

claim against Defendants.  The district court recognized that solitary confinement, in and of itself, was not prohibited by the Eighth Amendment, but that the length of such confinement could not be ignored, noting several recent concurring and dissenting opinions from the Supreme Court that questioned the constitutionality of lengthy terms of solitary confinement.  The district court noted that Melendez did not object to solitary confinement in a general sense but rather complained that his extended commitment deprived him of the most basic constitutional guarantees of humane treatment.  The court recognized that the evidence showed Melendez spent most of the previous five years in CM.  Specifically, Melendez had CM I status from September 13, 2016, through June 17, 2019, and again from October 19, 2020, through October 6, 2021, resulting from disciplinary charges against Melendez that were overturned.  The court noted that, after the first CM I stint, he was downgraded to CM II then CM III, successfully completing the CM step-down program on March 23, 2020.  The court also explained that, pursuant to the Florida Administrative Code ("FAC"), the Institutional Classification Team ("ICT") was required to conduct regular reviews of an inmate's CM status—once a week for the first sixty days, and then once every thirty days thereafter.  And, after an inmate is on CM status for six months, the district court explained that the classification officer was required to interview the inmate and prepare a formal assessment and evaluation.

The district court credited Pacholke's opinions as to solitary confinement, i.e., that it should be used sparingly and for the shortest time possible, aligned with the stated purpose of regular reviews for inmates' CM statuses and with Eighth Amendment jurisprudence that harsh conditions may become cruel and unusual if they persist for long periods of time without penological justification.  The district court also found the opinions of Dr. Kupers— who had interviewed Melendez twice within the last six months and had reviewed his prison medical records— convincing, credible, and entitled to significant weight.  Specifically, Dr. Kupers opined that solitary confinement exacerbated Melendez's mental illness—diagnosed as major depressive disorder with psychotic features, including paranoia, and very high suicide risk—and created daily situations where he was in conflict with custody staff and that Melendez needed to be transferred to a unit where more intensive mental health treatment was available.  Dr. Kupers explained that Melendez thought about suicide all the time and had attempted suicide at least seven times since 2013, most recently in August 2021, and that despite these incidents, FDC did not recognize that he was at risk of self-injury.

As to Dr. Emanoilidis's opinion that Melendez was not currently in crisis and that his mental health needs were being met, the district court noted that Dr. Emanoilidis had not personally evaluated Melendez nor spoken to him for more than ten minutes.  Additionally, Dr. Emanoilidis's opinions were based on his limited interactions with Melendez, the results of Melendez's

last full psychiatric evaluation, and records prepared by FDC clinicians who, the district court found, had spent little time examining Melendez and had underreported his "serious psychopathology."  By contrast, Dr. Kupers had personally evaluated Melendez for nearly five hours.

Furthermore, the court explained that it was troubled by the fact that FDC officials ignored Melendez's "suicidal gestures" and returned him to solitary confinement after such incidents and that mental health professionals in the prison neither intervened when Melendez unilaterally refused mental health treatment nor recorded the extent of Melendez's psychosis.  In particular, the court noted that, as to Melendez's August 2021 "suicidal gesture" in which he inserted two nails into his arm, a Multidisciplinary Service Team ("MDST") neither acknowledged the incident in its treatment progress meeting and report conducted within days of the incident, nor did the team have a psychiatrist evaluate Melendez.  The district court also noted that Melendez averred he told MDST at the meeting that he was hearing voices but that he was returned to his solitary confinement cell instead of immediately being taken to a medical unit or the hospital.  And, the court explained, when Melendez was eventually taken to the hospital, the doctor who evaluated him recognized his serious need for psychiatric intervention, bolstering Dr. Kupers's opinion.

The district court further stated that Melendez not only had been consigned to CM I status for an inordinately long time period, but that time period, in combination with the conditions

of CM I, suggested he was deprived of the minimal civilized measure of life's necessities, including human interaction, exercise, and regular opportunities to cleanse himself. The court noted Melendez's statements that, despite the rules governing CM inmates, he was not permitted to exercise outdoors since July 26, 2020, and, as of September 24, 2021, he had not showered in four weeks, leading to a staph infection in his legs. Melendez also averred that he laid awake at night afraid that officers would enter his cell and assault him. The court noted that Defendants had not offered evidence to rebut those assertions. Thus, the evidence demonstrated that Melendez's "lengthy confinement in [CM I] pose[d] a substantial risk of serious harm to his mental and physical health."

The district court also determined that Melendez was likely to establish that Defendants were deliberately indifferent to the risk of harm he faced "by the very fact that the risk is obvious," as the risks of harm associated with prolonged periods of isolation are well known, including by corrections officials tasked with promulgating and enforcing rules for safety and well-being of inmates. The court explained that FDC staff was aware of Melendez's stay in CM I because of their obligation to visit CM units and because, prior to Melendez's action, his attorney sent a letter to the then-warden of the prison detailing Melendez's mental health deterioration, his grievances, and the fact that he was, at the time, on a hunger strike.

12                    Opinion of the Court                    21-13455

As to the other injunction elements, the district court found that Melendez demonstrated the threat of irreparable harm because of his suicidal behavior and depression and because potential death constituted the ultimate irreparable injury. The court found the risk of harm to Defendants was minor, given that FDC already maintained facilities equipped to treat mentally ill prisoners. And the court explained it was in the public interest to ensure prisoners with mental illness are humanely treated in accordance with the Constitution. The court further explained that its relief was "narrowly drawn and extends no further than necessary to address the harm [he] was facing when he filed his emergency motion," as its directives ensured Melendez's rights were not further infringed in addition to safeguarding prison staff interacting with him.

Defendants appealed and moved to stay the first preliminary injunction in the district court pending their appeal. The district court denied Defendants' stay motion. Defendants filed an emergency motion to stay the preliminary injunction pending appeal in this Court, which we denied on October 11, 2021. On January 4, 2022, the first preliminary injunction expired by operation of law. *See* 18 U.S.C. § 3626(a)(2).

## B.  Second Preliminary Injunction (Case No. 22-10306)

On January 3, 2022, Melendez filed a second motion for a preliminary injunction. Melendez stated that, following the first preliminary injunction, Defendants began to comply with the court's injunction under threat of sanctions but, within days of

transfer, filed a report to the court downplaying his mental illness and portraying him as a malingerer. According to Melendez, on November 4, 2021, FDC's counsel notified his counsel that FDC had cleared him to return to CM. Then, on November 9, 2021, Melendez was returned to administrative solitary confinement, where FDC stated he would stay pending resolution of its inter-locutory appeal. Melendez asserted that FDC would likely return him to a CM unit upon the expiration of the first preliminary injunction.

Melendez asserted that Defendants had "no intention" of providing him with adequate mental health treatment and there-fore sought an order requiring that: (1) Defendants return Melen-dez to the Transitional Care Unit ("TCU") for inpatient mental health care; (2) a court-appointed, independent expert opine as to his mental health needs; (3) the parties have the opportunity to review the findings of the court-appointed expert and a reasona-ble opportunity to challenge any proposed discharge from the TCU; and (4) Defendants not hold Melendez in solitary confine-ment conditions, i.e., confinement to his cell for at least 22 hours per day or any other confinement characterized by minimal to rare meaningful contact with other individuals and the lack of op-portunities for congregate recreation, meals, and programming. Melendez asserted that he satisfied the test for issuing a prelimi-nary injunction for substantially the same reasons as the first pre-liminary injunction and noted that the court granted his previous injunction. Melendez filed several exhibits in support of his mo-

tion, including a demonstrative exhibit summarizing his special
housing unit records from December 2011 to July 2021, which
were produced by Defendants during expedited discovery.
Melendez also requested an evidentiary hearing.

Defendants again opposed Melendez's motion, arguing
that he was not likely to succeed on the merits of his Eighth
Amendment claim because he could not demonstrate deliberate
indifference and because his placement in CM was penologically
justified.  Specifically, they contended that Melendez was classi-
fied as CM I status because FDC officials determined he could not
be housed in GP.  They further argued that his claim should have
been brought as a writ for habeas corpus relief and was not ac-
tionable under § 1983.  And they argued that the requested relief
did not satisfy the PLRA.

The district court held a three-day evidentiary hearing on
the second preliminary injunction motion.  At the evidentiary
hearing, Melendez presented his own testimony as well as the tes-
timony of Pacholke and Dr. Kupers, both of whom had previous-
ly provided declarations in support of his preliminary injunction
motions.  In opposing the injunction motion, Defendants pre-
sented testimony from: (1) Carl Wesley Kirkland, Jr., the deputy
director of institutional operations at FDC; (2) Dr. Ryan Labrec-
que, an assistant professor of criminal justice; (3) Dr. Emanoilidis;
(4) Dr. Johnathan Greenfield, the assistant statewide psychiatric
director for FDC; and (5) Sergeant Eugene Williams.

At the conclusion of the hearing on January 24, 2022, the district court found that Melendez was likely to succeed in establishing that Defendants, through a pattern and practice, had maintained Melendez on CM status for a majority of the previous five years and that such pattern and practice of administration and maintenance constituted cruel and unusual punishment. The district court found there was no evidence establishing that Melendez should currently be placed in CM status. The court noted that FDC's clinicians indicated that Melendez had "demonstrated he has the coping resources to manage [CM] or [GP] environments" on November 8, 2021. The court further noted Dr. Greenfield's testimony that Melendez could care for himself and follow FDC's rules. And the court recognized that Melendez's security evaluations for September and October 2021 were satisfactory and above satisfactory. As such, the court ordered Defendants to return Melendez to a GP status. The court further ordered the parties to provide proposed findings of fact and conclusions of law regarding any additional preliminary relief. In an endorsed order issued the same day, the district court directed Defendants to return Melendez to GP status "as quickly as can be done safely." The court explained that if Melendez engaged in conduct warranting a recommendation for CM status, FDC shall immediately begin the Institutional Classification Team ("ICT") process—i.e., the process for making and reviewing prisoners' housing status classifications—and record by video and audio any ICT hearings, and any related mental health examinations, relating to his housing status.

Defendants filed their notice of appeal and an emergency motion to stay in the district court.  Subsequently, the district court issued a written order explaining its findings and reasons for granting the second preliminary injunction, adopting its reasoning from the first preliminary injunction, and denying Defendants' motion to stay.  The district court found that Melendez demonstrated a likelihood of success on the merits of his Eighth Amendment claim as to his conditions of confinement.  The court explained that Melendez had offered evidence in support of the allegations in his second amended complaint and second preliminary injunction motion—i.e., that Defendants had intentionally deprived Melendez of basic human needs while holding him in excessive periods of solitary confinement, that Melendez's mental and physical health had dramatically declined, and that he was not allowed outdoor recreation during his entire isolation in CM I and CM II nor allowed the minimum number of weekly showers, in violation of the FAC.

Reviewing the evidence, the court noted Pacholke examined Melendez's confinement status records and testified that Melendez "very rarely gets out of his cell and has participated in little to no recreation and little to no therapeutic programming or classes."  The court noted Melendez's testimony that he received little to no out-of-cell time while in CM status, that he was not permitted to keep his walker because he would not be out of his cell enough to justify it, and that his requests for outdoor recreation were ignored or denied by FDC officers.  Additionally, the

district court explained that, based on the summary of Melendez's special housing records, he was allowed outdoor recreation only 20 times, and 14 of those instances were when he was under the least restrictive CM III status. The court also noted that Melendez's records showed that he received the required minimum of three showers per week only 195 out of 361 weeks and that, at the evidentiary hearing, Melendez showed the black marks that remain on his legs from the staph infection he developed from being deprived of showers for so long.

The court rejected Defendants' contention that Melendez received the privileges to which he is entitled, based on his current housing status, as contradictory to Melendez's evidence, noting that Defendants had failed to offer evidence to dispute Melendez's evidence and that their witness, Kirkland, acknowledged that correctional staff were required to document the programming or privileges inmates on CM status receive. Therefore, the district court, in accordance with its prior ruling in the first preliminary injunction, found that Defendants subjected Melendez to cruel and unusual conditions of confinement and had subjective knowledge of the risk he faced.

The district court additionally found that Melendez will suffer irreparable harm in the absence of the injunctive relief and that his harm outweighed any harm Defendants may incur in complying with the injunction. The court noted that the mental health experts disagreed on whether Melendez was legitimately suicidal or harmed himself for secondary gain but found there

was no dispute that Melendez had engaged in multiple acts of self-
harm, with some requiring emergency treatment.  The court ex-
plained that such acts of self-harm could result in his death, even
if there was a dispute as to the rationale behind the acts.  And the
court noted that Melendez testified that he thought about self-
harm "a lot" and, within the last month, had come close to cut-
ting himself, although he changed his mind after thinking about
his sister.  The district court further found that, given the evi-
dence of a potential past and continuing constitutional violation,
granting Melendez's motion in part by ordering his transfer to GP
status served the public interest.

As to the PLRA's requirements, the district court found
that the granted relief "is narrowly tailored, extends no further
than necessary, and is the least intrusive means to correct the vio-
lation."  The court noted that Melendez had sought much broad-
er relief than what was granted: transfer to the TCU and for an
independent expert to weigh in before being released from the
TCU.  It noted that both parties' experts did not believe Melendez
currently required long-term inpatient treatment.  The court ex-
plained that the relief was tailored to address the violation, as the
evidence indisputably showed that Melendez had spent a majority
of the last five years in CM I status with little to no out-of-cell
time and that there was no dispute that solitary confinement was
a long-term housing solution for inmates.  The court further ex-
plained that the relief was narrowly tailored because Defendants'
own witnesses and the correctional records demonstrated une-

quivocally that Melendez's consignment to solitary confinement was not currently warranted, i.e., no FDC witness could explain why a CM or administrative confinement status was currently justified based on his present risk assessment.  For example, Melendez's recent security evaluations were satisfactory and above satisfactory, FDC's own clinicians indicated that Melendez demonstrated he has the coping resources to manage CM or GP environments, and Dr. Greenfield testified that Melendez was able to care for himself and follow the rules.

Further, the court noted that it had not directed FDC to keep Melendez in GP status regardless of his future behavior, explaining that its order did not prevent Defendants from managing their prisons or enforcing rules designed to protect inmates and staff.  For example, if Melendez engaged in future behavior warranting imposition of disciplinary measures, Defendants were entitled to impose such measures in accordance with FDC policies. It further explained that the requirement that ICT hearings being recorded, along with any mental health evaluations that may be conducted or used in connection with the ICT process, was also narrowly tailored and the least intrusive means of developing a record for the parties and the court, should future violations occur.

The court stated that it was "not unsympathetic to [FDC's] extraordinary responsibility to administer safe prisons under immense pressures," but "[w]hen a court is confronted with convincing evidence of inhumane conditions, 'court-ordered correc-

tion of [those] . . . conditions' is appropriate," especially when prison officials have been informed their practices are infringing an inmate's constitutional rights but persist in that conduct. And the court stated that Defendants failed to show how the injunction would adversely impact the public safety or operation of the criminal justice system. Accordingly, the district court granted Melendez's motion in part and entered the second preliminary injunction.

Following their notice of appeal, Defendants again moved for an emergency stay in this Court pending the resolution of their appeal. We denied Defendants' motion but expedited the case for merits disposition purposes and consolidated the cases.

## II.    STANDARD OF REVIEW

"We review a district court's grant of preliminary injunctive relief for abuse of discretion." *Jones v. Governor of Florida*, 950 F.3d 795, 806 (11th Cir. 2020). Our review of an order granting a preliminary injunction "is extremely narrow in scope." *Id.* (quoting *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997)). "[W]e review the district court's underlying legal conclusions *de novo* and its findings of fact for clear error." *Id.* "This deferential standard follows from '[t]he expedited nature of preliminary injunction proceedings,' in which 'judgments . . . about the viability of a plaintiff's claims and the balancing of equities and the public interest . . . are the district court's to make.'" *Id.* (alterations in original) (quoting *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,

425 F.3d 964, 968 (11th Cir. 2005)).  "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with the definite and firm conviction that a mistake has been committed."  *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008) (quoting *Dresdner Bank AG v. M/V Olympia Voyager*, 465 F.3d 1267, 1275 (11th Cir. 2006)); *accord Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010) ("[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (alteration in original) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985))).

We review the question of mootness *de novo*.  *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021).

## III.    ANALYSIS

In their consolidated appeals, Defendants contend that the district court erred in granting Melendez's motions for preliminary injunction in its first and second preliminary injunction orders.  We address the two injunction orders in turn.

### A.  First Preliminary Injunction in Case No. 21-13455

In their first appeal, Defendants argue that the district court erred in granting Melendez's first motion for preliminary injunction.  In their briefing, Defendants recognize that the district court's first preliminary injunction, entered on October 6, 2021, expired by operation of law on January 4, 2022.  But Defendants

assert that we should not find its appeal of the first preliminary injunction moot under the "capable of repetition, yet evading review" exception to mootness because Melendez sought (and obtained) a second preliminary injunction.  *See Sierra Club v. Martin*, 110 F.3d 1551, 1554 (11th Cir. 1997).

Congress enacted the PLRA "to expedite prison litigation and end judicial overreach into the management of prisons."  *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1205–06 (11th Cir. 2021).  In doing so, Congress established the limited circumstances in which district courts can issue "prospective relief" in inmates' civil actions challenging their prison conditions.  *Id.* at 1206.  Specifically, 18 U.S.C. § 3626(a)(1)(A) provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

Section 3626(a)(1)(A)'s requirements are often referred to as the "need-narrowness-intrusiveness" requirements.  *Ga. Advoc. Off.*, 4 F.4th at 1206.

Section 3626(a)(2) sets forth the requirements for preliminary injunctive relief.[1]  The statute "confirms that courts can issue preliminary injunctions in prison cases 'to the extent otherwise authorized by law.'" *Ga. Advoc. Off.*, 4 F.4th at 1206–07 (quoting § 3626(a)(2)).  The statute also provides that "preliminary injunctive relief must meet the need-narrowness-intrusiveness requirements." *Id.* at 1207.  And "it provides that preliminary injunctive relief shall expire within 90 days unless the court does two things: (1) makes the need-narrowness-intrusiveness findings for prospective relief under § 3626(a)(1), and (2) makes the order final." *Id.*

Melendez argues that Defendants' appeal of the first preliminary injunction is now moot, given that the injunction has

---

[1] Section 3626(a)(2) provides in full:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

expired.  We agree.  "An appeal is moot 'when, by virtue of an intervening event, a court of appeals cannot grant any effectual relief whatever in favor of the appellant.'"  *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996)).  "One such intervening event is the expiration of a preliminary injunction that is being challenged in an interlocutory appeal." *Id.* at 1228–29. And, as we have recently explained, "when a preliminary injunction expires by operation of law under § 3626(a)(2), any appeal from that injunction is moot." *Ga. Advoc. Off.*, 4 F.4th at 1215.  It is undisputed that the first preliminary injunction, which was not made final by the district court, expired on January 4, 2022. Therefore, Defendants' appeal of the first preliminary injunction is now moot.

While Defendants argue that we should apply the capable of repetition, yet evading review exception to mootness, we decline to do so.  The capable of repetition, yet evading review exception "applies in 'exceptional circumstances' where '(1) there is a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Ga. Advoc. Off.*, 4 F.4th at 1215 (alteration adopted) (quoting *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1228–29).  "The remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there

would be ample opportunity for review at that time." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001). And, in the context of a preliminary injunction under the PLRA, the exception does not apply "merely because the district court might enter another preliminary injunction without making additional need-narrowness-intrusiveness findings and making the order final within 90 days." *See Ga. Advoc. Off.*, 4 F.4th at 1216.

Moreover, the issues that Defendants raise as to the first preliminary injunction, even if capable of repetition, are not "evading review." Indeed, we address below the merits of Defendants' arguments against the second preliminary injunction.

Accordingly, we conclude that Defendants' appeal of the district court's order granting Melendez's first motion for preliminary injunction is now moot. We therefore dismiss the appeal as to case number 21-13455.

## B. Second Preliminary Injunction in Case No. 22-10306

We now turn to Defendants' appeal of the second preliminary injunction. Defendants argue that the district court erred in granting the second preliminary injunction for several reasons. First, they contend that the injunction impermissibly grants relief beyond the purported constitutional violation. Second, they argue that the injunction does not comply with the PLRA. Third, they contend that the district court erred in finding Melendez met his burden under Federal Rule of Civil Procedure 65 to establish the required elements for granting a preliminary injunction.

Fourth, they claim that the district court erred in ordering Melendez released from restrictive housing under § 1983. Finally, they argue that the injunction violates the separation of powers and federalism. We begin our analysis by determining whether the second preliminary injunction satisfies all the elements required for entry of injunctive relief and then turn to Defendants' other arguments.

### 1. *Whether Melendez demonstrated all the elements required for entry of a preliminary injunction*

For a district court to grant preliminary injunctive relief, the plaintiff must demonstrate that: (1) there is a substantial likelihood of success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened harm to the plaintiff outweighs the harm an injunction may cause to the defendants; and (4) the injunction does not disserve the public interest. *Ga. Advoc. Off.*, 4 F.4th at 1200. We are mindful that, in this Circuit, a preliminary injunction is an extraordinary remedy not to be granted unless the movant clearly establishes the burden of persuasion for each of the four elements. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

On appeal, Defendants argue that the second preliminary injunction satisfies none of these elements.

### a. *Substantial likelihood of success on the merits*

"A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain* success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1298 (11th Cir. 2005) (emphasis in original).  Here, Defendants argue that the district court erred in finding that Melendez was likely to succeed on the merits of his Eighth Amendment claim as to the conditions of his confinement.

The Eighth Amendment's prohibition against cruel and unusual punishment "prohibits the 'unnecessary and wanton infliction of pain,'" *Thomas*, 614 F.3d at 1303 (11th Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)), "or the infliction of pain totally without penological justification," *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987).  The Eighth Amendment can serve as a basis for a claim challenging specific conditions of confinement.  *Thomas*, 614 F.3d at 1303.  A conditions-of-confinement claim "requires a two-prong showing": (1) "an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities'" and (2) "a subjective showing that the official had a 'sufficiently culpable state of mind.'"  *Id.* at 1304 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985) (explaining an Eighth Amendment violation may occur when a state fails "to provide prisoners with reasonably adequate food, clothing, shelter, and sanitation").  Whether an injury or deprivation is sufficiently serious to satisfy the objective prong "is a question of law we evalu-

ate based on 'evolving standards of decency,'" and "[w]e balance these standards of decency against prison officials' need to keep the prison safe." *Thomas*, 614 F.3d at 1307 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). An inmate does not need to await a tragic event before seeking relief, but he must show that "a condition of his confinement 'pose[s] an unreasonable risk of serious damage to his future health' or safety." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (alteration in original) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

With respect to the subjective inquiry in prison conditions cases, "the relevant state of mind for purposes of liability is deliberate indifference." *Thomas*, 614 F.3d at 1304; *Farmer*, 511 U.S. at 834. The deliberate indifference standard sets a "high bar" in the prison context. *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020). "Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show 'subjective recklessness as used in the criminal law.'" *Id.* at 1285–86 (quoting *Farmer*, 511 U.S. at 839–40). Thus, the plaintiff must show defendants "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (alteration in original) (quoting *Halte v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995)). Whether prison officials possessed the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official

knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842).

We have long held that "administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment." *Sheley v. Dugger*, 833 F.2d 1420, 1428–29 (11th Cir. 1987). But "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards"; therefore, "the length of time in isolation is a factor which must be considered" in analyzing an inmate's Eighth Amendment claim. *Id.* at 1429 (quoting *Hutto v. Finney*, 437 U.S. 678, 686 (1978); *accord Hutto*, 437 U.S. at 486–87 ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."). Indeed, certain "conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). And there is a "'well established' Eighth Amendment right 'not to be confined . . . in conditions lacking'" either basic sanitation or hygiene. *See Brooks v. Warden*, 800 F.3d 1295, 1303–04 (11th Cir. 2015) (quoting *Chandler v. Baird*, 926 F.2d 1057, 1065–66 (11th Cir. 1991)); *see also Chandler*, 926 F.2d at 1063–66.

Given our deferential standard of review at the preliminary injunction stage, *see Jones*, 950 F.3d at 806, we cannot say that the district court abused its discretion in finding that Melendez's Eighth Amendment claim was likely to succeed on the merits. At the outset, we note that many of Defendants' arguments center on the district court's factual findings and credibility determinations made in granting the second preliminary injunction. But our review of the district court's factual findings is for clear error, meaning that, after reviewing the record evidence, we "must be left with the definite and firm conviction that a mistake has been committed." *Bryant*, 530 F.3d at 1377 (1377 (quoting *Dresdner Bank*, 465 F.3d at 1275); *Thomas*, 614 F.3d at 1307. And here, we find that the district court's factual findings are supported by the record evidence and based on credibility determinations it made after listening to the witnesses' testimonies. The district court was permitted to make credibility determinations as to the witnesses during the three-day evidentiary hearing, *see McDonald's Corp v. Robertson*, 147 F.3d 1301, 1311–12 (11th Cir. 1998), and we give the district court's credibility determinations made at a preliminary injunction evidentiary hearing "a great deal of deference," *see Mesa Air Grp. v. Delta Air Lines, Inc.*, 573 F.3d 1124, 1130 n.7 (11th Cir. 2009); *see also Stano v. Butterworth*, 51 F.3d 942, 944 (11th Cir. 1995) ("[A]s mandated by the Supreme Court, we will give even 'greater deference' to factfindings of the district court that are based on determinations of the credibility of witnesses." (quoting *Anderson*, 470 U.S. at 575)).

Turning to the objective prong, the district court did not abuse its discretion at the preliminary injunction stage in finding that Melendez made a "showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities'" based on the record before us. *See Thomas*, 614 F.3d at 1304 (quoting *Farmer*, 511 U.S. at 834). As the district court found, for a vast majority of the relevant time period, Melendez was placed in CM I status. The FAC defines CM as "the separation of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, when the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code r. 33-601.800(1)(a). CM I is the most restrictive of CM designations. *Id.* r. 33-601.800(2)(a). The FAC states that CM inmates shall have an exercise schedule "to ensure a minimum of six hours per week . . . of exercise out of doors," *id.* r. 33-601.800(10)(m), and a minimum of three showers per week, *id.* r. 33-601.800(10)(e). FDC staff are required to visit CM units weekly, *id.* r. 33-601.800(15), and the warden (or assistant warden) is a member of the ICT, *id.* r. 33-601.800(1)(g), which "evaluate[s] the recommendations for CM placement and the mental health assessment, interview[s] the inmate, and consider[s] all relevant information provided to the ICT by the inmate, *id.* r. 33-601.800(3)(h). ICT is required to review an inmate's CM status once per week for the first 60 days and once every 30 days thereafter. *Id.* r. 33-601.800(16)(a). "The purposes of this review shall

be to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that this can be done safely." *Id.*

Here, the district court—relying in part on the reasoning from its first injunction—found that there was evidence showing Melendez's "lengthy confinement in [CM I] pose[d] a substantial risk of serious harm" such that he was likely to succeed on his Eighth Amendment conditions of confinement claim. The district court explained that Melendez was consigned to CM I status for an "inordinately long period of time," which "in combination" with the conditions of how CM I status was applied to him, suggested that he had been deprived of the "minimal civilized measure of life's necessities." The district court found that Melendez was placed in excessive periods of isolation and deprived of the minimum out-of-cell recreation time and number of showers required by the FAC for CM I status inmates. The district court credited the testimony of Pacholke and Melendez, who both stated that Melendez had little to no out-of-cell time and went extended periods of time without showering, to the point he had developed a staph infection on his legs. The court further relied on Melendez's summary of the special housing unit records produced by Defendants during discovery, finding that Melendez was allowed outdoor recreation only 20 times out of 2,527 days and received the required weekly minimum of showers only 195 out of 361 weeks while having CM status. Furthermore, the district court found that the evidence demonstrated Melendez's confine-

ment in CM I posed a substantial risk of serious harm to his mental and physical health, crediting Dr. Kupers's opinions that: (1) Melendez suffered from major depressive disorder with psychotic features; (2) Melendez's mental illness had worsened considerably during his years of solitary confinement; and (3) he often thought about suicide. The court also expressed concern that FDC mental health professionals did not recognize nor record the extent of Melendez's mental illness. The court pointed specifically to MDST's August 19 review of Melendez's treatment progress, which did not mention Melendez's days-earlier "suicidal gesture" of inserting battery nails into his arm nor that Melendez was "hearing voices," even though Melendez testified that he had informed MDST of the occurrence.

In issuing the second preliminary injunction, which expressly incorporated the reasoning of the first injunction, the district court credited Melendez's testimony, as well as his two witnesses, Pacholke and Dr. Kupers. Dr. Kupers extensively testified as to his evaluation and diagnosis of Melendez and as to the effects of long-term solitary confinement on mentally ill inmates. For example, Dr. Kupers testified that Melendez had major depressive disorder and suffered from auditory "command hallucinations," that solitary confinement can exacerbate mental illness, that Melendez's mental health had deteriorated while in solitary confinement, and that Melendez "is someone who is an extremely serious suicide risk" with a long history of suicidal behavior. Additionally, Pacholke testified that, based on his review of Melen-

dez's records, Melendez very rarely gets out of his cell and had participated in little to no recreation or therapeutic programing or classes while in CM, and that Melendez did not require confinement in solitary on a near-permanent basis.  The court relied on Melendez's testimony that he had little to no out-of-cell time while in CM, that he was not allowed to keep his walker in CM because officials told him he would not need it, and that his requests for outdoor recreation were either ignored or denied.  And the court recognized that, even though the mental health experts disagreed on whether Melendez was legitimately suicidal, Melendez had testified that he thought about self-harm "a lot."

Thus, the district court concluded that Melendez—an inmate (1) diagnosed with major depressive disorder with psychotic features that was exacerbated by his extended stay in solitary confinement, (2) having a history of self-injurious acts while in CM, with some requiring emergency treatment, and (3) determined to be suicidal by a psychiatrist (Dr. Kupers)—had demonstrated his lengthy confinement in CM I, in combination with him receiving little to no out-of-cell recreation over the majority of a five-year period and being denied showers for multi-week periods, posed a substantial enough risk of serious harm to his mental and physical health to satisfy the objective prong of his Eighth Amendment claim.

Based on the record and our deferential review at the preliminary injunction stage, we conclude that the district court did not err in its conclusion or clearly err in its factual findings.  In-

deed, while solitary confinement, in and of itself, does not constitute cruel and unusual punishment, we must consider the length of the confinement in analyzing Melendez's claim.  *See Hutto*, 437 U.S. at 686–87 ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."); *Sheley*, 833 F.2d at 1428–29 (remanding for an evidentiary hearing because "Sheley's twelve-year confinement in CM raises serious constitutional questions," and noting that "[i]n addition to the mental and physical deterioration he alleges, Sheley's Eighth Amendment claim is supported, at this stage of the litigation, by his contention that his confinement in CM is punitive in nature").  And certain conditions of confinement in combination with one another can constitute an Eighth Amendment violation, even if each would not do so alone, "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. The district court found that the evidence showed Melendez had been deprived of out-of-cell recreation for extended periods of time and of basic hygiene (i.e., being unable to shower for weeks, which led to a staph infection) during his time in CM.  *See id.*; *Brooks*, 800 F.3d at 1303–04 (collecting cases).  Coupled with Dr. Kupers's opinion, credited by the district court, that Melendez's mental illness was exacerbated by the lengthy stay in solitary confinement, we agree that Melendez—at this stage and on this record—has made "an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a

denial of the 'minimal civilized measure of life's necessities.'" *See Thomas*, 614 F.3d at 1304 (quoting *Farmer*, 511 U.S. at 834).

Defendants, however, contend that the district court erred by failing to consider their "legitimate penological justifications" for placing (and retaining) Melendez in CM. Defendants assert that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification,'" *Rhodes*, 452 U.S. at 346 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976)), and that the conditions inflicting unnecessary pain or suffering upon the prisoner "must be balanced against competing penological goals," *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). Defendants assert that the district court failed to determine whether Melendez's placement in CM was totally without penological justification.

Defendants misread our precedents. We agree that, in determining whether an Eighth Amendment violation has occurred, we must balance the conditions inflicting unnecessary pain or suffering upon the prisoner against competing penological goals. *See Thomas*, 614 F.3d at 1307; *LaMarca*, 995 F.2d at 1535; *Ort*, 813 F.2d at 321. And one way to prove an injury was "unnecessary and wanton" is to show that the infliction of pain is without penological justification. But, contrary to Defendants' suggestion, that is not the *only* way an inmate can prove an Eighth Amendment violation. Rather, when penological justifications exist, we must balance those justifications against countervailing considerations suggesting that an injury or deprivation alleged by an inmate is

"objectively 'sufficiently serious' to satisfy the objective prong."
*Thomas*, 614 F.3d at 1307 (first quoting *Rhodes*, 452 U.S. at 346;
then quoting *Farmer*, 511 U.S. at 834).

Defendants additionally contend that the district court
failed to consider Melendez's actions while under CM status, such
as disobeying orders, disrespecting a prison officer, and tampering
with a safety device. While Defendants recognize these infrac-
tions are "non-violent," they point to their expert's testimony that
they are "serious violations" because disruptions and disturbances
can interfere with staff's ability to hear an inmate calling for help
in an emergency. Defendants further point to an incident be-
tween Melendez and Sergeant Williams in July 2020, which
served as the basis for Melendez's most recent placement in CM I.
During this incident, Melendez allegedly placed his hands around
Williams's throat during a medical examination following Melen-
dez's act of self-harm after Williams placed an ammonia stick on
Melendez. Defendants note that the disciplinary report as to this
incident was overturned, but contend that it was based on a tech-
nical error and that the underlying conduct can serve as a basis for
retaining Melendez in CM I.

In its order, the district court found that none of Defend-
ants' witnesses "could explain why a CM or administrative con-
finement status is currently justified based on [Melendez's] pre-
sent risk assessment." The court noted that Melendez's security
evaluations for September and October 2021 were "satisfactory
and above satisfactory" and that Dr. Greenberg had testified that

Melendez could "care for himself" and that he "follows the rules."
The district court relied on an FDC document stating Melendez
"has demonstrated that he has the coping resources to manage
CM or GP environments."   The district court also credited
Pacholke's opinion that there was no sound penological purpose
served by continuing to keep Melendez in CM.   And the district
court, at the hearing and in its written order, explained that if
Melendez engaged in conduct warranting a return to CM status,
Defendants were permitted to immediately begin the ICT status
so long as it was recorded by video and audio.   The district court's
findings are not clearly erroneous, and it did not abuse its discre-
tion in finding that CM was not currently penologically justified
on this record at this stage in the litigation.

Defendants also cite to *Bass v. Perrin*, 170 F.3d 1312 (11th
Cir. 1999), but we find *Bass* factually distinguishable.   In *Bass*, two
CM inmates had their outdoor recreation time suspended for
years through a formal process based on their possession of fire-
arms, stabbing another inmate, murdering a correctional officer,
and participating in a violent escape attempt.   *See id.* at 1315.   The
inmates challenged this deprivation of outdoor time as an Eighth
Amendment violation.   *Id.*   On appeal, we explained that com-
plete lack of outdoor recreation time "certainly involves the 'in-
fliction of pain'" because, while "being in solitary confinement
with minimal time outside is only marginally different from being
in solitary confinement with no time outside, there is nevertheless
a significant difference between some time outside—even a min-

imal amount—and none at all." *Id.* at 1316.  However, we explained that the "pain" was not "unnecessary" or "totally without penological justification" and that "it would be hard to imagine a situation in which two persons had shown a greater threat to the safety and security of the prison," given the inmates' violent criminal convictions and their continued violent behavior including battery and murder since being incarcerated.  *See id.* (quoting *Gregg*, 428 U.S. at 183).  Thus, the complete deprivation of outdoor recreation time "was a rational, albeit debatable, response to the substantial threat posed by the plaintiffs." *Id.* at 1317.  Melendez, however, has not engaged in the pervasive violent conduct we found penologically justified the *Bass* inmates' complete deprivation of out-of-cell recreation.

Defendants further claim that the district court relied on insufficient evidence to determine Melendez had little to no out-of-cell time.  Defendants contend that the district court improperly considered Melendez's demonstrative exhibit, in support of his motion, summarizing the special housing unit records that "were produced by FDC in expedited discovery" and recorded Melendez's "time out of cell."  Defendants assert that the summary was hearsay, not authenticated, and they were not given the opportunity to challenge it.  Defendants, however, did not object to Melendez's reliance on the summary of the records in their response to the motion.  At the evidentiary hearing, the district court informed Defendants' counsel that "the logs . . . that were . . . of record do not show that Mr. Melendez has been pro-

vided those opportunities not to be isolated." Similarly, the district court asked Defendants' witness, Kirkland, whether FDC had records of inmates receiving privileges and program opportunities, Kirkland stated that there were such records, and Melendez's counsel confirmed with Kirkland that the "logs" in question were titled "Daily Record of Special Housing" and their form number was "DC6-229." These two labels corresponded with the sample records Melendez submitted with his motion. Yet Defendants' counsel did not object to the court's consideration of the summary of records. Generally, a failure to object to evidence on the ground of hearsay results in waiver of appellate review of the issue. *See, e.g.*, *United States v. McDonald*, 935 F.2d 1212, 1221 (11th Cir. 1991).

Moreover, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). Relying on *Levi Strauss*, Defendants contend that the record summary was not appropriate for the court to consider because there was an evidentiary hearing where witnesses testified

and exhibits were introduced.  We find Defendants' argument
without merit.  Indeed, the district court in *Levi Strauss* held an
evidentiary hearing regarding the preliminary injunction at issue
where it took witness testimony.  *See* 51 F.3d at 984.  Therefore,
regardless of whether the record summary would be admissible
evidence in support of a permanent injunction, the district court
did not abuse its discretion in relying on the summary at the pre-
liminary injunction stage.[2]

In a similar vein, Defendants criticize the district court's
reliance on the testimonies of Pacholke and Melendez in finding
Melendez had little to no out-of-cell time.  Defendants speculate
that Pacholke relied on the summary of records, rather than the
records themselves (that were provided by Defendants), in form-
ing his opinion.  As to Melendez, Defendants contend that his tes-
timony was "self-serving," and that prisoners' suits should be
viewed with skepticism, are predicated upon a prisoner's bore-
dom and resentment of authority, and can lack substantial basis in
fact.  But, as we have explained, the district court's factual find-
ings are reviewed for clear error, and the district court was per-
mitted to resolve credibility determinations after considering the
evidence and testimony at the evidentiary hearing.  And the dis-

---

[2] We express no opinion as to whether Melendez's summary of the special
housing unit records would be admissible at a permanent injunction eviden-
tiary hearing nor at trial if Defendants later choose to object to its introduc-
tion into evidence.

trict court did so, relying in part on their testimonies to find that Melendez had received little to no out-of-cell time while in CM I. We therefore reject this argument.

The subjective prong of Melendez's Eighth Amendment claim—the deliberate indifference standard—is a closer call. In its written order, the district court incorporated its findings and reasoning from the first preliminary injunction as to deliberate indifference. The court found that deliberate indifference was established because "the risk was obvious," i.e., the risks of physical and mental harm associated with prolonged periods of isolation "are well known, certainly by corrections officials tasked with promulgating and enforcing rules for safety and well-being of inmates and staff." In finding so, the court relied on Dr. Kupers's opinions about the literature on the effects of long-term solitary confinement as well as commentary by Supreme Court Justices and by some circuit court opinions. The court also explained that the prison warden and assistant wardens were aware of Melendez's extended stay in CM I given their obligations under the FAC to visit CM units weekly. The district court further relied on a July 2018 letter sent by Melendez's attorney to the then-warden of the prison where Melendez was held, describing his mental health deterioration after spending two years in solitary confinement.

As to the district court's conclusion that Defendants knew the substantial risk Melendez faced by the fact that the risk was "obvious," we hesitate to reach the same conclusion at this stage. Dr. Kupers explained that there was "large literature on the ef-

fects of long-term . . . solitary confinement" with an "evolving
consensus" that, for inmates with serious mental illness, time
served in isolation greatly exacerbates mental illness and "too of-
ten results in suicide." But Dr. Ryan Labrecque, Defendants' ex-
pert witness, testified that Dr. Kupers relied on "opinion pieces
and other low-methodological-quality studies, largely those with-
out comparison groups" in support of his position and dismissed
as outliers "findings from the more methodologically rigorous
studies." We hesitate to conclude, based on this record, that the
risk of harm to mentally ill inmates in lengthy solitary confine-
ment was obvious to Defendants such that they were deliberately
indifferent. On the other hand, we recognize that Melendez's
claims of the risk of substantial harm go further. Melendez claims
that he was held for the vast majority of a five-year period in re-
strictive housing during which: (1) his mental health substantially
deteriorated due to his mental illness, resulting in acts of self-
harm, and (2) he received little to no out-of-cell time for months
(or years) and often was denied the FAC-required number of
three showers per week, including a four-week period where
Melendez was not permitted to shower and subsequently devel-
oped a staph infection in his legs.

Nonetheless, without deciding whether the risk of serious
harm Melendez faced was obvious to Defendants, we conclude
that the district court did not err in determining that, at this stage,
Melendez had demonstrated deliberate indifference by Defend-
ants based on the July 2018 letter his attorney sent to the prison

warden.  Melendez's attorney informed the warden that Melendez had been in CM since September 2016, during which he spent 24 hours per day in his cell, and that his mental health had "deteriorated substantially."  The attorney also informed the warden that Melendez reported that (1) "he informed officers that he was having a psychological crisis and needed to go to medical," (2) officers refused to take him to the medical unit for a crisis visit, and (3) he punctured a vein with a foreign object and began bleeding in his cell, which resulted in Melendez being taken to the infirmary and beaten off camera by several officers.  The attorney additionally listed grievances Melendez had filed, including one that stated the solitary confinement process prevented him from meaningful social interactions and was harmful to him "[m]entally, [p]hysically and [e]motionally."  The attorney asked the warden to investigate Melendez's reports, respond to his grievances, and transfer him to the medical unit to receive appropriate medical and mental health care.[3]  And an assistant warden at the prison acknowledged receipt of the attorney's letter, confirming that the allegations had been documented, Melendez had

---

[3] Although not explicitly relied upon by the district court, we note that Melendez's attorney sent a second letter to FDC regional director John Palmer on August 4, 2020—before the filing of the instant action—to inform the director of Melendez's suicidal behavior and history of self-harm while in isolation and to state that this behavior should have resulted in immediate transfer to an intensive psychiatric care facility.  And, after filing suit, Melendez sent two letters to Defendants' attorney before he filed his first preliminary injunction motion complaining of grievances, including the lack of showers and lack of out-of-cell recreation time.

been evaluated, and that the grievances had been reviewed and addressed.[4]  Finally, we note that FDC's records as to Melendez show a history of self-harm attempts, even if they do not state that the attempts were committed with suicidal intent.

Thus, the court did not clearly err in finding that Melendez, through his attorney, specifically informed Defendants of the substantial risk of serious harm he faced—the deterioration of his mental health based on his extended stay in CM, evidenced by his acts of self-harm, without the "minimal civilized measure of life's necessities," *see Thomas*, 614 F.3d at 1304 (quoting *Farmer*, 511 U.S. at 834), including, e.g., the allowance of any out-of-cell time for recreation.  *Cf. Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 621–22 (11th Cir. 2007) (concluding a reasonable juror could determine that the defendant "actually knew" the inmate faced a substantial risk of serious harm based on the plaintiff's testimony

---

[4] For the first time in their reply brief, Defendants contend that the letters submitted by Melendez that pre-date January 2021, the beginning of his current CM placement, are outside the scope of his challenge and thus were not relevant for the court to consider.  We generally decline to address arguments raised for the first time in an appellant's reply brief.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).  Moreover, we disagree with Defendants' premise—the July 2018 letter informed FDC officials of Melendez's mental health issues, including self-injurious behavior, and that Melendez's nearly two-year stay in CM I, without any out-of-cell recreation time, had resulted in his mental health deteriorating substantially. We fail to see how this letter is not relevant to the determination of whether Defendants actually knew of the substantial risk Melendez faced such that they were deliberately indifferent.

that he told the defendant specific information about the risk to his life and asked to be transferred or placed in protective custody).

Defendants, however, assert that their records show that Melendez either did not express to their mental health staff his complaints of being harmed by the restrictive housing or denied that he was being harmed or suicidal, instead stating his self-harm acts were "instrumental" or for "secondary gain"; in other words, for the purpose of being removed from CM. In essence, Defendants complain that the district court did not credit the evidence and testimony they presented against the issuance of the second preliminary injunction.

We recognize that there is evidence in the record to support Defendants' position that they did not know of any substantial risk of serious harm Melendez faced nor knowingly or recklessly disregarded that risk. For example, Defendants submitted an October 11, 2021, psychiatric evaluation written by Dr. Greenfield, in which he wrote that Melendez denied suicidality and auditory hallucinations. But Melendez presented testimony and evidence to the contrary in support of the injunction. During his testimony, Melendez stated that he experienced auditory hallucinations, which he claimed he had informed FDC officials of during his mental health examinations. He denied making the statements in his evaluations that he was not suicidal. In an October 8, 2021, evaluation, Melendez reported that he was "suicidal due to voices telling him to kill himself." Dr. Kupers also expressed

skepticism during his testimony that Melendez had denied audito-
ry hallucinations and suicide to FDC officials and questioned the
lack of reference to Melendez's past self-harm attempts in many
of the medical records.  Indeed, the district court was troubled by
the omission of Melendez's August 2021 self-harm act involving
"nails" in an MDST treatment progress report written only days
later.

The district court was permitted to make credibility deter-
minations and resolve conflicts in the evidence and testimony
presented by the parties.  While we may not have made the same
factual findings if we were in the position of the district court, our
review of those factual findings is for clear error.  And, after re-
viewing the record, we are not "left with the definite and firm
conviction that a mistake has been committed."  *See Thomas*, 614
F.3d at 1307 (quoting *Anderson*, 470 U.S. at 573).

Accordingly, while we do not rule on the merits of Melen-
dez's claim,[5] we conclude that the district court, at the prelimi-
nary injunction stage, did not abuse its discretion in finding that

---

[5] Indeed, in the preliminary injunction context, "the findings of fact and con-
clusions of law made by a court granting a preliminary injunction are not
binding at trial on the merits," and "it is generally inappropriate for a federal
court at the preliminary-injunction stage to give a final judgment on the mer-
its."  *See Camenisch*, 451 U.S. at 395.

Melendez's Eighth Amendment conditions of confinement claim had a substantial likelihood of succeeding on the merits.[6]

### b. Substantial threat of irreparable harm

Defendants also contend that the district court abused its discretion in finding Melendez demonstrated a risk of irreparable harm. Specifically, Defendants argue that Melendez has not shown irreparable harm because the district court stated that "death may not be 'probable' based on [his] history and mental health assessments," because Melendez did not commit an act of self-harm between November 2021 and January 2022, and because Melendez's "self-serving behavior" should not constitute irreparable harm.

Here, the district court found that Melendez would suffer irreparable harm in the absence of injunctive relief. While noting the experts disagreed on whether he was legitimately suicidal or harmed himself for "secondary gain," it was undisputed that Melendez had engaged in multiple acts of self-harm, with some requiring emergency treatment. The court noted that regardless of Melendez's intent, "acts of self-harm can result in death," citing

---

[6] Defendants also raise a "respondeat superior" argument, i.e., that the district court was required to, but did not find, the Secretary in his individual capacity played a role in the unconstitutional conduct alleged in the case. Defendants, however, did not raise this argument in their response to the second preliminary injunction or at the evidentiary hearing, and we decline to address it for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Dr. Kupers's testimony that "self-harm is an extreme action" and should be treated "as serious because it can, and at times does, lead to death."

Reviewing the record, the district court did not abuse its discretion in concluding that there was a substantial threat Melendez will suffer irreparable harm if the injunction was not granted. *See Ga. Advoc. Off.*, 4 F.4th at 1208. Although the district court did not resolve the factual dispute of the intent behind Melendez's self-harm acts, it nonetheless found that those acts could—intentionally or not—result in Melendez's death. Indeed, the record reflects that some of Melendez's acts of self-harm have resulted in hospitalization and emergency treatment. The district court also noted Melendez's testimony that he thought about self-harm "a lot" and "came close" to harming himself in the month preceding the second preliminary injunction. Additionally, while one recent FDC record states that Melendez's "mood and behaviors have been stable," and he has not engaged in any self-injurious behavior, another record shows that Melendez told FDC mental health staff he was "suicidal due to voices telling him to kill himself." And Dr. Kupers, in an affidavit attached to Melendez's motion, warned that if Melendez was replaced in CM at that time, "his level of despair and anxiety will rise quickly" such that, "to a reasonable degree of medical certainty, he would be at extremely high risk of engaging in further acts of self-harm and dying of the wounds he inflicts on himself."

As such, the district court did not err in finding that Melendez has shown a substantial risk of irreparable harm if the injunctive relief were not granted.

### c.  Balance of the harms and the public interest

Defendants also contend that the district court erred in finding that the threatened harm to Melendez outweighed any potential harm to Defendants and that the injunction would not disservice the public interest.  The balance-of-the-harms and public-interest elements merge when the government is the party opposing the injunctive relief.  *Swain*, 961 F.3d at 1293.

Here, the district court found that the balance of the parties' harms weighed in favor of Melendez and that its order transferring him to GP served the public interest given its finding that there was a past and continuing constitutional violation.  The court explained that it was "not unsympathetic to [FDC's] extraordinary responsibility to administer safe prisons under immense pressures" but that, "[w]hen a court is confronted with convincing evidence of inhumane conditions, 'court-ordered correction of [those] inhumane prison conditions' is appropriate."  It found this was "especially true when prison officials have been informed their practices have infringed or are infringing an inmate's constitutional rights, but those officials persist in that conduct."

Defendants argue that the district court, in weighing the parties' harms, ignored the risk FDC faces by requiring FDC to

discharge Melendez, who they assert belongs in CM I due to his history of violence and non-violent disruptive behavior, to GP. They assert that the district court's injunction undermines FDC's ability to effectively manage prison administration.

We recognize that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Mosley v. Zachery*, 966 F.3d 1265, 1273 (11th Cir. 2020) (alterations in original) (emphasis removed) (quoting *Bell v. Wolfish*, 411 U.S. 520, 547 (1979)). But, at the same time, "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). As explained previously, Melendez has, at this stage, shown a substantial likelihood of success on the merits of his Eighth Amendment claim based on his extended stay in CM I over the majority of a five-year period that was often without the privileges afforded to CM I inmates such as out-of-cell recreation time or showers and that, as a result, exacerbated his mental illness, as evidenced by his acts of self-harm.

Furthermore, the district court found that none of Defendants' witnesses "could explain why a CM or administrative confinement status is currently justified based on [Melendez's] present risk assessment." As the district court found, since being released from CM pursuant to the first preliminary injunction, Melendez has received satisfactory and above satisfactory security

evaluations.  Dr. Greenberg testified that Melendez could care for himself and follow the rules, and an FDC record stated that Melendez had the coping resources to manage CM or GP environments.  The district court also credited Pacholke's opinion that there was no sound penological purpose served by continuing to keep Melendez in CM.  And we note that the district court specifically asked Defendants' counsel during the evidentiary hearing to provide evidence explaining Melendez's current security risk if placed in GP and why it was necessary for him to return to CM status.

Moreover, the second preliminary injunction only pertains to Melendez individually—specifically, his housing in GP—and does not prevent Defendants from initiating the ICT process if Melendez engages in conduct warranting a recommendation for CM status.  Defendants simply must record by audio and video the ICT hearings and any mental health examinations related thereto and file them with the court under seal.  Defendants therefore are not hamstringed from placing Melendez back in CM if he, in their judgment, becomes a safety threat to FDC staff and other inmates while housed in GP.

Defendants also contend that the district court should have "preserve[d] the status quo" in issuing the second preliminary injunction by ordering Defendants to provide Melendez his statutorily required privileges as a CM I inmate, e.g., allowing him the required hours of out-of-cell time and number of showers per week.  But "[i]f the currently existing status quo itself is causing

one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury," e.g., "by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).[7]  As noted above, Melendez has demonstrated, at the preliminary injunction stage, a substantial risk of irreparable harm.  In addition, as the district court found, Melendez was only allowed 20 instances of outdoor recreation over a period 2,527 days and received the required three showers for CM inmates only 195 out of 361 weeks, contrary to the FAC provisions governing CM.  Based on Defendants' history of failing to comply with those rules, we do not believe it was error for the district court to not merely order Defendants to comply with the FAC instead of ordering him released to the GP.

We therefore conclude that the district court did not abuse its discretion in concluding the balance-of-harms and public interest elements favored granting an injunction.

### 2.  Whether the injunction complies with the PLRA

Defendants also contend that the district court failed to comply with the PLRA in issuing the second preliminary injunction.  Specifically, Defendants assert that the district court's order is not "narrowly tailored" because alternative relief could have

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

been ordered—ordering FDC to comply with their existing statu-tory obligations with respect to out-of-cell-time and showering in applying CM status to Melendez.  Defendants further contend that the injunction is not the least intrusive means necessary to correct the violation and claim that the district court failed to ad-dress this prong of the PLRA.  Finally, Defendants assert that the district court failed to make particularized findings as to any of the "need-narrowness-intrusiveness" criteria.

As previously noted, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  § 3626(a)(1)(A).  The PLRA "require[s] particular-ized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness cri-teria."  *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020) (alteration in original) (quoting *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1228).  Particularized find-ings must be made to each of the criteria, and a district court can-not "'simply state in conclusory fashion that the requirements of the [injunction] satisfy' the PLRA's narrowness, necessity, and non-intrusiveness standards."  *Id.* at 1279 (alteration in original) (quoting *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000)).

Reviewing the district court's order, it made the following findings as to the PLRA's requirements.  The district court began

by finding that the relief was "narrowly tailored, extends no further than necessary, and is the least intrusive means to correct the violation."    The district court explained that Melendez had "sought much broader relief than what [it] granted"—i.e., transfer to the TCU and an independent expert evaluation—but it had not ordered that relief, noting Dr. Kupers's testimony that he did not disagree with Dr. Greenfield that Melendez did not currently require long-term inpatient treatment.  The court stated the relief was tailored to address the constitutional violation because the evidence showed that Melendez had "spent a majority of the last five years in CM I status with little to no out-of-cell time" and that there was "no dispute that solitary confinement should not be a long-term housing solution for inmates," citing to the FAC and the testimony of Defendants' expert, Dr. Labrecque.  The court found the relief was also "narrowly tailored to address the harm" because FDC's own witnesses and records demonstrate unequivocally that Melendez's "consignment to solitary conditions [was] *not* currently warranted."  Indeed, the court noted the recent satisfactory security evaluations and the lack of testimony from FDC witnesses to explain why CM status was currently justified based on Melendez's present risk assessment.  The court also explained that it had not directed FDC to keep Melendez in GP regardless of his future behavior and that its order "in no way prevents [Defendants] from managing its prisons or enforcing rules designed to protect inmates and staff."  Furthermore, the court noted that if Melendez engaged in "future behavior that warrants the imposi-

tion of disciplinary measures," e.g., placement back into CM, FDC was entitled to do so in accordance with FDC policies.

As an initial matter, we reject Defendants' argument that the district court failed to address the intrusiveness prong. The district court's order explicitly states that the granted relief was the least intrusive means of correcting the violation. Additionally, the court made findings as to how FDC was not prevented from managing its prisons and enforcing its rules by the injunction and could initiate the ICT process against Melendez if he engaged in behavior warranting a return to CM, and these findings go to the PLRA's intrusiveness prong. We also reject Defendants' argument that the district court's order was merely a conclusory or formulaic recitation of the PLRA requirements; clearly, the district court made findings in support of the "needs-narrowness-intrusiveness requirements," even if Defendants believe those findings are erroneous.

Turning to Defendants' other PLRA arguments, we conclude that none of them have merit. As to the narrowly tailored requirement, Defendants contend that alternative relief could have been ordered, e.g., ordering them to comply with their statutory duties set forth in the FAC as to CM inmates that they had not previously complied with during Melendez's previous confinements in CM. In a similar vein, Defendants argue that the second preliminary injunction grants relief beyond targeting the existing wrong because its order releasing Melendez from CM eliminated a condition that did not violate the Constitution. *See*

*LaMarca*, 995 F.2d at 1543 ("While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong.").

We find that the district court did not abuse its discretion in finding the granted relief—ordering Melendez released into GP housing—was narrowly tailored to the alleged constitutional violation. While Defendants contend that the constitutional violation found by the district court was limited to the fact that Melendez was receiving little to no out-of-cell time, the district court's findings were not so limited. As explained previously, the district court incorporated the reasoning from its first preliminary injunction, in which the court found that: (1) Melendez's inordinately long confinement in CM I, coupled with conditions such as lack of out-of-cell recreation and lack of showering (in violation of the FAC provisions as to CM), suggested he had been deprived of "the minimal civilized measure of life's necessities"; and (2) the lengthy confinement posed a substantial risk of serious harm to Melendez's physical and mental health. Moreover, the district court found that there was no evidence establishing that Melendez should *currently* be placed on CM status based on the recent satisfactory security evaluations and lack of testimony from FDC to the contrary. And the district court had previously credited Dr. Kupers's testimony that solitary confinement exacerbated Melendez's mental illness. Thus, the relief granted is narrowly tailored to the alleged constitutional violation identified by the court. We additionally note that the injunction only applies to Melendez's

individual placement in GP and does not bar Defendants from initiating the process to place Melendez back in CM should his behavior warrant doing so. *Cf. Thomas*, 614 F.3d at 1324 (concluding an injunction was narrowly tailored where it governed the department's treatment of only one inmate "only target[ed] the narrow constitutional violation identified by the district court"—i.e., "the district court's injunction [did] not prohibit all non-spontaneous use of chemical agents on [the inmate] but merely require[d] that the [department's] trained mental health staff evaluate his psychological state prior to authorizing such force").

Defendants also contend that the injunction does not satisfy the "least intrusive means necessary" requirement because they must wait for Melendez to commit behavior warranting a return to CM before initiating an ICT hearing to do so. We disagree. The district court found that FDC's witnesses and correctional records demonstrated that Melendez's "consignment to solitary conditions is not currently warranted" and that finding is not clearly erroneous. In other words, Melendez would need to exhibit behavior constituting a security risk for Defendants to begin the process to place him back in CM. And the district court's order has given Defendants the discretion to do so—Defendants can impose disciplinary measures in accordance with FDC policies and may initiate the ICT process if warranted, so long as they are recorded and presented to the court. *Cf. id.* at 1325–26 (upholding injunction that required "little to no additional expenditures on the part of" the department of corrections and that did not re-

quire "onerous continuous supervision by the court or judicial interference in running [the prison]"). Contrary to Defendants' suggestion, this is not a case where the district court is micromanaging "the minutiae of prison operations." *See id.* at 1325 (quoting *Lewis v. Casey*, 518 U.S. 343, 362 (1996)).

We thus conclude that the district court did not err in finding that the second preliminary injunction satisfied the PRLA's requirements.

### 3. *Defendants' remaining arguments*

Defendants raise two final arguments against the second preliminary injunction. They contend that Melendez's challenge to the decision to place him in CM and his requests to be released from CM could only be made pursuant to a writ of habeas corpus, and not under § 1983.

"When an inmate challenges the 'circumstances of his confinement' but not the validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under § 1983." *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (quoting *Hill v. McDonough*, 547 U.S. 573, 579 (2006)). By contrast, "when an inmate raises any challenge to the 'lawfulness of confinement or [the] particulars affecting its duration,' his claim falls solely within 'the province of habeas corpus.'" *Id.* (alteration in original) (quoting *Hill*, 547 U.S. at 579). As the Supreme Court has stated, "[w]here the prisoner's claim would not 'necessarily spell speedier release,' . . . suit may be brought under

§ 1983." *Skinner v. Switzer*, 562 U.S. 521, 525 (2011) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)).

In his second amended complaint, Melendez sought the following relief as to his Eighth Amendment claim: (1) an order requiring that he be removed from CM and transferred to an appropriate FDC facility for inpatient mental health care; (2) an order preventing Defendants from imposing isolation lasting longer than 72 hours; and (3) an order requiring Defendants to provide him privileges such as outdoor recreation time, access to his tablet, and the minimum-required three showers per week, as well as to allow him to attend ICT hearings as to his housing status. In his second preliminary injunction motion, Melendez sought a similar type of relief. But neither of these requests for relief seek Melendez's "'immediate release from prison,' or the 'shortening' of his term of confinement." *Wilkinson*, 544 U.S. at 79 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 482 (1973)); *accord Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999) ("[Conditions of confinement] quite simply encompasses all conditions under which a prisoner is confined for his term of imprisonment. These include terms of disciplinary or administrative segregation such as keeplock or solitary confinement, as well as more general conditions affecting a prisoner's quality of life . . . ."); *Preiser*, 411 U.S. at 488 (explaining that, in *Haines v. Kerner*, 404 U.S. 519 (1972), the prisoner's claim that prison officials had acted unconstitutionally in placing him in solitary confinement as a disciplinary measure was properly brought in a § 1983 action, as it was solely relat-

ed to the state's alleged unconstitutional treatment of him while in confinement and did not "challenge the very fact or duration of the confinement itself"); *see also, e.g.*, *Quintanilla v. Bryson*, 730 F. App'x 738, 742 (11th Cir. 2018) (reversing a district court's dismissal for failure to state plausible claims of relief as to an inmate's challenge to his solitary confinement as violating the Eighth and Fourteenth Amendments brought in a § 1983 complaint). Similarly, the relief granted by the district court—ordering Melendez released into GP housing from CM—did not result in altering the legality or duration of Melendez's term of confinement. We therefore find that § 1983 is a proper vehicle for the Eighth Amendment claim Melendez raises.

Finally, Defendants briefly argue that the injunction violates the separations of powers and federalism. Defendants again point to their interest in prison management security and that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices." *See Mosley*, 966 F.3d at 1273–74. They assert that the district court acted as a "super-warden" by sidestepping their expertise and judgment and requiring them to release Melendez to GP and that the injunction "hamstrings" their officials by "seeking a permission slip from the district court" if they wish to change Melendez's housing status. *See Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020).

We find this argument without merit. Federal courts have the authority to eliminate and remedy unconstitutional condi-

tions, e.g., those constituting cruel and unusual punishment under the Eighth Amendment. *See Jones v. Diamond*, 594 F.2d 997, 1015 (5th Cir. 1979); *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation."); *see also e.g., Thomas*, 614 F.3d at 1318–22. "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511. Nevertheless, we "must not shrink from [our] obligation to 'enforce the constitutional rights of all "persons," including prisoners.'" *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)). As we have already explained, the district court did not err in concluding that, at the preliminary injunction stage, Melendez's Eighth Amendment claim had a substantial likelihood of success on the merits. And, contrary to Defendants' assertion, the injunction does not hamstring their officials by requiring them to seek permission from the district court to move Melendez back to CM status. Again, as the district court explained, Defendants are entitled to impose disciplinary measures on Melendez in accordance with FDC policies and may initiate the ICT process to place Melendez in CM should his future conduct warrant it.

* * * *

Accordingly, under our deferential standard of review at the preliminary injunction stage, we conclude that the district

court did not abuse its discretion in entering the second prelimi-
nary injunction.

## IV.    CONCLUSION

For the foregoing reasons, we dismiss Defendants' appeal
of the district court's first preliminary injunction in case number
21-13455, and we affirm the district court's second preliminary
injunction in case number 22-10306.

**DISMISSED IN PART, AFFIRMED IN PART.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                                              For rules and forms visit
Clerk of Court                                                              www.ca11.uscourts.gov

April 15, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-13455-GG   ; 22-10306 -GG
Case Style:  William Melendez v. Secretary, Florida Department of Corrections, et al
District Court Docket No:  3:20-cv-01023-BJD-JBT

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website. Enclosed
is a copy of the court's decision filed today in this appeal. Judgment has this day been entered
pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP
41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against appellants</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at
www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number
referenced in the signature block below. For all other questions, please call <u>Joseph Caruso, GG</u>
at <u>(404) 335-6177</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs