UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM H. MELENDEZ,

                    Plaintiff,

v.                                                    Case No. 3:20-cv-1023-BJD-JBT

RICKY DIXON, et al.,

                    Defendants.

_____

## **ORDER**

## I.    **Status & Background**

Plaintiff, William Melendez, an inmate of the Florida penal system, is proceeding on a counseled second amended complaint for the violation of civil rights (Doc. 134; Sec. Am. Compl.). He alleges the Florida Department of Corrections (FDC) and individuals employed by the FDC subjected him to cruel and unusual punishment by holding him in "continuous solitary confinement" for years during which time he was denied the minimum out-of-cell opportunities to which he was entitled. *See* Sec. Am. Compl. ¶¶ 3, 5, 9, 165-220. Plaintiff contends his extended placement in solitary confinement, or close management (CM), exacerbated his "severe mental illness," resulting in suicide attempts and acts of self-mutilation. *Id.* ¶¶ 3, 10-12. Plaintiff also alleges FDC supervisors and officers at both New River Correctional

Institution (NRCI) and Florida State Prison (FSP) violated his rights under the First Amendment (retaliation), the Eighth Amendment (excessive force, failure to intervene), and the Fourteenth Amendment (due process). *Id.* ¶¶ 127-64, 221-318. He also sues the FDC for violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). *Id.* ¶¶ 319-46.

Before the Court are the following motions: (1) the FDC, Dixon, Davis, McClellan, Reddish, Hummel, Palmer, Hunter, Woodall, and Tomlinson's (individuals collectively, "Managerial Defendants") motion for summary judgment (Doc. 393; FDC Mot.), with Plaintiff's response in opposition (Doc. 437; Pl. FDC Resp.) and the FDC's reply (Doc. 470; FDC Reply); (2) E. Williams, Gwara, Moreland, Oliva, and Bryant's (collectively, "NRCI Officer-Defendants") motion for summary judgment (Doc. 417; NRCI Mot.), with Plaintiff's response in opposition (Doc. 443; Pl. NRCI Resp.); (3) Van Allen, Atteberry, Brown, Chandler, Folsom, Nosbisch, Philbert, C. Williams, Geiger, Hall, Knott, Webb, Woods, and Willis's (collectively, "FSP Officer-Defendants") motion for summary judgment (Doc. 423; FSP Mot.), with Plaintiff's response in opposition (Doc. 440; Pl. FSP Resp.) and two replies, one by Van Allen only (Doc. 475; Van Allen Reply) and the other by the remaining FSP Defendants (Doc. 476; FSP Reply);[1] and (4) Plaintiff's motion to strike the affidavit of

---

[1] Defendants jointly submitted exhibits in support of their separate motions and replies, some of which are sealed. *See* Doc. 398 (amended index to exhibits); Doc.

Thomas Reimers (Doc. 436), with the FDC and Managerial Defendants'
response in opposition (Doc. 448).

## II. Motion for Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall
grant summary judgment if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that
a reasonable jury could return a verdict in favor of the nonmovant. *Mize v.
Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston
v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere
scintilla of evidence in support of the non-moving party's position is insufficient
to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger
v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

---

471 (index of exhibits to FDC Reply). Defendants' exhibits will be cited as "Def. Ex."
followed by letter designation (A through MM) and number where applicable.
Plaintiff filed exhibits with each separate response. His exhibits will be cited as "Pl.
[FDC, NRCI, or FSP] Ex." followed by the exhibit number. Plaintiff provides charts
describing generally what each exhibit is in support of his responses to the NRCI
Officer-Defendants' and the FSP Officer-Defendants' motions (Docs. 441, 444). Page
numbers for deposition transcripts correspond to those assigned by the court reporter;
page numbers for all other defense exhibits correspond to the Bates-stamped
numbers at the bottom of each page; page numbers for Plaintiff's exhibits and docket
entries correspond to the number assigned by the Court's electronic case management
system.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Arguments, Analysis, and Evidence

Through Plaintiff's responses to the motions, his claims have substantially narrowed. With respect to the Managerial Defendants, Plaintiff abandons the following claims: retaliation against Defendants Davis, McClellan, Reddish, and Woodall (raised in Counts I.C and I.D); excessive force against Defendants McClellan, Reddish, Woodall, Hummel, and Palmer (raised in Counts III.A, III.B, and III.C); and denial of procedural due process against Defendants Dixon, Hummel, Palmer, Davis, McClellan, Reddish, Hunter, and Tomlinson (raised in Counts IV.A, IV.B, and IV.C). *See* Pl. FDC Resp. at 2 n.1.

In response to the FSP Officer-Defendants' motion, Plaintiff notes he abandons the following claims: retaliation against Defendant Hall (Count I.A); unconstitutional conditions of confinement against Defendant Van Allen (Count II.D); and denial of procedural due process against Defendant Van Allen (Count IV.D). *See* Pl. FSP Resp. at 2 n.1. Moreover, Plaintiff voluntarily dismissed his claims against some of the officers: Oliva, Knott, Willis, Folsom, Webb, Woods, and Geiger. *See* Notice (Doc. 442); *see also* Order (Doc. 446).[2] As

---

[2] It is unclear whether Plaintiff intends to proceed on Count I.B, a retaliation claim against NRCI Officer-Defendants Bryant, Gwara, Moreland, Oliva, and E. Williams. The NRCI Officer-Defendants move for summary judgment on this Count, but their argument revolves around Defendant Oliva, who Plaintiff voluntarily dismissed. *See* NRCI Mot. at 23-32. *See also* Order (Doc. 446). Given Count I.B is based primarily on an allegation that Defendant Oliva retaliated against Plaintiff for

such, the NRCI Officer-Defendants' motion and the FSP Officer-Defendants' motion are due to be denied as moot as to the arguments raised on behalf of the dismissed Defendants.

### A. FDC Motion

Plaintiff pursues the following claims against the FDC and Managerial Defendants: unconstitutional conditions of confinement in violation of the Eighth Amendment against Defendants Dixon, Hummel, Palmer, Davis, McClellan, Reddish, Hunter, and Tomlinson (Counts II.A, II.B, and II.C); and discrimination under the ADA and RA against the FDC (Counts V and VI). With respect to the conditions-of-confinement claims, Plaintiff sues some Managerial Defendants in both their individual and official capacities: Palmer, Davis, McClellan, and Hunter. *See* Sec. Am. Compl. ¶¶ 166, 181, 196. Defendant Dixon is sued in his official capacity only. *Id.* ¶ 166. Defendants

---

filing grievances and encouraged other Defendants to retaliate against him as well, it appears that by dismissing Defendant Oliva, Plaintiff does not intend to pursue this claim against the remaining Defendants. However, no party addresses Count I.B as it relates to the remaining Defendants, so the Court will not address it. It is also unclear whether Plaintiff intends to proceed on Count IV.D against Defendant Brown, who is named in that Count along with Van Allen and Knott (already dismissed). *See* Sec. Am. Compl. ¶ 313. The FSP Officer-Defendants move for summary judgment on this Count, *see* FSP Mot. at 60, and Plaintiff does not oppose it in his response or point to any evidence that would substantiate his due process claim against Defendant Brown, *see generally* Pl. FSP Resp. As such, the Court finds Plaintiff wholly abandons Count IV.D.

Hummel, Reddish, and Tomlinson are sued in their individual capacities only. *Id.* ¶¶ 166, 181, 196.

> **i.   Eighth Amendment Conditions of Confinement**

The conditions-of-confinement claims against the FDC (and Managerial Defendants in their official capacities) have been extensively litigated through preliminary injunction proceedings and, thus, the Court will not recount the relevant Eighth Amendment legal principles governing the issue, which are set forth in its Orders and the Eleventh Circuit's opinion affirming this Court's ruling on Plaintiff's second emergency motion for preliminary injunction.[3] *See* Orders (Docs. 203, 253); Eleventh Circuit Opinion (Doc. 283; USCA Op.). As to the objective prong of the conditions-of-confinement claims, the parties do not dispute that Plaintiff engaged in conduct over the years that prison officials considered rule violations necessitating changes in his confinement status or the suspension of privileges to ensure the safety of the officers, inmates, and prison staff. The parties also do not dispute that Plaintiff successfully stepped

---

[3] This Court held a preliminary injunction hearing in October 2021, *see* Doc. 198; granted Plaintiff's first emergency motion for preliminary injunction, *see* Docs. 198, 203; held a three-day evidentiary hearing on Plaintiff's second emergency motion for preliminary injunction, *see* Docs. 240, 241, 243, 248-50; granted in part Plaintiff's second emergency motion for preliminary injunction, *see* Docs. 242, 253, 266; and entertained a request for a hearing on Plaintiff's motion for a permanent injunction, *see* Doc. 277, which the parties themselves resolved through a settlement.

down from CM status for a time. *See, e.g.*, Def. Ex. EE6 ¶¶ 6-7; Def. Ex. EE7 ¶ 10.

However, the parties dispute whether Plaintiff's conduct warranted such an extended placement in CM status particularly in consideration of his mental illness, which Plaintiff contends contributed to or caused much of his misbehavior ("behavioral dsycontrol") and whether Plaintiff received the rights and privileges to which he was entitled while in CM status. *See* Pl. FDC Resp. at 22 (citing Def. Ex. DD31 at ECF 143 (Dr. Kupers's Nov. 1, 2022 Report)).[4] Plaintiff's expert Dr. Terry Kupers opines that "[s]olitary confinement exacerbates mental illness," and thus Plaintiff's extended stay in solitary confinement caused "more depression, more delusions, [and] more hallucinations," leading to self-harm. *See* Def. Ex. DD31 at Dep. 117. In their motion for summary judgment, Defendants do not dispute or directly address Dr. Kupers's opinions. *See* FDC Mot. at 52-65.

Despite Plaintiff's extended placement in CM status, the FDC and Managerial Defendants argue Plaintiff "has not shown the conditions were

---

[4] Exhibit DD31 includes Dr. Kupers's deposition transcript and his reports. When citing to his deposition transcript, the Court will include the abbreviation "Dep." before the page number, indicating the page number corresponds to that assigned by the court reporter. When citing to Dr. Kupers's reports, the Court will include the abbreviation "ECF" before the page number, indicating the page number is that assigned by the Court's electronic case management system.

extreme enough to rise to the level of a constitutional violation" because he received the privileges to which he was entitled while in CM and because solitary confinement itself does not constitute cruel and unusual punishment. *See id.* at 55. This argument is unconvincing for the reasons previously stated by this Court and the Eleventh Circuit. Indeed, the Eleventh Circuit observed in its opinion, "when penological justifications exist" for administrative decisions affecting an inmate's confinement status or conditions and privileges, the court "must balance those justifications against countervailing considerations suggesting that an injury or deprivation alleged by an inmate is 'objectively sufficiently serious to satisfy the objective prong'." *See* USCA Op. at 36-37 (internal quotation marks omitted) (quoting in part *Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010)).

As he did during the preliminary injunction proceedings, Plaintiff points to some evidence showing the FDC held him in solitary conditions for many years during which time he was deprived of outdoor exercise and some showers. Plaintiff summarizes the extent of his placement in solitary conditions as follows:

> [FDC] has held Plaintiff in restrictive housing—CM, AC,[5] or DC[6]—for 2,319 days, totaling nearly seven years: April 29, 2014, to February 08, 2016;

---

[5] Administrative Confinement.

[6] Disciplinary Confinement.

August 24, 2016 to March 23, 2020; July 13, 2020 to
July 22, 2020; July 26, 2020 to October 8, 2021 (when
he was removed from CM by this Court's order, see
[Doc. 190]; November 8, 2021 to February 11, 2022
(when he was transferred to general population by this
Court's order, [Doc. 253]); April 13 to April 20, 2022;
May 2 to May 9, 2022; May 15, 2022; July 6, 2022 to
the present.

Pl. FDC Resp. at 7. The FDC and Managerial Defendants note that Plaintiff's

estimation of spending "nearly seven years" in CM is a "glaring

mischaracterization." *See* FDC Reply at 3. However, these Defendants

acknowledge that Plaintiff spent at least 1,951 days (total, not consecutive) in

CM status. *See id.*; *see also* FDC Mot. at 5-9, 13-15, 18-21, 24, 35-36; Def. Ex.

DD5 at 134, 147. Regardless of whether Plaintiff was housed in solitary

conditions for nearly seven years—as Plaintiff now advances—or closer to five

years, the evidence shows, as it did at the preliminary injunction stage, that

Plaintiff has spent a considerable length of time in solitary conditions while in

the custody of the FDC. *See* Order (Doc. 203) at 9 (finding Plaintiff had been

held in solitary conditions for 1,359 days); *see also* Order (Doc. 253) at 6 (noting

Plaintiff alleges in his complaint that he was held in solitary conditions for

about four-and-a-half years).

Moreover, the record demonstrates there remain genuine issues of

material fact regarding whether Plaintiff, while held in CM, actually received

the privileges and rights to which he was entitled (specifically showers and

outdoor recreation). Plaintiff contends and provides evidence showing he was repeatedly denied showers, although, it appears, not quite as often as the evidence suggested at the preliminary injunction stage. *See* Pl. FDC Resp. at 10 (citing Pl. FDC Exs. 8, 9, 10; Doc. 171-2 (Plaintiff's Sept. 24, 2021 Dec.) ¶¶ 18-19). Additionally, Plaintiff offers evidence showing he "did not get *any* outdoor recreation during the four years he was in restrictive housing at FSP," and at NRCI, he "got outdoor recreation on just one day for 2 hours." *See* Pl. FDC Resp. at 9-10 (citing Pl. FDC Exs. 7, 8, 43).[7]

The FDC and Managerial Defendants contest Plaintiff's reliance on his summary of the housing records as opposed to the records themselves, suggesting the summary is inaccurate because there are "multiple discrepancies" between it and the underlying housing records. *See* FDC Reply at 6. But their vague reference to purported discrepancies does not demonstrate Plaintiff's evidence is to be completely discounted. Additionally, Defendants contend simply that Plaintiff's representation regarding his out-of-cell opportunities "is incorrect," citing as support an exhibit it provides with

---

[7] Exhibit 7 comprises over 800 pages of FDC forms titled "Daily Record of Special Housing," which document Plaintiff's privileges or rights he actually received while in CM, including showers and outdoor exercise. *See generally* Pl. Ex. 7 (provided to the Court on a thumb drive because of the length). These records appear to be the ones Plaintiff's counsel summarized for the Court's consideration at the evidentiary hearing (Doc. 220-8). *See* Doc. 253 at 8-9, 9 n.6.

its reply and which is 526 pages long. *Id.* at 7-8, 15 (citing Def. Ex. GG (housing records)). The FDC and Managerial Defendants do not cite any specific pages of this exhibit, nor do they summarize it themselves. The Court will not scour the exhibit in search of evidence to support Defendants' argument.

Defendants further contend Plaintiff "neglects to mention his history of refusals of opportunities for outdoor recreation, showers, group therapy, medical evaluation, [and] treatment." *See id.* at 6-7, 15. To the extent the parties disagree over the reason Plaintiff did not receive or refused the showers to which he was entitled or any outdoor recreation, such questions are for the jury. *See, e.g.*, Order (Doc. 203) at 15-16.

With respect to Plaintiff's right to exercise, the FDC and Managerial Defendants point to privilege suspension forms, which document that his right to exercise never was suspended. *See* FDC Reply at 16 (citing Def. Ex. J at 56; Def. Ex. N at 53; Def. Ex. O at 58). This evidence does not rebut Plaintiff's evidence, which shows that, even though his right to exercise never was officially suspended, he did not go outdoors for recreation for years. *See* Pl. FDC Ex. 8.

In short, Plaintiff points to evidence showing he did not receive meaningful out-of-cell time over a period of years while held in CM confinement. Even if Plaintiff at times "refused" to leave his cell for certain

activities, the evidence permits the reasonable inference that Plaintiff's living conditions, considered in combination with his mental illness and other factors, objectively were inhumane. "[C]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *See* USCA Op. at 29 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). *See also* Order (Doc. 203) at 4. While solitary confinement in and of itself does not offend Eighth Amendment principles, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *See* USCA Op. at 29 (quoting *Sheley v. Dugger*, 833 F.2d 1420, 1428-29 (11th Cir. 1987)). *See also* Order (Doc. 203) at 4.

With respect to the subjective prong of the conditions-of-confinement claim, in accordance with this Court's previous ruling, Plaintiff points to enough evidence to create a triable issue as to the FDC and the individuals sued in their official capacities. *See* Order (Doc. 203). *See also* USCA Op. at 43-44. The officials sued in their individual capacities—Defendants Hummel, Palmer, Reddish, Davis, McClellan, Hunter, and Tomlinson—invoke qualified immunity. *See* FDC Mot. at 37, 55-56; FDC Reply at 16-18. As such, the Court will engage in an individualized qualified-immunity assessment. *See Alcocer v.*

13

*Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)) ("Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions.").

Prison officials sued in their individual capacities are "entitled to qualified immunity for [their] discretionary actions unless [they] violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows government employees to exercise their official duties without fear of facing personal liability. *Alcocer*, 906 F.3d at 951. The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. *Id.* In other words, even if a prison official makes a decision that is later found to be constitutionally deficient, the official is entitled to qualified immunity if the decision was based on a reasonable misapprehension of the law governing the circumstances. *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

14

### a. Defendant Erich Hummel

Defendant Hummel "is the former Region 2 Regional Director for the [FDC]," *see* Sec. Am. Compl. ¶ 20, a role he occupied for about two years, from 2017 to September 2019, *see* Def. Ex. DD3 at 25. Defendant Hummel acknowledged at his deposition that he knew extended periods of time in solitary confinement can have "negative mental health effects" on inmates, and he took courses within the FDC that discussed as much. *See id.* at 31, 33, 83. Hummel acknowledged that an inmate should not be placed in CM status "indefinitely," in part because "[it's] . . . better for the inmate" to be in general population where he can "live a quasi-normal life." *Id.* at 57-58, 65.

Plaintiff himself mailed a letter to Defendant Hummel (and Defendant Palmer) on April 26, 2019, in which Plaintiff complained about staff abuse and having been "kept locked down 24/7 since [August 24, 2016]" with no opportunities for recreation or congregation. *See* Pl. FDC Ex. 27 at 4. With his letter, Plaintiff included a declaration in which he reported that he attempted suicide in August 2016, which required treatment at an outside hospital, and then was placed in CMI status where he remained for about 761 days without leaving his cell for recreation or "any type of movement at all." *Id.* at 8-13. Plaintiff noted in the letter that he was following up on a complaint he sent to

15

the Regional Director's office on April 19, 2019, which the office "passed along to . . . [a] classification supervisor" at FSP for investigation. *See id.* at 3.

Defendant Hummel testified at his deposition that he had no recollection of having received Plaintiff's April 26, 2019 letter. *See* Def. Ex. DD3 at 100-02. Hummel explained that his office would receive so many letters and complaints from inmates that it would have been "impossible" for him to have reviewed them all. *Id.* at 101. He did not say, however, that his office did not receive the letter, and he acknowledged that someone from his office would "read every letter [received] from [an] inmate," and take appropriate steps in response, such as forwarding the letter to the warden of the institution for handling or investigation. *See id.* at 101-02.

Despite Defendant Hummel's inability to recall Plaintiff's letter, whether he in fact received and reviewed the letter or other correspondence in which Plaintiff reported being locked in his cell "24/7" is a disputed fact for the jury's consideration. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1487-88 (11th Cir. 1996) (explaining that, when there is a genuine dispute regarding a fact material to a qualified immunity defense, a district court may permit the jury to resolve the factual dispute before ruling on the entitlement to qualified immunity). *See also Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a [defendant] had the requisite knowledge of a substantial risk is a question of

16

fact subject to demonstration in the usual ways, including inference from circumstantial evidence ….”). Because a genuine factual dispute exists regarding whether Defendant Hummel had subjective knowledge of a substantial risk of serious harm, Defendant Hummel is not entitled to qualified immunity at this time.

### b. Defendant John Palmer

Defendant Palmer “is the current Region 2 Regional Director for the [FDC] and the former . . . Assistant Regional Director,” *see* Sec. Am. Compl. ¶ 21, serving in the latter role under Defendant Hummel, s*ee* Def. Ex. DD3 at 18-19. As Regional Director, Defendant Palmer conducts “quarterly inspections” or “site visits” of the prisons in his region, which includes FSP. *See id.* at 18-21. Defendant Palmer testified at his deposition that, during site visits, a member of his team reviews daily housing records of inmates, including with respect to inmates’ “contact entries,” or those related to their showers and recreation time. *See id.* at 28-29. If he or a member of his staff notices that a particular inmate is not receiving the rights to which he is entitled, or, for example, is “refusing a service” that may require a mental health referral, he will have an exit brief with the warden of the institution. *Id.* at 29-30. He acknowledged that, if an inmate consistently refuses meals,

that "may be an indicator or warning sign." *Id.* at 30. He also follows up with wardens to ensure issues have been corrected. *Id.* at 33.

Defendant Palmer tracks whether an inmate has been in restrictive housing, including CM, for longer than 90 days, acknowledging that the goal is for prison officials to "reduce inmates to the least restrictive level as soon as it's safe to do so." *Id.* 42-43. He asks wardens to "review with their team[s] those inmates [who] have been in . . . restrictive housing status for an extended period of time to see why." *Id.* at 43. He is aware that sometimes "inmates in restrictive housing . . . display symptoms that require a higher level of care." *Id.* at 46. Defendant Palmer is informed of "any incidents of serious self-injury," including those that would involve transport to a hospital, but he does not recall hearing about any such incidents involving Plaintiff. *Id.* at 50-52.

Defendant Palmer does not recall receiving any specific complaints or grievances directly from Plaintiff or his attorney about Plaintiff's conditions of confinement. *See id.* at 98-99, 106, 109, 114-15, 120, 126, 128, 130-31, 139-40. He testified that the letter Plaintiff wrote to him and Hummel in April 2019, would not necessarily have been "elevate[d] to him" but rather handled by a staff member. *Id.* at 114-15. He also testified he does not recall receiving the letter Plaintiff's counsel sent to his office on August 4, 2020, alerting Palmer to the "troubling pattern of ongoing abuse of [Plaintiff]," and that Plaintiff had

engaged in self-injury while in isolation. *See id.* at 140-41. *See also* Pl. FDC Ex. 48 at 1.

As with Defendant Hummel, the evidence permits the reasonable inference that Defendant Palmer was on notice of Plaintiff's conditions of confinement such that a jury should decide whether Palmer had subjective knowledge of a substantial risk of serious harm before the Court can decide whether he is entitled to qualified immunity as a matter of law. *See Cottrell*, 85 F.3d at 1487-88. Accordingly, Defendant Palmer is not entitled to qualified immunity at this time.

### c. Defendant Barry Reddish

Defendant Reddish "is the former Warden of FSP," *see* Sec. Am. Compl. ¶ 19, a position he held from March 2017 through March 2020, *see* Def. Ex. DD7 at 15; Def. Ex. EE4 ¶ 4. As warden, Reddish received training about "how different levels of confinement might affect a prisoner . . . [with] mental health issues." *See* Def. Ex. DD7 at 30. He conceded that confinement status as it may affect mental health was "covered extensively" in his training. *Id.* Defendant Reddish testified at his deposition that, as the Warden of FSP, he would "participate[] often as part of the institutional classification team [(ICT)] reviewing the inmates that were assigned to or continued in . . . restricted housing statuses," such as CM. *Id.* at 40. Reddish had "experienced and seen

inmates whose restrictive housing status . . . [had] negatively impact[ed] their mental health." *Id.* at 43-44. He further testified that an inmate who is "suicidal warrant[s] treatment and services immediately," which would "take priority over his regular CM housing." *Id.* at 134.

Defendant Reddish has no personal recollection or knowledge of Plaintiff. *Id.* at 82-83. However, he sat as a member of the ICT "on several of [Plaintiff's] reviews at FSP from 2017 through 2019." *See* Def. Ex. EE4 ¶ 7. Additionally, Plaintiff wrote grievances to the warden's office in May and June 2018, complaining about the conditions of his confinement and his extended placement in CM I status. *See* Pl. FDC Ex. 28 at 2-3; Pl. FDC Ex. 31 at 1, 4; Pl. FDC Ex. 45 at 2. He explicitly complained that CM housing was "harmful" to his mental health. *See* Pl. FDC Ex. 28 at 2-3; Pl. FDC Ex. 31 at 4; Pl. FDC Ex. 45 at 3. The grievances were returned without action, but at least three responses were signed by Defendant Reddish. *See* Pl. FDC Ex. 28 at 1; Pl. FDC Ex. 31 at 2; Pl. FDC Ex. 45 at 1.

Plaintiff's counsel sent a letter to Defendant Reddish on July 19, 2018, explaining that Plaintiff had "been in [CM] since September 2016," and "his mental health ha[d] deteriorated substantially." *See* Pl. FDC Ex. 40 at 3. The letter summarized the grievances Plaintiff had himself filed complaining about his solitary conditions. *Id.* at 4. There is evidence Defendant Reddish received

the letter because he emailed others at the prison asking about the allegations contained in the letter, including that Plaintiff had been on a hunger strike since early July. *See* Pl. FDC Ex. 33 at 2.

Given Plaintiff presents some evidence showing Defendant Reddish received communications alerting him that Plaintiff complained his extended placement in solitary confinement was negatively impacting his mental health, and given Defendant Reddish's background and training, the Court finds a jury reasonably could infer that Defendant Reddish had subjective knowledge of a substantial risk of serious harm. As such, Defendant Reddish is not entitled to qualified immunity.

### d. Defendant Donald Davis

Defendant Davis has served as FSP's warden since February 2020. *See* FDC Ex. DD2 at 11 (Davis Dep.); *see also* Sec. Am. Compl. ¶ 17. Warden Davis makes daily rounds at the prison and is required to "visit every inmate at least once a week." *See* FDC Ex. DD2 at 19. He is "aware there's some ideals about what long-term solitary confinement does to individuals without programs, without recreational opportunities, [and] without mental health support." *Id.* at 28. When making rounds, Warden Davis has opportunities to ensure inmates are given access to the programs and privileges to which they are entitled based on their housing status. *Id.* at 30.

21

For the reasons stated in the Court's order granting Plaintiff's first emergency motion for preliminary injunction, the Court finds the evidence permits the reasonable inference Warden Davis had subjective knowledge that Plaintiff was at substantial risk of serious harm. *See* Order (Doc. 203) at 21 (noting that wardens are required to make weekly rounds to CM units). Moreover, Plaintiff points to evidence showing Warden Davis received correspondence in August 2021 (from a Centurion employee and Plaintiff's attorney), which detailed Plaintiff's conditions of confinement, including, as relevant here, that he engaged in an act of self harm but refused to come out of his cell for a wellness check, had been the victim of staff abuse, had had only one shower since January 14, 2021, had not been "taken out of his cell for recreation," and was "suffering physically and mentally." *See* Pl FDC Ex. 34 at 1-3 (sealed); Pl. FDC Ex. 35 at 1-2 (sealed). *See also* Def. Ex. EE3 ¶ 11.

Even though the August 2021 correspondence was received after Plaintiff initiated this action, to the extent Plaintiff seeks injunctive relief, Warden Davis's "current attitudes and conduct" are relevant. *See Farmer*, 511 U.S. at 845 ("[D]eliberate indifference[] should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter.") (internal quotation

marks and citation omitted). In consideration of the evidence, the Court finds Warden Davis is not entitled to qualified immunity.

### e. Defendant Jeffrey R. McClellan

Defendant McClellan "is the Assistant Warden of FSP," *see* Sec. Am. Compl. ¶ 18, a position he has held since February 2014, *see* Def. Ex. EE5 ¶ 3. He too received the emails Warden Davis received from Plaintiff's attorney in August 2021 regarding Plaintiff's mental and physical conditions, and McClellan himself responded to Plaintiff's attorney. *See* Pl. FDC Ex. 35 at 3 (sealed). But he was alerted to Plaintiff's conditions of confinement before he initiated this lawsuit. For instance, Assistant Warden McClellan reviewed a letter from Plaintiff's attorney in July 2018, notifying prison officials that Plaintiff had been held in CM status since September 2016 during which time "his mental health ha[d] deteriorated substantially." *See* Doc. 171-9 at 3, 7. McClellan responded to Plaintiff's attorney by letter dated July 23, 2018, noting the complaints "ha[d] been documented" and that Plaintiff would be "evaluated by medical and mental health." *Id.* at 12. *See also* Pl. FDC Ex. 41.

Aside from correspondence alerting Assistant Warden McClellan of Plaintiff's conditions of confinement, McClellan had first-hand knowledge of Plaintiff's confinement status, including the length of time Plaintiff spent on CM, because he chaired many of Plaintiff's CM review hearings—in March

23

2018, September 2018, March 2019, September 2019, April 2021, and October 2021. *See* Pl. FDC Ex. 19; Def. Ex. EE5 ¶¶ 14-17, 19-20; *see also* Def. Ex. O at 1; Def. Ex. Q at 1; Def. Ex. DD5 at 124-25, 144, 168. In that role, McClellan knew of Plaintiff's CM history. *See* FDC Ex. DD5 at 127, 134, 147-48. Moreover, Assistant Warden McClellan receives reports documenting the "inmates in each region that [had] been in disciplinary confinement for an extended period of time." *Id.* at 219. He acknowledged having received a report in April 2018 that would have included Plaintiff's time spent in disciplinary confinement. *Id.* at 218, 221.

Finally, Assistant Warden McClellan authorized requests to suspend Plaintiff's phone, visitation, day room, and out-of-cell educational program privileges on the following dates, while Plaintiff was in CM status: February 2, 2018, June 29, 2018, and February 8, 2019. *See* Pl. FDC Ex. 24 at 1, 3, 5; *see also* Def. Ex. DD5 at 179-82. He also acknowledged at his deposition that in conducting reviews of an inmate's CM status, the ICT generally will consider the inmate's confinement housing sheet, which shows what privileges the inmate received over the review period. *See* Def. Ex. DD5 at 91, 103-04. He would notice whether an inmate declined or failed to receive recreation and questions inmates whether and when they decline recreation or showers. *See id.* at 110.

24

As summarized, the evidence permits the reasonable inference Assistant Warden McClellan had subjective knowledge that Plaintiff was at a substantial risk of serious harm. Accordingly, he is not entitled to qualified immunity.

### f.  Defendant P. Hunter

Defendant Hunter was a senior classification officer at FSP from March 2016 through April 2022. *See* Def. Ex. DD4 at 108; *see also* Sec. Am. Compl. ¶ 22. She received formal training through the FDC on corrections matters, including an annual three-hour course that addresses mental health diagnoses and "what manifestations would come from a person [with a] particular diagnosis." *See* Def. Ex. DD4 at 37-39. Through a different training course, Defendant Hunter learned the "signs" that may indicate an inmate is suicidal, including "not . . . showering and bathing." *Id.* at 50-51. In her role as a classification officer, Defendant Hunter made formal weekly rounds of CM units, was required to "interview" inmates in CM for their six-month reviews, and recommended to the ICT whether an inmate should remain on CM status. *Id.* at 52-53, 77-79, 94-95, 135.

Defendant Hunter participated in at least three CM reviews for Plaintiff in which she recommended he remain in CMI status—on March 13, 2017, August 30, 2017, and February 19, 2018. *Id.* at 108-09, 119, 137-38. *See also*

25

Def. Ex. E at 1; Def. Ex. F at 1; Def. Ex. J at 1; Def. Ex. EE8 ¶¶ 12-17. In the scope of those reviews, she learned Plaintiff had been on extended CM status previously, from January 24, 2014, through January 22, 2016, and that the incident responsible for his return to CM in August 2016 involved him cutting himself. *See* Def. Ex. DD4 at 124, 129-30. Additionally, Defendant Hunter received, read, investigated, and responded to a grievance Plaintiff submitted in May 2018, complaining that his "continued retention on CMI [was] negatively affecting [his] health physically and mentally." *Id.* at 156-59, 161. *See also* Pl. FDC Ex. 18 at 1.

The Court finds this evidence sufficiently permits the reasonable inference Defendant Hunter had subjective knowledge that Plaintiff was at a substantial risk of serious harm while housed at FSP. Accordingly, Defendant Hunter is not entitled to qualified immunity.

## g. Defendant Kevin Tomlinson

Defendant Tomlinson was a senior classification officer and a classification supervisor at NRCI. *See* Def. Ex. DD8 at 17, 20; *see also* Sec. Am. Compl. ¶ 25. He also served as the Acting Assistant Warden of Programs from January 2020 through April 2021. *See* Def. Ex. DD8 at 48-49; Def. Ex. EE ¶ 3. Defendant Tomlinson was a member of the ICT in his role as classification supervisor and served as ICT chairman in his role as Acting Assistant Warden

of Programs. *See* Def. Ex. DD8 at 42, 49; Def. Ex. EE ¶¶ 6, 10. He would have known through his participation on the ICT the extent of time Plaintiff spent in CM status within the FDC, although he primarily was involved in Plaintiff's step-down progress given Plaintiff was at NRCI to complete a step-down program. *See* Def. Ex. DD8 at 59.[8]

Defendant Tomlinson chaired the ICT hearing in August 2020, at which it was recommended Plaintiff return to CMI based on reports that he attacked a corrections officer after he inflicted injuries to himself. *Id.* at 62-65, 67, 84. He also chaired the ICT re-hearing on October 12, 2020. *Id.* at 86.[9] The ICT upheld its original recommendation that Plaintiff should be sent to CMI status. *Id.* at 90. When the ICT recommended that Plaintiff be returned to CMI status, Defendant Tomlinson knew Plaintiff had engaged in acts of self-harm, had been held in some form of CM or protective management since September 13, 2016, and had refused some mental health evaluations. *Id.* at 94-96.

Defendant Tomlinson testified at his deposition that the ICT is not comprised of mental health professionals, but that mental health must clear an inmate to be placed in CM status. *Id.* at 29. However, he also testified that

---

[8] The purpose of FDC's step-down program is to "gradually acclimate inmates to general population." *See* Def. Ex. EE20 ¶ 36.

[9] A re-hearing was held because the disciplinary report that formed the basis for the CMI referral was overturned on technical grounds. *See* FDC Ex. DD8 at 87-88.

the ICT maintains a record of any mental health refusals by an inmate in CM status, which "may come up in conversation when ICT meets," acknowledging that such refusals may be a sign of concern. *See id.* at 96-97.

The Court finds the evidence sufficiently permits the reasonable inference Defendant Tomlinson had subjective knowledge that Plaintiff was at a substantial risk of serious harm. Accordingly, Defendant Tomlinson is not entitled to qualified immunity.

### h. Conclusion on Qualified Immunity Analysis

After careful review of the relevant evidence, considered in the light most favorable to Plaintiff, the Court finds Plaintiff points to some evidence showing or permitting the reasonable inference that Defendants Hummel, Palmer, Reddish, Davis, McClellan, Hunter, and Tomlinson *each* knew of the conditions of confinement to which Plaintiff was exposed such that a jury reasonably could find they were subjectively aware that Plaintiff faced a substantial risk of serious harm.

These Defendants argue that they appropriately responded to Plaintiff's and his lawyer's grievances, letters, or complaints, demonstrating they were not deliberately indifferent to a risk of harm. *See* FDC Mot. at 56. *See also* FDC Reply at 11. In other words, they contend the evidence does not permit the conclusion they "disregarded [a known] risk" by conduct that is "more than

28

*gross* negligence." *See Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis in original). In support of their contention that they each responded reasonably to Plaintiff's and his attorney's complaints about his housing conditions, Defendants cite a 492-page exhibit. *See* FDC Reply at 8, 11 (citing Def. Ex. HH). They do not direct the Court to any specific page or explain or summarize what the exhibit shows with respect to any individual Defendant. It appears Defendants posit they "responded affirmatively" by merely reporting Plaintiff's complaints to the Office of the Inspector General, "in accordance with FDC's procedures." *See* FDC Reply at 11. As noted previously, the Court will not scour the record for Defendants. On this record, whether each Defendant responded reasonably to a known risk is subject to reasonable debate. *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").[10]

---

[10] The FDC and Managerial Defendants also argue Plaintiff's claims about his confinement status should have been "brought [through] a writ of habeas corpus," and a difference in medical opinion does not support a deliberate indifference claim. *See* FDC Mot. at 56-57. The Eleventh Circuit addressed and rejected the former argument, *see* USCA Op. at 60-61, and this Court does the same: Plaintiff challenges the conditions of his confinement, not the fact or duration of his confinement. As to the latter argument, Plaintiff does not allege or argue these Defendants were deliberately indifferent to his serious medical needs.

### ii.   ADA and RA Claims

In Counts V and VI of his complaint, Plaintiff asserts the FDC violated his rights under the ADA and RA. *See* Sec. Am. Compl. ¶¶ 319-46. He alleges he is a "qualified individual" because he has "physical and mental impairments that substantially limit one or more major life activities." *Id.* ¶¶ 320, 333. He further alleges that, because of his disabilities, he has been denied access to programs, services, and activities, and the FDC has failed to reasonably accommodate him. *Id.* ¶¶ 323-27, 334-42. He seeks both damages and injunctive relief. *Id.* ¶¶ 331, 346.

The ADA provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)); *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017) ("Discrimination claims under the ADA and the [RA] are governed by the same standards, and the two claims are generally discussed together.").

A claim of discrimination under the ADA or RA requires a plaintiff to establish "(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F. App'x 475, 477 (11th Cir. 2015) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

The term "'disability' means a physical or mental impairment that substantially limits one or more major life activities … or being regarded as having such an impairment" if the perceived impairment results in discrimination or other prohibited action. 42 U.S.C. § 12102(1), (3)(A). Examples of "major life activities" include caring for oneself, … eating, sleeping, walking, … learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

Normally, establishing a violation under the ADA or RA entitles a plaintiff to injunctive relief only. *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019). "To get damages . . . a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate

indifference.'" *Id.* (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)). To show deliberate indifference, a plaintiff must prove that "the defendant knew that harm to a federally protected right was substantially likely and … failed to act on that likelihood." *Id.* (alteration in original) (quoting *Liese*, 701 F.3d at 344).

The FDC first argues Plaintiff is not a qualified individual under the ADA or RA, pointing to a July 27, 2022 FDC medical record, which notes "[Plaintiff] is not classified as an ADA patient" from a physical standpoint, and Plaintiff's 2011 intake screening report, which notes "no significant psychological history." *See* FDC Reply at 18; Def. Ex. JJ-2, JJ-5. Additionally, the FDC implies Plaintiff is not mentally disabled as demonstrated by the undisputed fact that he "successfully worked his way through the step[-]down program . . . at [NRCI]." *See* FDC Mot. at 93-94; FDC Reply at 18.

As to a physical disability, Plaintiff alleges in his complaint that the FDC "den[ied] him access to his assistive device for mobility, specifically his walker, while in isolation." *See* Sec. Am. Compl. ¶¶ 326, 340. It is unclear whether Plaintiff meaningfully intends to pursue this portion of his ADA and RA claims. He clarifies in his response that the gravamen of his discrimination claims rests on his mental disability. *See* Pl. FDC Resp. at 71 n.8. In fact, Plaintiff says his "primary claim is—and always has been—that

32

[the FDC] discriminates against him by subjecting him to isolation because of his *mental* disability." *Id.* (emphasis in original). Despite this assertion, however, Plaintiff argues that he has a physical disability for which he requires a cane or walker, but the FDC refuses to accommodate him. *Id.* at 78-79.[11]

Plaintiff utterly fails to describe with any specificity the nature of his physical disability, nor does he point to any evidence showing he has been diagnosed with a physical impairment that would rise to the level of a disability under the ADA or RA. The only evidence he references regarding a physical disability is a post-use-of-force medical exam report dated September 7, 2022, which notes Plaintiff, at that time, suffered from "[g]ait imbalance" for which he uses a cane. *See* Pl. FDC Ex. 25 at 10. This record does not establish what Plaintiff's physical condition may have been at the times relevant to his claims, and it contradicts the argument that the FDC is not accommodating a physical disability.

---

[11] Plaintiff moves to strike the affidavit of Thomas Reimers (Doc. 436), which the FDC offers to show it "has an established comprehensive policy for identifying and treating inmates with physical and/or mental impairments and disabilities" and that a review of Plaintiff's medical records show he "is not identified as being disabled at this time," nor does he require a walker. *See* Def. Ex. EE9 ¶¶ 3, 7-9. In the interest of judicial economy and efficiency, and in consideration of other evidence, the Court will consider Mr. Reimers's affidavit and deny Plaintiff's motion.

With Reimers's affidavit, the FDC provides some medical records—to which Plaintiff does not object and were disclosed during discovery—that shows Plaintiff was given a walker in 2016 for lower extremity edema (swelling), and at some point given a cane pass, which was canceled on June 2, 2022, because Plaintiff used it "to attack security staff." *See* Def. Ex. EE9 at 6, 8, 10, 12.[12] Plaintiff points no evidence, or at most, only a "scintilla of evidence," to support his claim that the FDC failed to provide him a cane when such a device was medically indicated. *See Anderson*, 477 U.S. at 251; *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."). As such, the FDC's motion is due to be granted in part.

As to his alleged mental disability, Plaintiff points to evidence showing he "suffers from Major Depressive Disorder, an illness that 'substantially limits brain function.'" *See* Pl. FDC Resp. at 70-71 (citing evidence, including Dr. Kupers's reports). For instance, Dr. Kupers opines that Plaintiff's mental illness results in "vegetative signs," which are "problems with eating and weight, problems with sleeping." *See* Def. Ex. DD31 at Dep. 177-78. According

---

[12] It appears that when Plaintiff filed his complaint in 2020, he did not have a medical pass for mobility assistance. *See* Sec. Am. Compl. ¶ 4. He alleges his walker was confiscated when he entered segregation in 2016. *Id.*

to Dr. Kupers, solitary confinement exacerbates these symptoms, and thus Plaintiff's extended stay in solitary confinement caused "more depression, more delusions, [and] more hallucinations," leading to self-harm. *Id.* at 117.

At the very least, Plaintiff offers evidence showing he lacks an ability to care for himself or think. *See, e.g.*, *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003) ("A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself."); *see also* 28 C.F.R. § 35.108(d)(2)(iii)(K) (listing major depressive disorder as an impairment that, at a minimum, "substantially limits brain function"). In its motion, the FDC relies solely upon Mr. Reimers's affidavit to establish "Plaintiff's S3 grade is not so severe as to prevent access to daily life activities with assistance of the mental services he is receiving." *See* Def. Ex. EE9 ¶ 10. Not only is this statement vague and not a medical opinion, but it does not contradict Dr. Kupers's opinion. Whether Plaintiff has "access to daily life activities" does not mean his mental impairment does not "substantially limit[] one or more major life activities." Accordingly, the Court finds the FDC fails to carry its burden on this argument.

Next, the FDC argues Plaintiff is and has been "afforded necessary and appropriate healthcare," including for his mental illness, and has not been discriminated against because of his mental illness but rather has been

35

appropriately disciplined or managed for his numerous outbursts and behavioral problems. *See* FDC Mot. at 95-98; FDC Reply at 19. The FDC explains it has in place a "comprehensive plan" to address the mental health needs of its inmates, including those placed in CM status. *See* FDC Mot. at 95-96; FDC Reply at 20. For instance, the FDC explains,

> Inmates like the Plaintiff are only placed into [CM] status after rigorous policies and procedures are followed by a group of multi-disciplinary experts in their respective fields. And inmates in crisis in CM have access to timely, appropriate mental health care that is very successful.

FDC Mot. at 95. Many of the Defendants testified at their depositions that inmates placed in CM status are first "cleared" from a mental health standpoint to be in that level of custody. *See, e.g.*, Def. Ex. Ex. DD4 at 41; Def. Ex. DD5 at 28-30 (explaining that inmates housed in CM at FSP have been "evaluated by mental health"; if an inmate has mental health problems, he will not be housed at FSP or on CM). S*ee also* Def. Ex. DD13 at 146.

Plaintiff does not dispute the FDC has a comprehensive multidisciplinary system in place. *See* Pl. FDC Resp. at 76-78. What Plaintiff disputes is whether the system works at least as applied to him. *Cf., e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 605-06 (1999) (noting, as an example, that a State may prevail on a fundamental-alteration defense if it

could demonstrate it had "a comprehensive, *effectively working* plan" that addressed the plaintiff's complaints (emphasis added)).

Dr. Kupers explains that the FDC's CM referral process is inadequate with respect to psychological assessment. *See* Def. Ex. DD31 at ECF 144-46 (Dr. Kupers's Nov. 1, 2022 Report). Dr. Kupers testified at his deposition that "the conditions of solitary confinement exacerbate [Plaintiff's] mental illness and trigger [a] suicidal crisis." *Id.* at Dep. 178-79. According to Dr. Kupers, "[Plaintiff's] major depressive disorder makes him extremely vulnerable to the stress reactions that are typical of solitary confinement." *Id.* at 183. He concludes the mental health professionals at the FDC, operating in accordance with the FDC's comprehensive plan, have conducted "inadequate" exams of Plaintiff, and Plaintiff's bad behaviors "are driven by … his mental illness" to a significant extent, which FDC staff do not appreciate, understand, account for, or simply ignore. *Id.* at 181-82. *See also id.* at ECF 145-46 (Dr. Kupers's Nov. 1, 2022 Report). Dr. Kupers explains that Plaintiff's mental illness "leads to behavioral dyscontrol (i.e. bizarre behavior, rule-breaking, or simply non-functional behavior), suicidal crises and disciplinary problems." *Id.* at 143.

The parties dispute the reason for Plaintiff's demonstrated and undisputed "bad" behavior over the relevant years—the FDC characterizes him as impudent, whereas Plaintiff offers evidence showing his behavioral

37

issues and disciplinary problems are at least partially attributable to his mental illness. Plaintiff also offers evidence (discussed previously) showing that, while housed in solitary conditions, he was denied access to FDC programming and out-of-cell activities. And he presents some evidence permitting the reasonable inference that decisions to retain him in CM for as long as he was there and to suspend certain privileges or deny him the out-of-cell time to which he was entitled were attributable to his mental illness even despite a comprehensive plan being in place. For instance, Plaintiff argues and cites evidence in support that Plaintiff's CM referrals or recommendations followed acts of self-harm, including some that required treatment at an outside hospital. *See* Pl. FDC Resp. at 72 (citing Pl. FDC Ex. 3; Def. Ex. C at 1; Def. Ex. D at 1-2). *See also* Def. Ex. E at 1; Def. Ex. S at 79-83, 92-95; Def. Ex. V at 1; Def. Ex. DD31 at ECF 190-91 (Dr. Kupers's Sept. 16, 2021 Report).

Finally, the FDC implies exigent circumstances existed when Plaintiff was placed in CM because he was "believed to be high on drugs," tried to break sprinkler heads inside his cell, and engaged in acts of self-mutilation that resulted in hospital visits. *See* FDC Mot. at 97-98. Even if true that the officers involved in certain incidents were acting under particularly stressful conditions, they were not the ones to decide whether Plaintiff should be confined to CMI status. *See, e.g.*, Def. Ex. DD4 at 87-89 (explaining that the

classification supervisor makes a CM recommendation, the ICT convenes and decides whether to accept the recommendation, and then the state classification office makes the final determination). *See also* Def. Ex. E at 1-2; Def. Ex. EE5 ¶¶ 6, 14, 16, 17, 21. Moreover, the relevance of any exigent circumstances goes "more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." *See Bircoll*, 480 F.3d at 1085.

Construing the facts in the light most favorable to Plaintiff, which the Court must do at this stage, the Court finds Plaintiff's ADA and RA claims may proceed to trial with respect to his mental impairment but not his physical impairment.

### B. NRCI Motion

The NRCI Officer-Defendants move for summary judgment on Count III.G. *See* NRCI Mot. at 34. In this Count, Plaintiff alleges Defendants Gwara, Moreland, and E. Williams used excessive force against him on July 28, 2020, and Defendant Bryant, who was present, failed to intervene. *See* Sec. Am. Compl. ¶¶ 271-77. The incident occurred inside the medical unit, after Plaintiff engaged in multiple acts of self-harm over the course of three days. *See* NRCI Mot. at 36.

Defendants do not dispute that a use-of-force occurred, but they say it was reactionary because Plaintiff, during a psychotic episode, attempted to choke Defendant E. Williams. *See id.* at 44. Defendants further contend that post-use-of-force video footage shows that Plaintiff must be lying about the incident, or his memory is not to be trusted because he was "in the midst of a three-day psychotic crisis," which culminated on July 28, 2020. *Id.* at 35-36. Defendants also argue the medical evidence of Plaintiff's injuries does not align with his allegations, further permitting the inference he is lying, and it is implausible that they would have taken the efforts they did to save his life to then "sadistically or maliciously beat him." *Id.* at 37-38, 42-43, 48-50 (internal quotation marks omitted).

In response, Plaintiff argues there remain genuine issues of material fact because, if a jury accepts the facts as he describes them, he will prevail. *See* Pl. NRCI Resp. at 2-3, 27-30. He also disputes Defendants' primary contention that his testimony should be discounted because of his mental illness or because he testified at his deposition that he was hallucinating and hearing voices on the day of the incident and in the preceding days. *Id.* at 2-3, 31-32. Plaintiff says he "was not hallucinating at the time of the attack." *Id.* at 7-8.

Plaintiff testified at his deposition that Defendants Gwara, Moreland, and E. Williams transported him to the medical unit because he was found

40

lying on the floor of a self-harm-observation-status cell covered in blood. *See* Def. Ex. DD1 (Vol. I) at 68-69. *See also* Def. Ex. EE 14 ¶ 14 (Oliva's declaration, averring he discovered Plaintiff "face down on the concrete ground in his cell following his self-harming [incident] . . . . in a puddle of blood"). Plaintiff explained that he passed out from losing so much blood. *See* Def. Ex. DD1 (Vol. I) at 66. He claims Defendants Gwara and E. Williams "slammed" him onto the cot in the medical unit, then he felt E. Williams pushing on his arm, which he thought had been dislocated, so he lifted his hands (apparently to pop his arm back into socket), at which point Gwara jumped on the cot to pin him down while E. Williams and Moreland punched him repeatedly. *Id.* at 77-80, 82, 84. He testified that "Bryant was standing right behind Officer Gwara who was pinning [his] hands down." *Id.* at 84. The NRCI Officer-Defendants maintain Bryant was not present during the use-of-force. *See* Def. Ex. EE12 ¶ 11; Def. Ex. 15 ¶ 11; Def. Ex. EE16 ¶ 11.

In their nearly identical use-of-force reports, Defendants explain they used force because Plaintiff refused to comply with commands to stop choking E. Williams. *See* Def. Ex. T at 37-42. They explain that, in the medical clinic, Defendant E. Williams used an ammonia stick to keep Plaintiff awake, presumably because he had lost so much blood. *Id.* at 37, 39, 41. They describe the following:

> [Plaintiff] woke up and . . . look[ed] at [E. Williams and] screamed, 'I'm going to fucking kill you Williams, you're a part of them!' [and] then grabbed [E. Williams] by [his] throat and began squeezing. At this time, reactionary physical force became necessary due to [Plaintiff] harming staff. [E. Williams] attempted to break [Plaintiff's] grasp from [his] throat by utilizing a downward strike with [his] forearm to [Plaintiff's] wrists, to no avail. … Officer Moreland then administered one closed-fist strike to [Plaintiff's] facial area while still issuing loud verbal commands to [Plaintiff] to release his grasp. [Plaintiff] continued to hold his grasp on [E. Williams's] throat, at which time Officer Moreland administered one more closed-fist strike to the same area on [Plaintiff's] facial area, at which time he released his grasp on [E. Williams's] throat. Officer Gwara then grabbed both hands of [Plaintiff] and pinned them to his stomach. [Plaintiff] then ceased his combative behavior.

*Id.* at 37-42. Plaintiff sustained injuries during the incident, primarily to his face. *See id.* at 39. The photographic and video evidence show the injuries, which speak for themselves. *See id.* at 44; Def. Ex. CC (sealed videos 20-13607).

Plaintiff's expert Dan Pacholke avers in his declaration that "[t]he nature of [Plaintiff's] injuries suggest that he was subjected to a serious use of force." *See* Pl. NRCI Ex. 12 ¶ 80. Pacholke explains that "by everyone's account, [Plaintiff] had lost a lot of blood that day, as he did the previous two days." *Id.* He concludes the officers' "claim that they had to resort to the amount of force they applied to get [Plaintiff] to release his grasp of Williams'[s] neck was unlikely given the officers' sizes compared to [Plaintiff], the particular

42

correctional restraints [Plaintiff] was wearing[,] and his weakened condition." *Id.* ¶ 81. Pacholke notes, "[Plaintiff] is a frail man who had lost a lot of blood [in the] last few days[;] breaking loose from his grip should have been relatively easy." *Id.* ¶ 91. Pacholke also addresses the near identical language in the NRCI Officer-Defendants' use-of-force reports and their deposition testimony about those reports, suggesting a jury reasonably could infer the officers improperly "coordinated their stories." *Id.* ¶¶ 84-90.

The parties tell conflicting stories, but the Court must accept Plaintiff's version of events as true. *See Haves*, 52 F.3d at 921 (explaining a district court considering a motion for summary judgment "must view all evidence and make all reasonable inferences" in the non-movant's favor). This is so because when two parties' stories conflict, neither of which is blatantly contradicted by indisputable evidence, a district court may not make credibility determinations in favor of one party over the other. *See Sears v. Roberts*, 922 F.3d 1199, 1206, 1208-09 (11th Cir. 2019) (reversing the district court's entry of summary judgment in favor of the officer-defendants because the officers' documentary evidence, including disciplinary reports and affidavits, consisted of "various forms of their own testimony," which directly contradicted Plaintiff's sworn allegations).

Defendants offer no indisputable evidence, such as video footage of the relevant incident, that blatantly contradicts Plaintiff's account of the incident.[13] As such, the record presents "a classic swearing match, which is the stuff of which jury trials are made." *Id.* at 1208 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)). Plaintiff and Defendants describe conflicting accounts regarding whether force was necessary or, if it was, whether it was more than necessary under the circumstances. Accepting Plaintiff's account as true, he demonstrates there is a genuine issue of material fact regarding whether Defendants Gwara, Moreland, and E. Williams used excessive force against him and whether Defendant Bryant failed to intervene. *See Sears*, 922 F.3d at 1208-09.

If Defendants believe Plaintiff's credibility is undermined by documentary or video evidence, such considerations are for the jury.[14] Additionally, whether or the extent to which Plaintiff's mental illness may

---

[13] There are no cameras inside the medical unit.

[14] Pacholke correctly observes that the video "isn't very useful other than [to] document[] how beaten [Plaintiff] was following the incident." *See* Pl. NRCI Ex. 12 ¶ 93. To the extent Plaintiff contends the nurse did not do anything about the "wires" in his arms, *see* Def. Ex. DD1 (Vol. I) at 89, the video evidence does not necessarily contradict his statement, *see* Def. Ex. CC (sealed videos 20-13607). The video footage shows a frail, apparently physically depleted Plaintiff, lying on a gurney in the medical until for quite some time during which nurses remove the bloodied bandage from his arm, wipe away blood (more than once), affix a new bandage, check his facial injuries, and take his blood pressure and temperature. *See id.*

have impacted his perception of events or memory of the incident is for the jury's consideration after hearing the evidence. Defendants offer no evidence to convince the Court at this juncture that Plaintiff conjured the incident due to his mental illness, even despite Plaintiff's own acknowledgement that he believed he was having a "psychotic episode" for about three days, *see* Def. Ex. DD1 (Vol. I) at 89, and despite Dr. Kupers's opinion that Plaintiff's behavior on July 28, 2020, as described by former-Defendant Oliva, "is entirely consistent with the 'psychotic features' part of the diagnosis Major Depressive Disorder with Psychotic Features," *see* Def. Ex. DD31 at ECF 138 (Dr. Kupers's Nov. 1, 2022 Report). Dr. Kupers does not conclude or opine that Plaintiff hallucinated the events he contends occurred inside the medical room on July 28, 2020. *See id.*

For the above reasons, the NRCI Officer-Defendants' motion is due to be denied.

### C. FSP Motion

The FSP Officer-Defendants move for summary judgment on the following Counts: II.D (conditions of confinement against Defendants Philbert, Hall, and Brown);[15] III.D (excessive force against Defendant Van Allen related

---

[15] Plaintiff notes in his response to the FSP Officer-Defendants' motion that he is no longer proceeding on the conditions-of-confinement claim against Defendant

to an October 3, 2017 incident); and III.E (excessive force or failure to intervene against Defendants Atteberry, Brown, Chandler, Hall, Nosbisch, Philbert, and C. Williams related to a February 2, 2018 incident). *See* FSP Mot. at 35, 46.

### i.    Count II.D

Defendants Philbert, Hall, and Brown invoke qualified immunity as to the conditions-of-confinement claim. *See id.* at 41-45. They argue Plaintiff's claim fails because each did not personally deny Plaintiff an opportunity to exercise outdoors or to shower, and they did not have subjective knowledge of a substantial risk of serious harm. *See id.* at 41, 43. In his response, Plaintiff concedes that these Defendants did not personally deny him outdoor recreation or showers. *See* Pl. FSP Resp. at 43-44. Rather, he contends that, in their roles as supervisory officers, they were responsible for reviewing his housing records, which documented when he left his cell, including for recreation and showers. *Id.* at 42-43. As such, Plaintiff argues, a jury reasonably could infer each Defendant, individually, "was personally aware of and involved in the denial of out-of-cell recreation and showers." *Id.* at 43-44.

Plaintiff argues Defendants had subjective knowledge of his allegedly unconstitutional conditions of confinement because Defendant Philbert "was a

---

Van Allen, *see* Pl. FSP Resp. at 2 n.1, and the other Defendants named in Count II.D (Folsom, Geiger, and Knott) were dismissed, *see* Order (Doc. 447).

sergeant or a lieutenant on the day shift for at least 49 of the weeks that Plaintiff received no outdoor time," and he "worked 184 shifts on weeks where Plaintiff received fewer than three showers"; Defendant Hall "was a captain on the day shift for at least 60 of the weeks that Plaintiff received no outdoor time," and he "worked 139 shifts on weeks where Plaintiff received fewer than three showers"; and Defendant Brown "was a sergeant on the day shift for at least 17 of the weeks Plaintiff received no outdoor time," and he "worked 45 shifts on weeks where Plaintiff received fewer than three showers." *See* Pl. FSP Resp. at 9, 43-44. *See also* Pl. FSP Exs. 6, 24. Defendants do not disagree with Plaintiff's summary of the work schedule but note Plaintiff's chart is not entirely accurate with respect to the number of showers he had during some weeks, and they argue that Plaintiff did not miss enough showers to constitute an extreme deprivation and, regardless, Plaintiff fails to point to evidence "to connect [them] to Plaintiff's lack of recreation or alleged missed showers." *See* FSP Reply at 4-9.

In his declaration, Defendant Hall avers that, during the time Plaintiff was in CM at FSP, he was a Captain. *See* Def. Ex. EE13 ¶ 2. Defendant Philbert testified at his deposition that he was a Sergeant at FSP from 2011 until 2018, when he became a Lieutenant. *See* Def. Ex. DD24 at 13, 21, 91. Defendant Brown testified at his deposition that he was a Sergeant at FSP

starting in January 2015 until he was promoted to Lieutenant in 2018, at which point he was transferred to a different correctional institution. *See* Def. Ex. DD13 at 25, 64-65.

All three Defendants acknowledged at their respective depositions that they are familiar with relevant FDC rules providing that showers and outdoor recreation are "rights" or "entitlements" for inmates, not merely privileges. *See* Def. Ex. DD13 at 31, 35; Def. Ex. DD19 at 32-35; Def. Ex. DD24 at 90, 94-95. All three also acknowledged that inmates can incur disciplinary reports for refusing all three weekly showers, *see* Def. Ex. DD13 at 41-42, 60; Def. Ex. DD19 at 31-33; Def. Ex. DD24 at 94-95, because, as Defendant Hall observed, failing to shower with regularity "[can] lead to a medical issue . . . . [causing] medical and psychology [to] get involved," *see* Def. Ex. DD19 at 32-33. For instance, Defendant Philbert said he would notice if an inmate would have refused showers "multiple times in a row," and has questioned inmates who have done so. *See* Def. Ex. DD24 at 93-95.

All three Defendants also worked exclusively or often with CM inmates, so they knew that CM inmates spent most of their days inside their cells, coming out only when officers would take them for certain "activities," such as showers, recreation, or medical call-outs. *See* Def. Ex. DD13 at 18-19, 27-29, 31; Def. Ex. DD19 at 20, 23-24, 26-28; Def. Ex. DD24 at 22, 25, 31, 46. Finally,

all Defendants recognized they were responsible for documenting inmate movement on or reviewing inmate housing logs ("229 forms") or shared the latter responsibility with the other officer in charge on the wing. *See* Def. Ex. DD13 at 18-19, 25, 29, 40; Def. Ex. DD19 at 53-54; Def. Ex. DD24 at 31, 49, 91-92. Defendant Philbert explained, "90 percent of everything [an] inmate does is documented on the [229 form]." *See* Def. Ex. DD24 at 93. Defendant Brown testified that the 229 form essentially goes with an inmate wherever he goes in the compound; "whoever the[] [inmate comes] in contact with . . . document[s] whatever activities [the inmate] ha[s] throughout the time [he is] out of [his] cell." *See* Def. Ex. DD13 at 40. Every prison official who pulls an inmate for an out-of-cell activity documents the activity on the 229 form. *See id.* at 41.

While recognizing this is a close question, the Court finds Plaintiff points to enough evidence to create a genuine issue of material fact whether Defendants Brown, Hall, and Philbert had subjective knowledge that Plaintiff was at a substantial risk of serious harm and, with that knowledge, responded in an objectively unreasonable manner, or failed to respond. *See Cottrell*, 85 F.3d at 1487-88. The evidence permits the reasonable inference that these Defendants knew, based on their familiarity with Plaintiff (as an inmate on their wing) or a review of his 229 forms, that Plaintiff did not receive all the

out-of-cell rights (showers and exercise) to which he was entitled during the weeks in which they were supervisory officers on Plaintiff's wing, amounting to the deprivation of "the minimal civilized measure of life's necessities." *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Regardless of whether Plaintiff refused or officers denied him out-of-cell opportunities, and even without knowing of Plaintiff's mental health background, given Defendants' work with and knowledge of CM inmates, a reasonable jury could conclude they were aware of a substantial risk of serious harm "from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842. A jury also reasonably could conclude they remained willfully ignorant of or ignored a substantial risk of serious harm by conduct that amounts to more than gross negligence. *See Goebert*, 510 F.3d at 1328.

Accordingly, Defendants Philbert, Hall, and Brown are not entitled to qualified immunity at this time.

### ii.   Count III.D

In Count III.D, Plaintiff alleges Defendant Van Allen "slammed [Plaintiff's] hand in the cell door's steel food flap and leaned into the flap with his [Van Allen's] body to crush [Plaintiff's] fingers." *See* Sec. Am. Compl. ¶¶ 73, 252. He alleges he did not receive medical treatment for six days, at which time the medical staff applied a splint because he could not bend his fingers due to

swelling. *Id.* ¶ 74. Defendant VanAllen argues he is entitled to summary judgment because Plaintiff's injuries were minimal, he caught Plaintiff's fingers in the food flap by accident, and a prison official's review of video footage showed that, once Plaintiff yelled that his fingers were caught, Van Allen immediately stopped pushing his weight against the flap to release it. *See* FSP Mot. at 48-49.[16]

In response, Plaintiff argues "[t]here is a triable issue as to whether Van Allen intentionally and maliciously applied force to Plaintiff when he slammed the flap on Plaintiff's hand." *See* Pl. FSP Resp. at 65. He cites his own deposition testimony. *Id.* at 11, 65. At his deposition, Plaintiff testified that Defendant Van Allen's conduct was intentional because Van Allen knew his fingers were in the flap and, knowing that, Van Allen "used the side of his body to hold the flap closed." *See* Def. Ex. DD1 (Vol. I) at 148-50, 152. Plaintiff concedes that when he started screaming, Defendant Van Allen released the flap. *See id.* at 150, 153.

At his deposition, Defendant Van Allen testified that he did not "slam [Plaintiff's] hands, and [he] would never slam someone's hands in [the flap]." *See* Def. Ex. DD25 at 85. He acknowledges that he pushed some of his body

---

[16] Defendants do not provide the video footage itself. *See* FSP Mot. at 48-49. *See also* Doc. 398 (amended index of exhibits).

weight against the flap, explaining that the flaps can be old and rusty and require a bit of force to close. *Id.* at 64, 72.[17] Defendant Van Allen wrote Plaintiff a DR for tampering with a security device (the flap). *See* Def. Ex. G1 at 3. In the DR, Van Allen reported that he gave Plaintiff "several orders to remove his arm from the flap," but Plaintiff refused. *Id.* Van Allen did not mention that Plaintiff's fingers got caught in the flap, s*ee id.*, but he explained at his deposition, that whether Plaintiff's fingers were caught in the flap was not relevant to the DR. *See* FDOC Ex. DD25 at 80.

The parties dispute a material fact: whether Defendant Van Allen intentionally or accidentally caught Plaintiff's fingers in the flap of his cell. Defendants point to no video evidence that indisputably contradicts Plaintiff's account, which, even if "self-serving," *see* Van Allen Reply at 5, permits the reasonable inference that Van Allen intentionally used force against him for no penological reason. As such, Defendant Van Allen is not entitled to summary judgment on Count III.D.

---

[17] It does not appear all food flaps require such exertion to close and lock. In the video footage showing the February 2, 2018 use-of-force incident, Defendant Hall is seen easily closing the food flap of Plaintiff's cell and locking it without needing to use his body weight to do so. *See* Def. Ex. CC (sealed video 18-02841).

### iii.    Count III.E

In Count III.E, Plaintiff alleges Defendants Atteberry, Brown, Chandler, Hall, Nosbisch, Philbert, and C. Williams used excessive force against him when conducting a cell extraction on February 2, 2018. *See* Sec. Am. Compl. ¶¶ 82, 259. Plaintiff alleges that he agreed to submit to restraints, but Defendant Hall "nevertheless gave the order to extract [him from his cell] using force." *Id.* ¶ 83. He alleges the officers used such force against him once they entered his cell that he could not walk because of his resulting injuries. *Id.* ¶ 84.

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987). At the same time, it is well understood that prison guards, who are charged with maintaining order and protecting inmates and staff, may use force when necessary "to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). *See also Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991). Accordingly, courts must balance concerns of an inmate's right to be free from cruel and unusual punishment with a prison official's obligation to ensure a safe and secure institution. *Ort*, 813 F.2d at 321-22.

"Pepper spray is an accepted non-lethal means of controlling unruly inmates." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled in*

*part on other grounds as recognized by Randall v. Scott*, 610 F3d 701, 709 (11th Cir. 2010). An inmate against whom force is used to restore order demonstrates an Eighth Amendment violation "*only* if the measure taken 'inflicted unnecessary and wanton pain and suffering' caused by force used 'maliciously and sadistically for the very purpose of causing harm.'" *Williams*, 943 F.2d at 1575 (emphasis is original). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Whether an officer used more force than necessary to quell a disturbance or regain control of a prisoner requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to staff and inmates, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. *See id.*; *Whitley*, 475 U.S. at 321 ("*Whitley* factors"). *See also Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). In considering the *Whitley* factors, courts should "give a wide range of deference to prison officials acting to preserve discipline and security." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting *Bennett v. Parker,* 898 F.2d 1530, 1533 (11th Cir.1990)). The Supreme Court has stressed,

> [C]ourts must determine whether the evidence goes
> beyond a mere dispute over the reasonableness of a

> particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Whitley*, 475 U.S. at 322. Nonetheless, if an officer reasonably uses force to quell a disturbance, the force should cease once the behavior giving rise to the need for force abates. *Ort*, 813 F.2d at 324.

### a. Use of Chemical Spray

Defendant Philbert seeks summary judgment in his favor because his only role in the incident was to spray Plaintiff with chemical agents before the cell extraction occurred, and the video evidence indisputably shows Plaintiff was being noncompliant at the time Philbert sprayed him. *See* FSP Mot. at 52. Plaintiff concedes he had his arms or hands through the flap in his cell door but contends he did so to alert officers that he had been denied his morning meal. *See* Pl. FSP Resp. at 61. In other words, Plaintiff argues, he "had a legitimate reason for refusing the order to remove his hands," and Defendant Philbert's use of chemical agents "was [a] grossly disproportionate" response to his conduct so "as to violate the Eighth Amendment." *Id.*

Video evidence of the incident, *see* Def. Ex. CC (sealed video 18-02841), does not "support a reliable inference of wantonness" as to Defendant Philbert.

55

*See Whitley*, 475 U.S. at 322. Defendant Philbert sprayed Plaintiff at Defendant Hall's direction for Plaintiff's refusal to remove his hands from the flap. After Defendant Philbert administered chemical agents, he was no longer actively involved in gaining Plaintiff's compliance, nor was he responsible for ensuring Plaintiff timely received a decontamination shower. It appears he left the area. *See* Def. Ex. CC (sealed video 18-02841). *See also* Def. Ex. DD24 at 107-08, 114 (Philbert testifying at deposition that he did not observe the cell extraction; he left the cell area, but he stayed on the wing). Plaintiff admittedly had his hands through the flap because he wanted his breakfast tray. *See* Def. Ex. DD1 (Vol. I) at 217.

Even though Plaintiff believed he was justified in having his hands through the flap at least initially, the uncontradicted facts are that he refused to comply with multiple lawful orders to remove his hands so the flap could be closed.[18] Plaintiff points to Dan Pacholke's expert declaration to argue Defendants "rush[ed]" to use force when the issue could have been resolved by giving Plaintiff his food tray. *See* Pl. FSP Resp. at 14 (citing Pl. Ex. 12 ¶¶ 13-

---

[18] Notably, when Defendant Hall provides his lead-in statement for the hand-held camera, his voice can barely be heard because Plaintiff is yelling, presumably to explain for the camera his side of the story. *See* Def. Ex. CC (sealed video 18-02841). Plaintiff testified at his deposition that he removed his hands from the flap (and the flap was closed) before Defendant Philbert came to spray him, *see* Def. Ex. DD1 (Vol. I) at 223-24, but the video evidence shows otherwise, *see* Def. Ex. CC (sealed video 18-02841). Plaintiff's hands are visible through the food flap for about four minutes before he is sprayed. *See id.*

18). But Pacholke himself acknowledges that "[t]wenty-two minutes elapsed from when [Defendant] Hall first learned that [Plaintiff] was agitated [over his morning meal] to when he resorted to using chemical force." *See* Pl. Ex. 12 ¶ 18. Such an elapse of time does not suggest officers rushed to use force. Moreover, Pacholke testified at his deposition that an open food flap can be a source of danger and is a "violation [officers] want to resolve." *See* Def. Ex. DD32 at 38, 40.

Even if Defendants Hall or Philbert (or other staff) could have more effectively invoked "Crisis Intervention Techniques," Plaintiff points to no evidence permitting the reasonable inference that the use of chemical agents to obtain his compliance was "repugnant to the conscience of mankind" under the circumstances. *See Moore v. Hunter*, 847 F. App'x 694, 698 (11th Cir. 2021) ("It is not 'repugnant to the conscience of mankind' that an officer . . . might use chemical spray against an inmate in order to prevent his attempted suicide, even if a more restrained response might have been preferable.") (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010)). *See also Danley*, 540 F.3d at 1307 ("[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out.").

The nature of force used was minimal and tempered. Plaintiff does not dispute that Defendant Philbert administered three one-second bursts of

chemical agents. *See* Def. Ex. I at 31. *See also* Pl. FSP Resp. at 14. And the video evidence shows Defendant Philbert did not direct all three bursts at Plaintiff's face. *See* Def. Ex. CC (sealed video 18-02841). For the reasons stated, Defendants carry their burden to show there is no genuine issue for trial as to Defendant Philbert's use of force, and Defendant Philbert is entitled to summary judgment as to Count III.E.

### b. Cell Extraction

Defendant Hall requested and assembled the cell extraction team, comprising Defendants Atteberry, Brown, Chandler, Nosbisch, and C. Williams. *See* Def. Ex. CC (sealed video 18-02841); *see also* Def. Ex. I at 31-32. Defendants argue the video evidence "shows that Plaintiff's version of the events [is] wrong." *See* FSP Mot. at 53. The argument is unconvincing. On the video, Defendant Hall and the nurse can be heard asking Plaintiff if he would submit to hand restraints to be removed from his cell for a decontamination shower, but his response is not audible. *See* Def. Ex. CC (sealed video 18-02841). The nurse offers a declaration in which she avers that Plaintiff did not say he wanted to take a shower and would submit to restraints. *See* Def. Ex. EE10 ¶ 7. However, Plaintiff claims he said "yes" when asked if he would come out for a shower. *See* Def. Ex. DD1 (Vol. I) at 228, 235-36. The Court must accept Plaintiff's account as true.

The video evidence also does not indisputably contradict Plaintiff's description of what happened inside his cell because Plaintiff is not visible, and no conduct by any specific member of the extraction team is discernible. *See* Def. Ex. CC (sealed video 18-02841). As such, even if Defendants were "calm before the cell extraction," *see* FSP Mot. at 53, there is no indisputable evidence contradicting Plaintiff's account of what occurred inside the cell—that, after Plaintiff had been handcuffed and shackled, Defendants C. Williams and Nosbisch "punch[ed] him in the face," and Defendant Brown "slammed [his] head into the wall and into the floor," while the other Defendants assisted or watched. *See* Def. Ex. DD1 (Vol. I) at 230, 238, 242-43.[19] An inmate who was in the cell next to Plaintiff's is prepared to testify that he heard Plaintiff yelling he "wanted to come out for a chemical shower" but the officers were shouting

---

[19] Plaintiff states some facts that are indeed contradicted by the video evidence, including that his mattress was removed before he was sprayed (it was removed after), that the shield remained inside the cell when he was allegedly being punched (it was removed almost immediately), that he was bending over the sink rinsing his face when the extraction team entered his cell (he was standing), and that a spit shield was placed on his head before he was removed from his cell (it was not). *Compare* Def. Ex. DD1 (Vol. I) at 227, 238, 243-45, *with* Def. Ex. CC (sealed video 18-02841). Plaintiff also contends Defendants punched his face so hard that all his front teeth broke, but Defendants proffer evidence showing he had multiple teeth missing before this incident. *Compare* Def. Ex. DD1 (Vol. I) at 231-32, *with* Def. Ex. I at 129-37. These discrepancies may undercut Plaintiff's credibility or demonstrate he has memory (or other) problems, but such considerations are for a jury. The video evidence does not indisputably demonstrate Plaintiff is lying about or misremembering *material* facts related to the February 2, 2018 cell extraction incident.

over him. *See* Pl. FSP Ex. 15 ¶ 14. The inmate-witness also avers that he heard a lot of banging and loud noises inside Plaintiff's cell, which "sounded like [Plaintiff] was being slammed repeatedly into the metal bed frame." *Id.* ¶¶ 19, 20. Accepting Plaintiff's version of events as true, which the Court must at this juncture, Defendants Hall, Atteberry, Brown, Chandler, Nosbisch, and C. Williams are not entitled to summary judgment as to Count III.E.

Accordingly, it is now

**ORDERED:**

1.    The FDC, Dixon, Davis, McClellan, Reddish, Hummel, Palmer, Hunter, Woodall, and Tomlinson's motion for summary judgment (Doc. 393) is **GRANTED in part** and **DENIED in part**.

   a.    The motion is **GRANTED** to the extent Plaintiff abandons the claims raised in Counts I.C, I.D, III.A, III.B, III.C, IV.A, IV.B, and IV.C; and, as to Counts V and VI, Plaintiff fails to demonstrate he has a qualifying *physical* disability that the FDC has not accommodated.

   b.    The motion is **DENIED** to the extent the following claims will proceed to trial: unconstitutional conditions of confinement against Defendants Dixon, Davis, McClellan, Reddish, Hummel, Palmer, Hunter, and Tomlinson (Counts II.A, II.B, and II.C); and violations of

the ADA and RA as to Plaintiff's mental impairment (asserted in Counts V and VI).

2.      The NRCI Officer-Defendants' motion for summary judgment (Doc. 417) is **DENIED** as follows:

      a.      The motion is **DENIED as moot** as to the claims against Defendant Oliva because that Defendant has been dismissed. *See* Order (Doc. 446).

      c.      The motion is **DENIED** to the extent the excessive-force claim against Defendants Bryant, Gwara, Moreland, and E. Williams (Count III.G) will proceed to trial.

3.      The FSP Officer-Defendants' motion for summary judgment (Doc. 423) is **GRANTED in part** and **DENIED in part**.

      a.      The motion is **GRANTED** to the extent Plaintiff abandons Count I.A and the claims against Defendant Van Allen raised in Counts II.D and IV.D; Plaintiff proffers no evidence to support the due process claim against Defendant Brown raised in Count IV.D; and Defendant Philbert is entitled to summary judgment on Count III.E (excessive force).

b.      The motion is **DENIED as moot** as to the claims against Defendants Knott, Willis, Folsom, Webb, Woods, and Geiger, because those Defendants have been dismissed. *See* Order (Doc. 446).

c.      The motion is **DENIED** to the extent the following claims will proceed to trial: unconstitutional conditions of confinement against Defendants Brown, Hall, and Philbert (Count II.D); excessive force against Defendant Van Allen (Count III.D); and excessive force against Defendants Atteberry, Brown, Chandler, Hall, Nosbisch, and C. Williams (Count III.E).

4.      Plaintiff's motion to strike the affidavit of Thomas Reimers (Doc. 436) is **DENIED**.

5.      Defendant Woodall is entitled to summary judgment. Judgment to that effect will be withheld pending final adjudication of the action as a whole. *See* Fed. R. Civ. P. 54. The **Clerk** shall terminate Defendant Woodall as a party to this action.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of July 2023.

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record